# EXHIBIT AAA

10/30/2018
Case 1:17-cv-08153-LAK Document 33-3 Filed 10/31/18 Page 2 of 165
With a Search Warrant and a Threatened Indictment, Mueller's Inquiry Sets a Tone - The New York Times

## The New York Times

# With a Search Warrant and a Threatened Indictment, Mueller's Inquiry Sets a Tone

By Sharon LaFraniere, Matt Apuzzo and Adam Goldman

Sept. 18, 2017

WASHINGTON — Paul J. Manafort was in bed early one morning in July when federal agents bearing a search warrant raided his Virginia home. They took binders stuffed with documents and copied his computer files, looking for evidence that Mr. Manafort, President Trump's former campaign chairman, set up secret offshore bank accounts. They even photographed the expensive suits in his closet.

The special counsel, Robert S. Mueller III, then followed the house search with a warning: His prosecutors told Mr. Manafort they planned to indict him, said two people close to the investigation.

The moves against Mr. Manafort are just a glimpse of the aggressive tactics used by Mr. Mueller and his team of prosecutors in the four months since taking over the Justice Department's investigation into Russia's attempts to disrupt last year's election, according to lawyers, witnesses and American officials who have described the approach. Dispensing with the plodding pace typical of many white-collar investigations, Mr. Mueller's team has used what some describe as shock-and-awe tactics to intimidate witnesses and potential targets of the inquiry.

Mr. Mueller has obtained a flurry of subpoenas to compel witnesses to testify before a grand jury, lawyers and witnesses say, sometimes before his prosecutors have taken the customary first step of interviewing them. One witness was called before the grand jury less than a month after his name surfaced in news accounts. The special counsel even took the unusual step of obtaining a subpoena for one of Mr. Manafort's former lawyers, claiming an exception to the rule that shields attorney-client discussions from scrutiny.

"They are setting a tone. It's important early on to strike terror in the hearts of people in Washington, or else you will be rolled," said Solomon L. Wisenberg, who was deputy independent counsel in the investigation that led to the impeachment trial of President Bill Clinton in 1999. "You want people saying to themselves, 'Man, I had better tell these guys the truth.'"

A spokesman for Mr. Mueller declined to comment. Lawyers and a spokesman for Mr. Manafort also declined to comment.



Mr. Manafort's apartment in Alexandria, Va., was searched in July.
Win McNamee/Getty Images

Few people can upend Washington like a federal prosecutor rooting around a presidential administration, and Mr. Mueller, a former F.B.I. director, is known to dislike meandering investigations that languish for years. At the same time, he appears to be taking a broad view of his mandate: examining not just the Russian disruption campaign and whether any of Mr. Trump's associates assisted in the effort, but also any financial entanglements with Russians going back several years. He is also investigating whether Mr. Trump tried to obstruct justice when he fired James B. Comey, the F.B.I. director.

Mr. Manafort is under investigation for possible violations of tax laws, money-laundering prohibitions and requirements to disclose foreign lobbying. Michael T. Flynn, the former national security adviser, is being scrutinized for foreign lobbying work as well as for conversations he had last year with Russia's ambassador to the United States. On Monday, Mr. Flynn's siblings announced the creation of a legal-defense fund to help cover their brother's "enormous" legal fees.

The wide-ranging nature of Mr. Mueller's investigation could put him on a collision course with Mr. Trump, who has said publicly that Mr. Mueller should keep his investigation narrowly focused on last year's presidential campaign. In an interview with The New York Times, Mr. Trump said Mr. Mueller would be overstepping his boundaries if he investigated his family's finances unrelated to Russia.

For the moment, Mr. Mueller's team has shown a measure of deference to White House officials, sparing them grand jury subpoenas and allowing them to appear for voluntary interviews. Those sessions are expected to begin soon. Ty Cobb, a lawyer brought in to manage

the White House response to the inquiry, has told administration officials that he wants to avoid any subpoenas from the special prosecutor.

Staff members have been working long hours answering Mr. Mueller's request for 13 categories of documents, including records related to Mr. Comey's firing and Mr. Trump's role in drafting a misleading statement about a June 2016 meeting between campaign officials and Russian-born visitors. Nonetheless, the demand for documents has provoked at least one angry confrontation between Mr. Cobb and Donald F. McGahn II, the White House counsel, over whether certain documents should be withheld to protect the president's right to confidentiality.

But associates of both Mr. Manafort and Mr. Flynn have received more peremptory treatment. Instead of invitations to the prosecutor's office, they have been presented with grand jury subpoenas, forcing them to either testify or take the Fifth Amendment and raise suspicions that they had something to hide. At least three witnesses have recently been subpoenaed to testify about Mr. Manafort: Jason Maloni, a spokesman who appeared before the grand jury for more than two hours on Friday, and the heads of two consulting firms — Mercury Public Affairs and the Podesta Group — who worked with Mr. Manafort on behalf of Viktor F. Yanukovych, the pro-Russia former president of Ukraine.

Mr. Mueller's team also took the unusual step of issuing a subpoena to Melissa Laurenza, a specialist in lobbying law who formerly represented Mr. Manafort, according to people familiar with the subpoena. Conversations between lawyers and their clients are normally considered bound by attorney-client privilege, but there are exceptions when lawyers prepare public documents that are filed on behalf of their client.

Mr. Mueller took over the Russia investigation in May, after the F.B.I. had already spent nearly a year looking into connections between Mr. Trump's associates and Russians. His team has occasionally been caught by surprise, hearing of possibly important information only when it is revealed in the news media.

This was the case in July, when Mr. Mueller's prosecutors learned about email exchanges between Donald Trump Jr. and an emissary for a Kremlin-connected Russian oligarch only after they were disclosed in The New York Times, according to a law enforcement official who spoke on condition of anonymity. Donald Trump Jr., the president's son, set up the Trump Tower meeting to receive what he was told would be damaging information about Hillary Clinton from the Russian government.

Soon after his name surfaced, one of the Russian-born participants at the meeting, Rinat Akhmetshin, was ordered to testify before the grand jury, according to one of Mr. Akhmetshin's associates.

"They seem to be pursuing this more aggressively, taking a much harder line, than you'd expect to see in a typical white-collar case," said Jimmy Gurulé, a Notre Dame law professor and former federal prosecutor. "This is more consistent with how you'd go after an organized crime syndicate."

The tactics reflect some of the hard-charging — and polarizing — personalities of Mr. Mueller's team, seasoned prosecutors with experience investigating financial fraud, money laundering and organized crime.

Admirers of Andrew Weissmann, one of the team's senior prosecutors, describe him as relentless and uncompromising, while his detractors say his scorched earth tactics have backfired in some previous cases. Greg B. Andres, another one of Mr. Mueller's prosecutors, once ran an investigation into a Mafia kingpin. Zainab N. Ahmad made her name as a prosecutor pursing high-profile terrorism cases.

Some lawyers defending people who have been caught up in Mr. Mueller's investigation privately complain that the special counsel's team is unwilling to engage in the usual back-and-forth that precedes — or substitutes for — grand jury testimony. They argue that the team's more aggressive tactics might end up being counterproductive, especially if some grand jury witnesses turn out to be more guarded than they would have been in a more informal setting or invoke the Fifth Amendment.

Robert S. Mueller III, a former F.B.I director, is known to dislike meandering investigations that languish for years.   Doug Mills/The New York Times

The longer Mr. Mueller's investigation goes on, the more vulnerable he will be to allegations that he is on a fishing expedition, said Katy Harriger, a professor of politics at Wake Forest University and the author of a book on special prosecutors. Such accusations dogged the

investigation of Kenneth W. Starr, the independent counsel whose investigation of Mr. Clinton stretched on for years.

To a degree, Mr. Mueller is in a race against three congressional committees that are interviewing some of the same people who are of interest to the special prosecutor's team. Even if the committees refuse to grant them immunity, congressional testimony that becomes public can give other witnesses a chance to line up their stories.

Rep. Adam Schiff of California, the top Democrat on the House Intelligence Committee, said committee staff members were going to great lengths not to get in Mr. Mueller's way. But Senator Charles E. Grassley, the chairman of the Senate Judiciary Committee, indicated last week that his committee might subpoena witnesses to testify about the circumstances of Mr. Comey's firing even over Mr. Mueller's objections.

Mr. Mueller's need to navigate this complex landscape could explain the timing of the raid on Mr. Manafort's house, which took place in the early hours of July 26. The raid came one day after Mr. Manafort was interviewed by staff members of the Senate Intelligence Committee.

On the day of the raid, Mr. Manafort was scheduled to talk to the Senate Judiciary Committee, an interview that was eventually canceled.

It is unusual for a prosecutor to seek a search warrant against someone who, like Mr. Manafort, had already put his lawyer in contact with the Justice Department. No search warrants were executed during the investigations by Mr. Starr or Patrick J. Fitzgerald, a special counsel appointed during the George W. Bush administration to investigate the leak of the name of a C.I.A. officer.

To get the warrant, Mr. Mueller's team had to show probable cause that Mr. Manafort's home contained evidence of a crime. To be allowed to enter the home unannounced, prosecutors had to persuade a federal judge that Mr. Manafort was likely to destroy evidence.

Said Mr. Gurulé, the former federal prosecutor, "Clearly they didn't trust him."

*Correction: September 19, 2017*
*An earlier version of a picture caption with this article misstated the middle initial of President Trump's former campaign chairman. He is Paul J. Manafort, not Paul D.*

*Correction: June 25, 2018*
*An earlier version of this article misstated the method that investigators used to enter Paul Manafort's home to execute a search warrant. They did not pick the lock, federal prosecutors said in a court filing.*

Kenneth P. Vogel, Matthew Rosenberg and Rebecca R. Ruiz contributed reporting.

A version of this article appears in print on Sept. 19, 2017, on Page A1 of the New York edition with the headline: Mueller Adopts Aggressive Tone In Russia Inquiry

READ 2183 COMMENTS

# EXHIBIT BBB

# Senate committee agrees with intelligence community assessment of election meddling, breaking with GOP House investigation

By Jeremy Herb, Lauren Fox and Manu Raju, CNN

Updated 4:46 PM ET, Wed May 16, 2018

**(CNN)** — The Senate Intelligence Committee's leaders said Wednesday they believed that the intelligence community's 2017 assessment of election meddling was correct, breaking with Republicans on the House Intelligence Committee who questioned the conclusion that the Russians were trying to help President Donald Trump get elected.

"There is no doubt that Russia undertook an unprecedented effort to interfere with our 2016 election," Senate Intelligence Chairman Richard Burr, a North Carolina Republican, said in a statement. "Committee staff have spent 14 months reviewing the sources, tradecraft, and analytic work, and we see no reason to dispute the conclusions."

The top Democrat on the committee, Sen. Mark Warner of Virginia, said that "after a thorough review, our staff concluded that the ICA conclusions were accurate and on point. The Russian effort was extensive, sophisticated and ordered by President Putin himself for the purpose of helping Donald Trump and hurting Hilary Clinton."

The joint statement comes after former director of the National Security Agency Michael Rogers, former CIA Director John Brennan and former Director of National Intelligence James Clapper sat down with the committee in a closed hearing Wednesday morning about the 2017 assessment.

The bipartisan conclusion from the Senate Intelligence Committee leaders is a sharp break from Republicans on the House Intelligence Committee, who disputed the intelligence community's findings that Russian President Vladimir Putin was trying to help Trump.

The House Republican report alleges there were "significant intelligence tradecraft failings" in that assessment from the intelligence community, which they argue "undermine confidence" in the conclusions about Putin's objectives in the 2016 election. The Republicans argued that the draft of the assessment on that point was "subjected to an unusually constrained review and coordination process."

Last week, Burr signaled his committee would break with the House Republicans. When asked about the House findings, he said: "Well, I'm not sure the House was required to substantiate every conclusion with facts."

"We may have different opinions," Burr said. "But whatever we propose, whatever we assess, we're going to have the facts to show for that."

Following Wednesday's statement, several top Republicans also voiced support for the intelligence community's findings. Texas Sen. John Cornyn, the Senate's No. 2 Republican, said the assessment was "by and large well done."

"I think the President tends to conflate collusion and meddling, and fairly there is overwhelming evidence in meddling and no evidence in collusion," Cornyn said. "I think the ICA by and large was well done. I do think they dropped the ball with respect to crediting the Steele dossier -- I think it gave rise to a lot of rumors and gave rise to a lot of unverified information, which should not have been part of it."

"The IC did a good job in a very rapid time period pulling together the details," said Oklahoma Sen. James Lankford, a Republican member of the Senate Intelligence Committee. "The ICA wasn't comprehensive about

Case 1:17-cv-08153-LAK Document 33-3 Filed 10/31/18 Page 10 of 165

everything. They had a very thin slice of what they were looking at. For what they did, in the time period they did it, it was accurate."

Maine Sen. Susan Collins, another Republican member of the panel, said, "I think the IC assessment was thorough, well-researched, and well done based on the information they had at the time."

Sen. Tom Cotton, an Arkansas Republican and a frequent defender of Trump's, declined to comment.

Later Wednesday, Republicans on the House Intelligence Committee stood by their finding.

Rep. Mike Conaway, a Texas Republican who ran the House's Russia investigation, told CNN he supports their conclusion "until I know any differently" and downplayed the difference as just a "narrow" one.

"We spent thousands of man hours at the CIA going through the documents," Conaway told CNN. "I'm confident in the people who did our work."

Rep. Will Hurd, a vulnerable Texas Republican who sits on the panel, told CNN, when asked if he stood by the findings, "You've seen our report -- yeah. The Senate is allowed to have its own opinion."

And Rep. Chris Stewart of Utah said "absolutely" he stands by the report, saying there were "deficiencies" in the analytical tradecraft used by the agencies.

"There's only one person in the world who can answer that question: and that's Vladimir Putin," Stewart said when asked about the IC's assessment that Putin wanted to help Trump.

Sen. Lindsey Graham, a South Carolina Republican, encouraged GOP House members to accept the intelligence community's findings, following the Senate Intelligence statement.

"What I would tell Republicans: they could come after us in 2018 and they probably will. ... I have no reason to dispute the intelligence community findings."

Burr would not discuss the matter further in person, saying that the panel would soon issue a report on the matter.

"I'm going to let the report, when it comes out, speak for itself," Burr said.

*CNN's Ted Barrett contributed to this report.*

# EXHIBIT CCC



# All of Robert Mueller's indictments and plea deals in the Russia investigation so far

That we know of.

By Andrew Prokop | andrew@vox.com | Updated Oct 10, 2018, 11:35am EDT



Alex Wong/Getty

Special counsel Robert Mueller's team has indicted or gotten guilty pleas from 32 people and three companies — that we know of.

That group is composed of four former Trump advisers, 26 Russian nationals, three Russian companies, one California man, and one London-based lawyer. Six of these people (including now all four former Trump aides) have pleaded guilty.

If you also count investigations that Mueller originated but then referred elsewhere in the Justice Department, you can add plea deals from two more people to the list.

It's a sprawling set of allegations, encompassing both election interference charges against overseas Russians, and various other crimes by American Trump advisers.

However, Mueller hasn't yet alleged any crimes directly connecting the two — that is, alleging that Trump advisers conspired with Russian officials to impact the election. He is continuing to investigate that.

Other reported focuses of Mueller's investigation — such as potential **obstruction of justice** by the Trump administration — have also not resulted in any indictments yet.

**The full list of known indictments and plea deals in Mueller's probe**

**1) George Papadopoulos**, former Trump campaign foreign policy adviser, was arrested in July 2017 and **pleaded guilty** last October to making false statements to the FBI. He got a 14-day sentence.

**2) Paul Manafort**, Trump's former campaign chair, was indicted on a total of 25 different counts by Mueller's team, related mainly to his past work for Ukrainian politicians and his finances. He had two trials scheduled, and the first ended in a conviction on eight counts of financial crimes. To avert the second trial, Manafort struck a plea deal with Mueller in September 2018.

**3) Rick Gates**, a former Trump campaign aide and Manafort's longtime junior business partner, was indicted on similar charges to Manafort. But in February he agreed to a **plea deal with Mueller's team**, pleading guilty to just one false statements charge and **one conspiracy charge**.

**4) Michael Flynn**, Trump's former national security adviser, **pleaded guilty** last December to making false statements to the FBI.

**5-20) 13 Russian nationals and three Russian companies** were indicted on conspiracy charges, with some also being accused of identity theft. The charges related to a Russian propaganda effort designed to interfere with the 2016 campaign. The companies involved are the **Internet Research Agency**, often described as a "Russian troll farm," and two other companies that helped finance it. The Russian nationals indicted include 12 of the agency's employees and its alleged financier, Yevgeny Prigozhin.

**21) Richard Pinedo**: This California man **pleaded guilty** to an identity theft charge in connection with the Russian indictments, and has agreed to cooperate with Mueller. He was sentenced to 6 months in prison and 6 months of home detention **in October.**

**22) Alex van der Zwaan:** This London lawyer **pleaded guilty** to making false statements to the FBI about his contacts with Rick Gates and another unnamed person based in Ukraine. He was sentenced to 30 days in jail and has completed his sentence.

**23) Konstantin Kilimnik**: This longtime business associate of Manafort and Gates, who's currently based in Russia, **was charged** alongside Manafort with attempting to

obstruct justice by tampering with witnesses in Manafort's pending case this year.

**24-35) 12 Russian GRU officers**: These officers of Russia's military intelligence service were **charged with crimes** related to the hacking and leaking of leading Democrats' **emails** in 2016.

Finally, there are two other people Mueller initially investigated, but then handed over to others in the Justice Department to handle. Both eventually agreed to plea deals.

**Michael Cohen**: Trump's former lawyer pleaded guilty to 8 counts — tax and bank charges, related to his finances and taxi business, and campaign finance violations, related to hush money payments to women who alleged affairs with Donald Trump.

**Sam Patten**: This Republican operative and lobbyist **pleaded guilty** to not registering as a foreign agent with his work for Ukrainian political bigwigs, and agreed to cooperate with the government.

That's the full list, but we'll delve into the charges in a bit more detail below.

**The four ex-Trump aides who struck plea deals with Mueller**



Mark Wilson/Getty Images

So far, no Trump associates have been specifically charged with any crimes relating to helping Russia interfere with the 2016 election.

Yet four have pleaded guilty to other crimes. Manafort and Gates were charged with a series of offenses related to their past work for Ukrainian politicians and their finances. Papadopoulos and Flynn both admitted making false statements with investigators to hide their contacts with Russians.

**Papadopoulos:** Back in April 2016, Papadopoulos **got a tip** from a foreign professor he understood to have Russian government connections that the Russians had "dirt" on Clinton in the form of "thousands of emails." He then proceeded to have extensive contacts with the professor and two Russian nationals, during which he tried to plan a Trump campaign trip to Russia.

But when the FBI interviewed Papadopoulos about all this in January 2017, he repeatedly lied about what happened, he now admits. So he was arrested in July 2017, and later agreed to plead guilty to a false statements charge, which was dramatically unsealed in October 2017.

Initially, it seemed as if Papadopoulos was cooperating with Mueller's probe. But we later learned that the special counsel cut off contact with him last year, after he talked to the press. In the end, he didn't provide much information of note, Mueller's team said in court filing. His involvement with the investigation is now over, and in September 2017, he was sentenced to 14 days incarceration.

**Flynn:** In December 2016, during the transition, Flynn spoke to Russian Ambassador Sergey Kislyak about sanctions that President Barack Obama had just placed on Russia, and about a planned United Nations Security Council vote condemning Israeli settlements.

But when FBI agents interviewed him about all this in January 2017, Flynn lied to them about what his talks with Kislyak entailed, he now admits. In December 2017, Flynn pleaded guilty to a false statements charge and began cooperating with Mueller's investigation. We haven't seen the fruits of his cooperation yet, and he has not yet been sentenced.

**Manafort and Gates**: This pair worked for Ukrainian politicians (and, eventually, the Ukrainian government) for several years prior to the Trump campaign, and made an enormous amount of money for it. Mueller charged them with hiding their lobbying work and the money they made from it from the government, as well as other financial crimes and attempts to interfere with the investigation.

Gates was the first to strike a plea deal. In February, Mueller dropped most of the charges he had brought against him. In exchange, Gates pleaded guilty to two counts — one **conspiracy to defraud the United States** charge encompassing the overall Ukrainian lobbying and money allegations, and a false statements charge. (With the latter, Gates **admitted** lying to Mueller's team during a meeting this February. A Dutch lawyer, Alex van der Zwaan, also pleaded guilty to lying to the FBI related to his Ukrainian work with Gates.)

Manafort, meanwhile, fought the charges in two venues, Washington, DC, and Virginia. His first trial was in Virginia, and in August, it ended with his conviction on eight counts — five counts of subscribing to false income tax returns, one count of failing to report his foreign bank accounts, and two counts of bank fraud. The jury deadlocked on another 10 counts, so for those, the judge declared a mistrial.

The conviction finally brought Manafort to the table, and on September 14, he and Mueller's team struck a plea deal requiring his cooperation. Manafort pleaded guilty to just two more counts — conspiracy to defraud the United States, and an attempted obstruction of justice charge. But he admitted that the other allegations Mueller previously made against him were true as well.

**About two dozen overseas Russians have been charged with election interference**

Mueller has also filed two major indictments of Russian nationals and a few Russian companies for crimes related to alleged interference with the 2016 election: the troll farm indictment, and the email hacking indictment.

**The troll farm indictment**: In February, Mueller brought charges related to the propaganda efforts of one Russian group in particular: the **Internet Research Agency**. That group's operations — which included social media posts, online ads, and organization of rallies in the US — were, the indictment alleges, often (but not exclusively) aimed at denigrating Hillary Clinton's presidential candidacy and supporting Donald Trump's.

Mueller indicted the Internet Research Agency, two other shell companies involved in financing the agency, its alleged financier (Yevgeny Prigozhin), and 12 other Russian nationals who allegedly worked for it.

The specific charges in the case include one broad "conspiracy to defraud the United States" count, but the rest are far narrower — one count of conspiracy to commit wire fraud and bank fraud, and six counts of identity theft. It is highly unlikely that the

indicted Russian individuals will ever come to the US to face trial, but one company involved, Concord Catering, is **fighting back in court**.

No Americans have been charged with being witting participants in this Russian election interference effort. However, one American, **Richard Pinedo of California**, pleaded guilty to an identity fraud charge, seemingly because he sold bank account numbers created with stolen identities to the Russians. Pinedo agreed to cooperate with the probe as part of his plea deal. He **was sentenced** to 6 months in prison and 6 months home detention in October.

**The email hacking indictment**: Brought in July, here Mueller charged 12 officers of the GRU, Russia's military intelligence agency, with crimes committed to the high-profile **hacking and leaking of leading Democrats' emails** during the 2016 campaign.

**Specifically indicted** were nine officers of the GRU's "Unit 26165," which Mueller alleges "had primary responsibility for hacking the DCCC and DNC, as well as the email accounts of individuals affiliated with the Clinton Campaign" like John Podesta. Three other GRU officers, Mueller alleges, "assisted in the release of stolen documents," "the promotion of those releases," "and the publication of anti-Clinton content on social media accounts operated by the GRU."

A trial here is unlikely, since all of the people indicted live in Russia.

### Konstantin Kilimnik, a longtime Manafort associate, has been charged with obstruction of justice

Then, Konstantin Kilimnik — who worked with Manafort in Ukraine and is now based in Russia — **was charged** alongside Manafort with obstruction of justice and conspiracy to obstruct justice, in June.

Mueller argued that, earlier in 2018, Manafort and Kilimnik worked together to contact potential witnesses against Manafort and encourage them to give false testimony. He argues that this is attempted witness tampering, and qualifies as obstruction of justice.

The alleged tampering relates to the "**Hapsburg group**"— a group of former senior European politicians Manafort paid to advocate for Ukraine's interests.

Both Manafort and Kilimnik tried to contact witnesses to get them to claim the Hapsburg group only operated in Europe (where US foreign lobbying laws don't apply). But Mueller says there's ample evidence that the group did work in the US too, and the witnesses thought Manafort and Kilimnik were trying to get them to commit perjury.

In Manafort's September plea deal, he admitted to this. Kilimnik, however, is in Russia, and will likely remain there rather than face charges.

**Michael Cohen and Sam Patten struck plea deals after Mueller referred their investigations elsewhere**



Eduardo Munoz Alvarez/AFP/Getty

---

Last but not least, there are two known instances where Mueller surfaced incriminating information about people, but handed off the investigations into them to elsewhere in the Justice Department.

**Michael Cohen**: Mueller's team was investigating Trump's former attorney in 2017, but at some point, they referred the Cohen probe to the US Attorney's office for the Southern District of New York (SDNY). It was SDNY that authorized the FBI raid of Cohen's residence and office in April.

In August, Cohen cut a deal. He agreed to plead guilty to 8 counts. Six of them involved his own finances — 5 tax counts involving hiding various income related to his taxi medallion business and other financial transactions from the US government, and a bank fraud count.

More salaciously, Cohen admitted participating in a scheme to violate campaign finance laws in connection with hush money payments to women alleging affairs with then-presidential candidate Donald Trump.

Cohen admitted causing an unlawful corporate campaign contribution, by orchestrating a hush money payment of $150,000 from American Media Inc. (the parent company of the National Enquirer) to former Playboy model Karen McDougal.

He also admitted himself paying $130,000 to porn actress Stormy Daniels days before the 2016 general election, and said it was at candidate Trump's direction. The crime here was in violating campaign donation limits (individuals are permitted to give only a few thousand dollars a year to a federal campaign, and Cohen's payment was far above that).

**Sam Patten**: A GOP lobbyist who had worked in some of the same Ukrainian circles as Manafort and alongside Konstantin Kilimnik, Mueller's team began investigating Patten, but at some point handed him off to the DC US attorney's office. However, the plea deal Patten eventually struck obligated him to cooperate with Mueller.

According to a **criminal information document** filed by the DC US attorney's office, Patten and Kilimnik (who is not named but referred to as "Foreigner A") founded a lobbying and consulting company together. They did campaign work in Ukraine and lobbying work in the US, and were paid over $1 million between 2015 and 2017.

Specifically, the document claims that Patten contacted members of Congress and their staffers, State Department officials, and members of the press on behalf of his Ukrainian clients — all without registering under the Foreign Agents Registration Act, as required by law.

Patten also admits to helping his Ukrainian oligarch client get around the prohibition on foreign donations to Donald Trump's inauguration committee. The oligarch sent $50,000 to Patten's company, and then he gave that money to a US citizen, who bought the four tickets. The tickets were given to the oligarch, Kilimnik, another Ukrainian, and Patten himself.

Finally, Patten also admits to misleading the Senate Intelligence Committee and withholding documents from them during testimony this January. He pleaded guilty to one count of violating the Foreign Agents Registration Act.

# EXHIBIT DDD



Politics

# Trump associate socialized with alleged Russian agent Maria Butina in final weeks of 2016 campaign

By Rosalind S. Helderman

August 3

Maria Butina, the Russian gun-rights activist who was charged last month with working as an unregistered agent of the Kremlin, socialized in the weeks before the 2016 election with a former Trump campaign aide who anticipated joining the presidential transition team, emails show, putting her in closer contact with President Trump's orbit than was previously known.

Butina sought out interactions with J.D. Gordon, who served for six months as the Trump campaign's director of national security before leaving in August 2016 and being offered a role in the nascent Trump transition effort, according to documents and testimony provided to the Senate Intelligence Committee and described to The Washington Post.

The two exchanged several emails in September and October 2016, culminating in an invitation from Gordon to attend a concert by the rock band Styx in Washington. Gordon also invited Butina to attend his birthday party in late October of that year.

Prosecutors have said Butina, 29, who became a graduate student at American University in 2016, attempted to infiltrate the U.S. political system at the direction of a senior Russian official. Her activities came at the same time that, according to U.S. intelligence officials, Moscow was seeking to interfere in the presidential election to help Trump.

During the campaign, Butina asked Trump at a public event in 2015 about his views on Russia and briefly met Donald Trump Jr. at a National Rifle Association meeting in May 2016.

U.S. investigators probing alleged coordination between the Trump campaign and Russia have been examining dozens of contacts between Russians and Trump associates, including Trump Jr., former campaign chairman Paul Manafort and presidential son-in-law Jared Kushner, as well as foreign policy advisers Carter Page and George Papadopoulos.

Gordon, 50, a former naval officer who served as a Pentagon spokesman under President George W. Bush before working on several Republican political campaigns, said his contacts with Butina were innocuous.

"From everything I've read since her arrest last month, it seems the Maria Butina saga is basically a sensationalized click bait story meant to smear a steady stream of Republicans and NRA members she reportedly encountered over the past few years," he said in a statement to The Post, noting that she networked extensively. Gordon provided the same statement and some details of his interactions to

the Washington Times, which published his account Friday afternoon after The Post contacted **Gordon** for comment.

"I wonder which prominent Republican political figures she hasn't come across?" **Gordon** asked.

Robert Driscoll, an attorney for Butina, said the email exchanges show that Butina was a student eager to network with Americans who shared her interests and no more. **Gordon** and Driscoll both said the interactions were not romantic and the two had no additional contact after the birthday party in October 2016.

"A military guy who had been involved would have been a prime target, if that's what she was about," Driscoll said. "But the evidence is clear that there wasn't any significant contact."

Jay Sekulow, an attorney for Trump, declined to comment, as did a spokeswoman for the Senate Intelligence Committee.

Prosecutors say an American identified in court documents as "person 1" helped introduce Butina to people who had "influence in American politics." The Post has identified that person as Paul Erickson, a GOP operative from South Dakota with whom Butina was in a romantic relationship.

The emails described to The Post show that Butina met **Gordon** at a party at the Swiss ambassador's residence on Sept. 29, 2016. **Gordon** told The Post that he had been invited to the party by Faith Whittlesey, the prominent Republican and former U.S. ambassador to Switzerland who died earlier this year.

Later that night, Erickson wrote an email to **Gordon** and Butina, offering to "add an electronic bridge" to the pair's meeting earlier that evening.

Erickson wrote to Butina that **Gordon** was "playing a crucial role in the Trump transition effort and would be an excellent addition to any of the U.S./Russia friendship dinners to occasionally hold."

He continued that **Gordon**'s view on international security was listened to by all the "right" people in the "immediate future of American politics."

Erickson did not respond to a request for comment.

Erickson explained to **Gordon** in the email that Butina was living in Washington while she completed a master's degree at American University. Erickson described Butina as a "special friend" of the NRA and said she was the special assistant to the deputy governor of the Bank of Russia, according to the correspondence described to The Post.

Prosecutors have said the central banker, Alexander Torshin, helped direct Butina's activities in the United States, including an effort to make contacts in the leadership of the NRA. NRA officials have not responded to requests for comment.

The emails show **Gordon** quickly responded to Erickson, sending Butina and Erickson a clip of a recent appearance he had made on RT, the Russian state-run English language television network. In the RT interview, **Gordon** said Trump took a "real common-sense approach to Russia."

"We want to reduce hostility with Russia because, look, we have common interests," he said.

Butina responded with praise, writing in an email to **Gordon** that he "looked very good" and had appeared smart and comfortable in the television appearance. She invited **Gordon** to attend a group dinner at the Army and Navy Club, hosted by George O'Neill Jr., the conservative writer and heir to the Rockefeller fortune, to discuss the relationship between the United States and Russia. Prosecutors cited the dinners organized by O'Neill, described in court documents as "person 2," as part of Butina's efforts to influence thought leaders.

O'Neill did not respond to requests for comment.

**Gordon** responded that he could not attend the dinner, but he asked Butina over emails to get together for drinks and the concert. In one email described to The Post, **Gordon** included a link to a September 2016 Politico story reporting that he was a part of Trump's growing transition effort. **Gordon** included a smattering of Russian phrases in his emails, beginning several notes "Privyet Maria," with a Russian word for "hello." In one email, he wrote "Kak di la?" The phrase is Russian for "How are you?"

In an emailed statement to The Post, **Gordon** said that Butina presented herself to "likely thousands of people" as a graduate student and founder of a Russian gun-rights group.

"It appears she sought out countless influential Americans in her steadfast efforts to strengthen relations with Russia. Recognizing that every single president since the Cold War tried to improve relations with Russia, including Pres. Obama, her Russian-American friendship efforts seemed in sync with a decades-old US foreign policy goal," he said.

The contact was not Erickson's first attempt to connect Butina and Torshin to the Trump campaign. In May 2016, he emailed Trump adviser Rick Dearborn and urged Dearborn to set up a meeting between Trump and Torshin at an upcoming NRA convention. Erickson described Torshin in the email as "[Russian President Vladimir] Putin's emissary" for building warmer ties with the United States.

The campaign declined Erickson's invitation but Torshin and Butina ultimately encountered the candidate's son at a private dinner at the NRA convention, and they chatted briefly, Trump Jr. has said.

**Gordon**, who said he was never paid for his work on the Trump campaign and never performed any duties on the transition team, was assigned in March 2016 to serve as the point person for a newly named advisory group on foreign policy and national security. That committee also included Page,

who has drawn interest from investigators for delivering a foreign policy speech in Moscow in July 2016, and Papadopoulos, who pleaded guilty last year to lying to the FBI about his Russia contacts and has been cooperating with special counsel Robert S. Mueller III.

Gordon attended a March 2016 meeting of the group presided over by Trump while he was a presidential candidate, where Papadopoulos introduced himself by announcing he could help arrange a meeting between Trump and Putin.

Page told the House Intelligence Committee in November 2017 that he had informed Gordon before visiting Moscow in July 2016, where he delivered a speech at a Russian university and exchanged brief greetings with Deputy Prime Minister Arkady Dvorkovich.

While in Moscow, Page wrote Gordon and another Trump aide that he had received "incredible insights and outreach" from a "few Russian legislators and senior members of the Presidential administration here." Page testified that he exchanged only brief greetings with one Russian official, Dvorkovich, who had attended his speech.

Gordon has described Page and Papadopoulos as "peripheral members of a relatively peripheral advisory committee."

Gordon has also said he briefly met Russian Ambassador Sergey Kislyak at the Republican National Convention, in an exchange he has said was innocuous. And he was the Trump campaign's point person for a Republican platform committee discussion in which he argued against language that would have endorsed having the United States send lethal weapons to Ukraine. The proposed provision, which was not adopted, was perceived as hostile to Russia.

Gordon has said he pushed the platform committee to reject the language, proposed by a Republican delegate, because he had heard Trump talk about his desire to forge better relations with Russia and considered the language to be damaging for that goal.

Because of those contacts, Gordon has said he was asked to testify before all three congressional committees that have investigated Russian interference in the election, as well as investigators working for Mueller.

Gordon said he disclosed his Butina contact in congressional testimony but was not asked about her by Mueller's team. He said FBI agents in Washington who have been investigating Butina have not asked to speak with him.

Carol D. Leonnig, Alice Crites and Shane Harris contributed to this report.



**Rosalind S. Helderman**
Rosalind Helderman is a political enterprise and investigations reporter for The Washington Post. She joined The Post in 2001. Follow 🐦

10/23/2018                  Trump associate socialized with alleged Russian agent Maria Butina in final weeks of 2016 campaign - The Washington Post

Case 1:17-cv-08153-LAK   Document 33-3   Filed 10/31/18   Page 26 of 165



**The Washington Post**

# Thank you.

Your subscription supports journalism that matters.

# EXHIBIT EEE



**The Plum Line** Opinion

# What if our system can't handle Trump's out-of-control self-dealing?

By Sarah Posner

Two new investigative reports out today vividly describe in fresh detail the scope and scale of President Trump's business conflicts of interests and the damage they are inflicting on our political system.

The reports, taken together, raise the question: Can our system handle the unprecedented conflicts and self-dealing that this president is engaged in?

The two investigative reports, one from USA Today and the other from the government watchdog group Public Citizen, together show how Trump's refusal to divest himself from his global business holdings has created a new ecosystem, outside the view of the public and the oversight capabilities of other branches of government. In the new Trump ecosystem, the world's wealthiest people and corporations can buy direct access to the president, simultaneously lining his pockets while achieving their own personal or policy goals.

For the first time in the nation's history, USA Today concludes, "wealthy people with interests before the government have a chance for close and confidential access to the president as a result of payments that enrich him personally." This Trumpian ecosystem is completely unprecedented; as former Office of Government Ethics director Walter Shaub told the newspaper, "We never thought we'd see anyone push the outer limits in this way."

Our system is not prepared to hold Trump or these outside influence peddlers accountable because no one — not the framers of our Constitution or lawmakers of any era in U.S. history — ever anticipated a president who would retain a lucrative stake in such a far-reaching business empire once in office, despite the blatant and extensive conflicts of interest it has set in motion. Worse, no one envisioned that a president would so brazenly snub his nose at ethical standards intended to uphold the simple credos that access to the president of the United States is not for sale and the presidency is not a profit-making enterprise.

It's precisely because such contempt for ethics was unimaginable that no constraints against Trump-like behavior were ever put in place. And now we are beginning to see the effects of his running roughshod over the standards that distinguish a functioning democracy from a kleptocracy.

The USA Today report shows how Trump, despite his claims that he would "drain the swamp" of lobbyists, has simply given wealthy people direct access to him. All they have to do is pay the hefty

membership fees at one of his private golf clubs. Initiation fees can exceed $100,000, and members pay annual dues on top of that.

USA Today's reporting methods on this story themselves reflect the Trump administration's utter disdain for transparency, a crucial component of government accountability. Trump has abandoned the Obama-era policy of releasing the White House visitor logs maintained by the Secret Service and has refused to release records of visitors to the private clubs he has treated as his weekend White Houses, such as the Trump National Golf Club in Bedminster, N.J., and Mar-A-Lago in Palm Beach, Fla. The clubs' membership rolls are secret as well. As a result, the public doesn't know who is paying to see the president, or why.

But USA Today was able to determine who the members of Trump's clubs are by using social media and a publicly available website where golfers post their handicaps. The paper discovered that those members include "dozens of lobbyists, contractors and others who make their living influencing the government" and who now have direct access to him based on their ability to afford the fees at clubs owned by Trump.

As a result, these club members could be influencing Trump's thinking on a range of issues, using their wealth and access to shape policy, operating out of public view and in the confines of the luxurious private accommodations only available to the nation's wealthiest people.

Meanwhile, the Public Citizen report, aptly titled "President Trump, Inc.," is even more shocking, if that's possible. It details how Trump's promise before assuming office to transfer control of his business empire to his sons "merely amounted to reshuffling his businesses holdings, with himself remaining the ultimate beneficiary." In this "meaningless shell game," Public Citizen notes, "each of the entities to which Trump transferred his assets ended up under the control of a revocable trust that operates for the benefit of Trump." As a result, Trump is open to being paid, influenced and, as the report warns, even "leveraged" by an adversary — suggesting that some might try buying access to influence the president's actions, while others might use information about his business liabilities against him, possibly making him vulnerable to a different sort of manipulation.

Public Citizen was able to trace the president's holdings using his federally required financial disclosure forms, which are less detailed and revealing than his tax returns would be but still showed that he maintains a "stake in more than 500 businesses, with many of those businesses holding stakes in one another in a bewildering tangled mess."

These businesses include his golf clubs and hotels, like his new one in Washington that has become both a new hub of official Washington and a profit center for the president and his family. Yet despite being complicated, these disclosure forms nonetheless provide "a roadmap to wealthy individuals or corporations, foreign or domestic, friend or foe, to select their preferred vehicle to ingratiate themselves to, or gain leverage on, the president of the United States," the report notes.

Case 1:17-cv-08153-LAK   Document 33-3   Filed 10/31/18   Page 30 of 165

In the old days, meaning as recently as a year ago, rich people and corporations looking to influence government would donate to political campaigns and super PACs. Trump has made all of that superfluous to influencing his presidency, with the added bonus (for him) that the payments increase his personal wealth.

The country is facing an avalanche of crises, from natural disasters to the Russia investigation to Trump's venal immigration policy to North Korea. Yet holding Trump accountable, and fixing oversight so that it actually works for the new ecosystem he has created, might be one of the greatest emergencies Congress faces, before Trump's approach becomes the new, and normalized, way of doing business in Washington. But the GOP-controlled Congress is unlikely to act to rein in Trump's ethical transgressions when it comes to his self-dealing. With no accountability, Trump will continue to rewrite the rules, opening the door for a future of new abuses — perhaps including some that, just as in the pre-Trump era, we cannot even imagine now.

> 💬 **532 Comments**



**Sarah Posner**
Sarah Posner is a reporter and the author of "God's Profits: Faith, Fraud, and the Republican Crusade for Values Voters." Her work has appeared in The Washington Post, the New York Times, Rolling Stone, Mother Jones and many other publications. Follow 🐦



## The Washington Post

# Thank you.
Your subscription supports journalism that matters.

**Stories from The Lily**
The Lily, a publication of The Washington Post, elevates stories about women.



Charlottesville's first black female police chief on rebuilding trust in a community scarred by violence and protest

Abbi Jacobson's guide to America is an expedition into her vulnerability, regrets and Whole Foods



16 in a refugee camp: Here's what her days are like

# EXHIBIT FFF

THE
# NEW YORKER

# TRUMP'S BUSINESS OF CORRUPTION

*What secrets will Mueller find when he investigates the President's foreign deals?*

**By Adam Davidson**

President Donald Trump's attorney Jay Sekulow recently told me that the investigation being led by Robert Mueller, the special counsel appointed by the Justice Department, should focus on one question: whether there was "coördination between the Russian government and people on the Trump campaign." Sekulow went on, "I want to be really specific. A real-estate deal would be outside the scope of legitimate inquiry." If he senses "drift" in Mueller's investigation, he said, he will warn the special counsel's office that it is exceeding its mandate. The issue will first be raised "informally," he noted. But if Mueller and his team persist, Sekulow said, he might lodge a formal objection with the Deputy Attorney General, Rod Rosenstein, who has the power to dismiss Mueller and end the inquiry. President Trump has been more blunt, hinting to the *Times* that he might fire Mueller if the investigation looks too closely at his business dealings.

Several news accounts have confirmed that Mueller has indeed begun to examine Trump's real-estate deals and other business dealings, including some that have no obvious link to Russia. But this is hardly wayward. It would be impossible to gain a full understanding of the various points of contact between the Kremlin and the Trump campaign without scrutinizing many of the deals that Trump has made in the past decade. Trump-branded buildings in Toronto and the SoHo neighborhood of Manhattan were developed in association with people who have connections to the Kremlin. Other real-estate partners of the Trump Organization—in Brazil, India, Indonesia, and elsewhere—are now caught up in corruption probes, and, collectively, they suggest that the company had a pattern of working with partners who exploited their proximity to political power.

One foreign deal, a stalled 2011 plan to build a Trump Tower in Batumi, a city on the Black Sea in the Republic of Georgia, has not received much journalistic attention. But the deal, for which Trump was reportedly paid a million dollars, involved unorthodox financial practices that several experts described to me as "red

flags" for bank fraud and money laundering; moreover, it intertwined his company with a Kazakh oligarch who has direct links to Russia's President, Vladimir Putin. As a result, Putin and his security services have access to information that could put them in a position to blackmail Trump. (Sekulow said that "the Georgia real-estate deal is something we would consider out of scope," adding, "Georgia is not Russia.")

The waterfront lot where the Trump Tower Batumi was supposed to be built remains empty. A groundbreaking ceremony was held five years ago, but no foundation has been dug. Trump removed his name from the project shortly before assuming the Presidency; the Trump Organization called this "normal housekeeping." When the tower was announced, in March, 2011, it was the centerpiece of a bold plan to transform Batumi from a seedy port into a glamorous city. But the planned high-rise—forty-seven stories containing lavish residences, a casino, and expensive shops—was oddly ambitious for a town that had almost no luxury housing.

Trump did very little to develop the Batumi property. The project was a licensing deal from which he made a quick profit. In exchange for the million-dollar payment, he granted the right to use his name, and he agreed to visit Georgia for an elaborate publicity campaign, which was designed to promote Georgia's President at the time, Mikheil Saakashvili, as a business-oriented reformer who could attract Western financiers. The campaign was misleading: the Trump Tower Batumi was going to be funded not by Trump but by businesses with ties to Kazakh oligarchs, including Timur Kulibayev, the son-in-law of Kazakhstan's autocratic ruler, Nursultan Nazarbayev, and a close ally of Putin. Kazakhstan has the largest economy in Central Asia, based on its vast reserves of oil and metals, among other natural resources. Kazakhstan is notoriously corrupt, and much of its wealth is in the hands of Nazarbayev's extended family and his favored associates.

Trump visited Georgia in April, 2012, at a politically vulnerable time for Saakashvili. Nine years earlier, Saakashvili had led the Rose Revolution, which overturned the country's autocratic post-Soviet leadership. After assuming power, he initially cracked down on widespread petty corruption and cleaned up the civil service, which had functioned largely on bribes. Then, in 2008, he led a disastrous war against Russia over control of the breakaway region of South Ossetia. By then, his fight against corruption had largely ceased, and Transparency International and other N.G.O.s were reporting that élite corruption—in which wealthy, politically

connected people receive better treatment from courts, prosecutors, and government administrators—was rampant in Georgia. Under these conditions, few Western investors or brands were willing to put money into the country. Saakashvili himself was increasingly unpopular, and the Trump deal was meant to help salvage his reputation.

Saakashvili showed Trump around Tbilisi, the capital, and Batumi. Georgian television covered the events fawningly, promising viewers that Trump would soon build a second tower, in Tbilisi. One broadcaster proclaimed that Trump was the world's top developer. At the groundbreaking ceremony in Batumi, Saakashvili said that the tower was "a big deal . . . that changes everything around here." At another event, beneath a banner that proclaimed "TRUMP INVESTS IN GEORGIA," he thanked Trump for being part of the project—which, he said, had a budget of two hundred and fifty million dollars. He also awarded Trump the Georgian Order of Brilliance. Trump, in turn, praised Saakashvili. "Everybody in the world, they speak of Georgia and the great miracle that's taking place," he said.

Upon returning home, Trump appeared on "Fox and Friends." Gretchen Carlson, the host at the time, asked him, "What are you going to be investing in?" He responded, "I'm doing a big development there—and it's been amazing." He said of Saakashvili, "He's one of the great leaders of the world."

---

VIDEO FROM THE NEW YORKER

Sally Yates on Protecting Robert Mueller's Investigation

Trump's Business of Corruption | The New Yorker

Virtually none of the things that Saakashvili and Trump said about the deal were true. The budget of the Trump Tower Batumi was not two hundred and fifty million dollars but a hundred and ten. Trump, meanwhile, could hardly have invested such a sum himself. He professed to be a billionaire, but a few months earlier an appeals court in New Jersey had shut down Trump's legal campaign against Timothy O'Brien, the author of "TrumpNation," which argued that Trump had wildly inflated his fortune, and was actually worth less than a quarter of a billion dollars. Julie George, a political scientist at Queens College who studies Georgia, told me that, by 2012, Saakashvili's tenure could in no way be considered a "great miracle." The country's economy was floundering, and shortly after Trump's visit it was revealed that the government had been torturing political opponents. (Saakashvili did not respond to requests for comment.)

The announcement of the Batumi tower was handled with cynical opportunism by both Trump and Saakashvili, but that was not the deal's biggest problem. The developer that had paid Trump and invited him to Georgia—a holding company known as the Silk Road Group—had been funded by a bank that was enmeshed in a giant money-laundering scandal. And Trump, it seemed, had not asked many questions before taking the money.

Before the collapse of the Soviet Union, in 1991, Batumi had been a popular resort town, but by the early aughts it had fallen into disrepair. Its beachfront

hotels housed refugees from the nearby Abkhazia region, which had broken away from Georgia in 1992. Batumi was the capital of the semiautonomous Adjara region, which was itself on the verge of declaring independence. Saakashvili saw the redevelopment of Batumi as critical for maintaining Georgian sovereignty there. Batumi residents promised to turn the city into the Monaco of the Black Sea.

But nobody seemed willing to put money into Batumi. Levan Varshalomidze, the governor of Adjara at the time, told me that Saakashvili and other Georgian officials sought financial backers, but they could not get anyone to invest in a run-down Georgian port.

Then, in 2005, something remarkable happened. Saakashvili and President Nazarbayev, of neighboring Kazakhstan, announced that B.T.A. Bank—the largest bank in Kazakhstan—was giving several hundred million dollars in loans to help develop Georgia. The loans would pay for the construction of hotels in Batumi, the expansion of the Georgian telecommunications industry, and the growth of a Georgian bank. Curiously, all the loans went to subsidiaries of one company: the Silk Road Group, which specialized not in real-estate development but in shipping crude- and refined-oil products, by rail, from Kazakhstan to other countries. Its senior executives had very little experience in telecommunications, banking, or hospitality. The Silk Road Group, which had annual revenues of roughly two hundred million dollars, was planning, in an instant, to venture into several new industries. Compounding the risk, this expansion involved taking on a debt one and a half times its annual revenue.

That wasn't the only puzzling thing about the loans. At the time that B.T.A. was lending all this money to the Silk Road Group, the bank's deputy chairman, Yerkin Tatishev, was apparently crossing an ethical line—positioning himself to exert improper influence over some of the very Silk Road Group subsidiaries that were benefitting from the loans. B.T.A. Bank had representatives on the boards of those subsidiaries, but one representative serving on two boards, Talgat Turumbayev, was simultaneously working for Tatishev's company, the Kusto Group, supervising mergers and acquisitions. (Turumbayev told me that serving on the boards wasn't a conflict of interest, because it didn't take "a lot of time.")

I spoke with people who had knowledge about the subsidiaries. They told me that the subsidiaries were co-owned by the Silk Road Group and secret partners. The

source at one subsidiary told me he suspected that Tatishev—who repeatedly participated in company meetings—was a hidden owner.

Tatishev, who is estimated by *Forbes* to be worth half a billion dollars, left B.T.A. Bank in 2009. He insisted to me that, while he was there, he had no personal financial involvement in the Silk Road Group. But he acknowledged that he "developed a strong friendship" with George Ramishvili, the company's C.E.O., and "offered to advise him." He added, "It was the right thing to do, and this is my definition of friendship." But is it true that Tatishev merely advised the Silk Road Group? The Web site of Tatishev's company, the Kusto Group, declares that it has been "an outstanding partner for the Silk Road Group" since 2006, noting, "Together we have successfully invested in various sectors of the Georgian economy." Whenever I pointed out such contradictions to Tatishev, he came up with new answers. In an e-mail, he said that the joint investments were simply "charity/heritage projects." After he told me that he never served on the committee of B.T.A. Bank that oversees lending, I checked, and confirmed that this was false. He then insisted that he "did not recall" participating.

If, as the Web site suggests, Tatishev financially involved himself in businesses funded by the B.T.A. Bank loans, then he and the Silk Road Group may well have committed bank fraud. When bank executives have a personal financial stake in projects that their own bank is financing, it is known as "self-dealing," and it is a crime in nearly every country, including Kazakhstan. I recently spoke with Sergei Gretsky, a professor at the Catholic University of America, who wrote his Ph.D. dissertation on the Kazakh banking sector. When I asked him if it would be illegal for the deputy chairman of a Kazakh bank to have personal investments in a project that his bank was funding and withhold that information from investors, he laughed and said, "Yes, of course."

Richard Gordon, the director of the financial-integrity unit at Case Western Reserve University School of Law, explained that self-dealing represented a central cause of the 1997 global financial crisis. Banks in Indonesia, South Korea, Brazil, Russia, Pakistan, and Taiwan failed, in part, because bank executives and board members kept lending money to themselves and to their cronies. "This leads to defaults, bank bankruptcies, or government bailouts," he said. Since then, nearly every nation has made efforts to prevent self-dealing. Gordon said that, at most banks today, the

board members and senior staff don't even have a credit card associated with the bank, in order to eliminate any appearance of a conflict of interest.

Lending to companies in which a senior bank executive has a personal stake is a crime because it violates the central trust that makes banking possible. The fundamental business of banking is to borrow money from one group and lend it to another. B.T.A., which had been heralded internationally as a fast-growing bank in a troubled part of the world, had raised money by selling bonds through J. P. Morgan, Credit Suisse, and many other top Western banks. If these Western banks had known that a senior B.T.A. official was heavily involved in the operations of a company that was receiving huge loans from B.T.A., they might have balked.

In the years before the Trump Tower Batumi deal, B.T.A. Bank became entangled in a spectacular crime. Mukhtar Ablyazov, the bank's chairman, was a prominent figure in Kazakhstan, and not just because he was a billionaire. He was one of the leading sponsors of a political party opposed to President Nazarbayev. In 2009, when Nazarbayev signalled a desire to seize control of B.T.A. Bank, Ablyazov fled the country for London—taking billions of dollars in bank funds with him. He accomplished this with a diffuse scheme: dozens of offshore companies under his control received loans from B.T.A., and none of the loans were paid back.

In 2010, when a Trump Organization executive, Michael Cohen, began negotiating with the Silk Road Group about licensing Trump's name for the Batumi tower, Ablyazov was facing eleven lawsuits in the U.K. The Kazakh government, which had indeed seized control of B.T.A. Bank, had sued him to reclaim ten billion dollars that he had allegedly siphoned out of the country. The *Financial Times* covered the case extensively, as did the *Times*, which described "a scheme by B.T.A.'s former chairman, Mukhtar Ablyazov, to direct between $8 billion and $12 billion worth of B.T.A. loans—about half of the bank's loan book—to companies that he secretly controlled." The article noted that Ablyazov was renting "a 15,000-square-foot mansion" in London.

It would have taken only a Google search for the Trump Organization to discover that the Silk Road Group had received much of its funding from B.T.A. Bank, which, at the time of the Batumi deal, was mired in one of the largest fraud cases in recent history. The Silk Road Group had even been business partners with the central figure in the scandal: Ablyazov and the Silk Road Group were two of the owners of a bank in Georgia. I asked Cohen, who visited Georgia with Trump, if he

had been concerned about the Silk Road Group's connection to B.T.A. Bank. "I didn't even know that B.T.A. was involved in this entire scenario up until the moment you told me," he said. He added that he was not aware of any information about how the tower would be funded—or even "if there was going to be any funding at all." He went on, "We had not gotten to that stage of the process. Remember, this was a licensing deal. The financing of the project was the responsibility of the licensee"—the Silk Road Group.

I recently spoke with John Madinger, a retired U.S. Treasury official and I.R.S. special agent, who used to investigate financial crimes. He is the author of "Money Laundering: A Guide for Criminal Investigators." When I told him what Cohen had said to me, he responded, "No, no, no! You've got to do your due diligence. You shouldn't do a financial transaction with funds that appear to stem from unlawful activity. That's like saying, 'I don't care if Pablo Escobar is my secret business partner.' You *have* to care—otherwise, you're at risk of violating laws against money laundering."

A judge in the U.K. ruled repeatedly against Ablyazov, starting in 2009, and ordered him to hand over more than four billion dollars to B.T.A. (The Kazakh government insisted that six billion dollars more remained missing.) The judge, Sir Nigel John Martin Teare, said that Ablyazov's use of offshore holding companies had facilitated "fraud on an epic scale." Teare ruled that "there can be only one explanation for the fact that the very large sums of money which were advanced were immediately transferred to companies owned or controlled by Mr. Ablyazov, namely, that the original loans were part of a dishonest scheme whereby Mr. Ablyazov sought to misappropriate monies which belonged to the bank." Ablyazov was eventually sentenced to twenty-two months in a U.K. prison, for contempt of court, because he had refused to reveal disputed assets. In February, 2012, when Trump was planning his trip to Georgia, Ablyazov fled to France. He is currently fighting extradition.

T he Silk Road Group, which was established in Georgia shortly after the fall of the Soviet Union, does not have a conventional corporate structure. It is a holding company that controls dozens of corporate entities registered around the world. In total, B.T.A. loaned the Silk Road Group three hundred million dollars, and these funds were dispersed among its many subsidiaries, making the money trail hard to follow. For example, an eight-million-dollar loan was granted to Batumi Riviera Holding, B.V., which was registered in Holland. Batumi Riviera Holding has

reported having a sole asset: a company called Vento, L.L.C., which is registered in Georgia. That registration indicates that its creditor is B.T.A., which made loans valued at seventy-five per cent of the initial investment in the company. Batumi Riviera Holding, in turn, is owned by Tbilisi Central Plaza, a company registered in Malta. Tbilisi Central Plaza is owned by Susalike Holding GmbH, which is registered, in Germany, to a Silk Road Group subsidiary.

Giorgi Rtskhiladze co-owns the Silk Road Transatlantic Alliance, a subsidiary that focusses on business deals involving the U.S. He brokered the Trump relationship. The Silk Road Group's leadership in Georgia asked him to represent the company in interviews for this article. I recently met him at the St. Regis hotel in New York. When I asked why the Silk Road Group had such a bewildering structure, Rtskhiladze said, "There are tax reasons, and there are other reasons. To reduce liabilities, if we were sued or have to sue, certain courts are more efficient." He pointed out that many companies legitimately use offshore jurisdictions to register their firms.

"That's true," Richard Gordon, the financial-integrity expert at Case Western, said. However, he added, "it is difficult to conceive of legitimate reasons for one shell company in an offshore jurisdiction to own a chain of companies established in a series of other offshore jurisdictions." Such byzantine arrangements add expense, complexity, and uncertainty—the opposite of what businesses normally want—without providing any clear benefit, other than obfuscation. Moreover, by registering in so many different jurisdictions, the Silk Road Group has actually increased its legal risk, because a potential claimant can sue the company in all those jurisdictions. Gordon, who helped write the Republic of Georgia's tax law, told me that he could think of no reason that this structure would help a Georgian company lawfully pay fewer taxes.

---

MORE FROM THIS ISSUE
## AUGUST 21, 2017

| ANNALS OF AGRICULTURE | SHOUTS & MURMURS | SKETCHBOOK | A CRI |
|---|---|---|---|
| How Driscoll's Reinvented the | Million-Dollar Subway Fixes | N.Y.C.'s Most Eligible Pigeons | Is Th Prot |

| Strawberry | By Evan Waite and River Clegg | By Will McPhail | By Nc |

By Dana Goodyear

---

When I described to John Madinger, the retired Treasury official, the various entities and transactions involved in the funding of the Trump Tower Batumi, he said, "That is what you would expect to see in a money-laundering operation: multiple shell companies in multiple countries. It's designed to make life hard for people trying to follow the transaction."

It was difficult to pierce the veil of ownership, but I made some headway by collaborating on a reporting project with an investigations team at the Columbia University School of Journalism. Manuela Andreoni and Inti Pacheco, two recent graduates who are now investigative fellows, have spent months researching the Silk Road Group, Mukhtar Ablyazov, Yerkin Tatishev, and B.T.A. Bank. They have looked closely at relevant lawsuits, and they have obtained and translated property records and corporate registries from around the world.

Although Tatishev had repeatedly assured me that he was not involved in making decisions about Silk Road Group projects that had been funded by B.T.A. loans, I continued to accrue contradictory evidence. I recently received a cache of internal Silk Road Group e-mails, dating back to 2014, and they make clear that Tatishev has exerted detailed operational control over the company's activities, including real-estate businesses that were funded by the B.T.A. loans. The e-mail cache shows that David Borger, a German financier who is a top executive at the company, regularly informed Tatishev about delicate internal financial matters and asked him for approval on a wide variety of decisions pertaining to Silk Road Group hotels, casinos, telecommunications infrastructure, and hydroelectric plants. Many of these projects had been initially funded by loans made while Tatishev was a senior official at B.T.A. Bank.

In one e-mail exchange, from earlier this year, Tatishev weighed in on a decision about which investment bank the Silk Road Group should use for a transaction. "We are cool guys," Tatishev wrote. "And should always work with cool guys." Borger responded, "Dear Yerkin, in this case can you please help us to get a cool deal with them?" He then asked Tatishev to describe how he wanted the deal to be structured.

In another recent e-mail discussion, which touched on crucial questions about the ownership and the financing of a major Silk Road Group project, Borger told Tatishev, "I need your ok." In a subsequent e-mail, George Ramishvili, the C.E.O. of the Silk Road Group, added that Tatishev needed to give his approval. Tatishev did so. In a 2014 e-mail, a Silk Road Group consultant sent Tatishev and Ramishvili a summary of a plan they had devised to settle the outstanding debt owed to B.T.A. Bank.

Video from Trump's visit to Georgia provides further evidence that Tatishev was a key part of the Silk Road Group—and suggests that Trump recognized his importance. During a speech that Trump gave in Tbilisi, Tatishev can be seen sitting in the audience next to Ramishvili. Trump says, "We have two great partners." He points toward the seats where Tatishev and Ramishvili are sitting. "And they're going to do a fantastic job." (Giorgi Rtskhiladze, the Silk Road Transatlantic Alliance executive who met me in Manhattan, told me that Trump must have thought it was him, not Tatishev, sitting next to Ramishvili. But Rtskhiladze and Tatishev look nothing alike: Rtskhiladze is clean-shaven, with light-colored hair; Tatishev is nearly bald, with dark facial hair.) Tatishev accompanied Trump to meet Saakashvili at the Presidential Palace, in Tbilisi. When Michael Cohen, the Trump Organization executive, went to Georgia in 2010 to discuss building a tower with the Silk Road Group, he also met with Tatishev. A representative of the Silk Road Group said that Tatishev is a friend of Ramishvili and simply wanted to say hello to a big American tycoon. Inviting friends to important business meetings, the representative said, is common practice in the Caucasus region.

With minimal due diligence, Trump Organization executives would have noticed that the Silk Road Group exhibited many warning signs of financial fraud: its layered and often hidden ownership, its ornate use of shell companies, its close relationship with a bank that was embroiled in a financial scandal. Trump's visit to Georgia occurred while his company was making a series of similar foreign deals. Until then, the Trump Organization had ventured abroad only occasionally: in 1999, a set of Korean buildings licensed the Trump name; in 2006, Trump bought a golf course in Scotland; the following year, construction began on a Trump-branded tower in Turkey. But by 2012 Trump was struggling in the U.S. market. His biggest investment, in American casinos, had proved ruinous, and he was now a minority owner of a near-bankrupt business. Trump had defaulted on loans multiple times, and nearly every bank in the U.S. refused to finance deals bearing his name. And so

Trump turned to people in other countries who did not share this reluctance to give him money. In 2012 alone, the Trump Organization negotiated or finalized deals in Azerbaijan, Brazil, Canada, Georgia, India, the Philippines, the United Arab Emirates, and Uruguay.

At the time, the Trump Organization had only a handful of staff members involved in dealmaking. His children Ivanka Trump and Donald Trump, Jr., assumed a management role in many of these foreign projects. According to Rtskhiladze, Trump, Jr., helped oversee the Batumi deal. At one point, Rtskhiladze and Cohen held two days of meetings in New York to discuss the project. Trump, Jr., dropped by several times. According to former executives at the Trump Organization, the company lacked rigorous procedures for assessing foreign partners.

A month after Trump visited Georgia, he agreed to license his name to, and provide oversight of, a luxury hotel in Baku, Azerbaijan, a deal that I examined in an article in *The New Yorker* earlier this year. Trump received several million dollars from the brother and the son of an Azerbaijani billionaire who was then the Minister of Transportation—a man who, U.S. officials believe, may have been simultaneously laundering money for the Iranian Revolutionary Guard. In 2013, Trump met with the Azerbaijani-Russian billionaire Aras Agalarov and his son, Emin; that November, they partnered with Trump on the Miss Universe contest, in Moscow, and discussed building a Trump Tower in the Russian capital. In June, 2016, at Emin Agalarov's request, Trump, Jr., met with Natalia Veselnitskaya, a lawyer who has represented Russian intelligence. Trump, Jr., was promised damaging information about Hillary Clinton. Veselnitskaya came to the meeting accompanied by business associates who have extensive ties to Georgia and Azerbaijan.

In December, 2012, not long after Trump signed the Batumi licensing deal, a company called Riviera, L.L.C., bought the fifteen-acre parcel of land on which the Trump Tower Batumi would supposedly be built. The price was twelve million dollars, and the seller was Vento, L.L.C., which was owned by a company that was owned by a company that was owned by a company that was owned by the Silk Road Group. Riviera, L.L.C., was also partly owned by the Silk Road Group. In other words, the Silk Road Group was selling property to itself.

The Financial Action Task Force, headquartered in Paris, is led by representatives from thirty-seven nations. In 2007, the task force issued a report about the use of real-estate projects for money laundering. The report makes note of several red flags.

It warns of "complex loans" in which businesses "lend themselves money, creating the appearance that the funds are legitimate." It also warns of the use of offshore shell companies and tangled corporate legal structures, especially those in which third parties are hired to administer a company and conceal its true ownership. These intertwined companies can then trade property among themselves, in order to create inflated valuations: "An often-used structure is, for example, the setting up of shell companies to buy real estate. Shortly after acquiring the properties, the companies are voluntarily wound up, and the criminals then repurchase the property at a price considerably above the original purchase price. This enables them to insert a sum of money into the financial system equal to the original purchase price plus the capital gain, thereby allowing them to conceal the origin of their funds."

The report states that money launderers often find that "buying a hotel, a restaurant or other similar investment offers further advantages, as it brings with it a business activity in which there is extensive use of cash." Casinos—like the one planned for the Trump Tower Batumi—are especially useful in this regard. The casino was to be owned by the Silk Road Group and its partners.

Alan Garten, the chief legal officer for the Trump Organization, declined to describe the due diligence behind the Batumi tower. When the deal was signed, the general counsel for the Trump Organization was Jason Greenblatt, who is now President Trump's envoy to negotiate Middle East peace. (The White House declined to comment for this story, referring me instead to Sekulow, Trump's lawyer, who also declined to discuss the specifics of the Batumi deal.)

A representative of the Silk Road Group told me that the company had been eager to assuage any ethical concerns the Trump Organization or other potential partners may have had, and so it had conducted due diligence—on itself. In May, 2012, the Silk Road Group commissioned K2 Intelligence, a firm founded by the investigator Jules Kroll, to produce a report. (This was fourteen months *after* the Trump Organization signed the Batumi deal.) I recently obtained a summary of the report, which explained that K2 was "asked to probe the background and integrity of S.R.G.'s principal shareholder, George Ramishvili, more deeply than a standard investigative or compliance report might." However, the report seems to have addressed only one issue: a rumor, circulating in the Georgian media, that Ramishvili had once been a member of the Mkhedrioni, a right-wing militia. K2 concluded that the rumor was false. The summary did not address the Silk Road Group's funding

sources, its complex legal structure, or its relationship to the B.T.A. Bank scandal, which was unfolding in London courts at the time. Other due diligence may have been performed, but the Silk Road Group, K2, and the Trump Organization declined to share specific information.

Ross Delston, a prominent anti-money-laundering attorney in Washington, D.C., told me that, if one of his clients approached him with the possibility of entering a licensing relationship with the people involved in the Batumi deal, he "would tell him not to walk away but to run away—to run like hell." He explained, "There are too many aspects of the deal that don't make sense, and there's no way, as an outsider, that you could conduct sufficient due diligence to figure out if it is criminal."

So many partners of the Trump Organization have been fined, sued, or criminally investigated for financial crimes that it is hard to ascribe the pattern to coincidence, or even to shoddy due diligence. In criminal law, there is a crucial concept called "willful blindness": a person can be convicted of a crime even if he was unaware of certain aspects of the crime in which he was engaged. In U.S. courts, judges routinely explain to juries that "no one can avoid responsibility for a crime by deliberately ignoring what is obvious." (When the Trump Organization cancelled the Batumi deal, it noted that it held the Silk Road Group "in the highest regard.")

John Madinger, the former Treasury official, said that, in any deal that might involve money laundering, there is one critical question: "Does the financial transaction make economic or business sense?" In recent years, a lot of residential housing has been built in Batumi, but most of it has consisted of what Colliers, the market-analysis firm, calls "low-segment"—down-market—apartments. The Trump Organization, with its extensive experience in the luxury real-estate market, could surely sense that it would not be easy to enlist hundreds of wealthy people to buy multimillion-dollar condominiums in Batumi. I asked several New York real-estate developers to assess the proposed tower. One laughed and said that the Batumi deal reminded him of "The Producers," the Mel Brooks movie about two charlatans who create a horrible musical designed to fail. Another New York developer, who spent years making deals in the former Soviet Union, told me, "A forty-seven-story tower of luxury condominiums in Batumi is an *insane* idea. I wouldn't have gone near a project like this."

Giorgi Rtskhiladze, the Silk Road Transatlantic Alliance executive, confirmed that the luxury-housing market in Batumi was nonexistent in 2012, when he invited

Donald Trump to visit Georgia, but said that the tower's investors were nonetheless confident that a Trump-branded skyscraper would attract buyers. He insisted that the Silk Road Group had not taken part in anything illicit, and said that B.T.A. Bank's 2005 decision to lend the Silk Road Group several hundred million dollars was hardly suspicious. The company had been working in Kazakhstan for years, transporting oil products, and had become close with the Tatishev family. When the bank that Tatishev helped run, B.T.A., decided to invest in redeveloping Batumi, the obvious partner was the Silk Road Group. "We were the partner they knew," Rtskhiladze said. "We're active in the region."

Rtskhiladze acknowledged that it was quite a big loan for such a poor country. "Unbelievable," he called it. And it was true that the Silk Road Group had little experience in hotels or construction or telecommunications when it suddenly entered those industries. But, he pointed out, Georgia was still emerging from the torpid days of the Soviet Union. "You're talking about a *country* that had no experience," he said. "Nobody else had experience." In any case, he suggested, "real-estate development wasn't that complicated. You hire third parties, who do feasibility studies. You look at the numbers. It wasn't that difficult." He added, "We like to do clean, transparent business."

I asked Rtskhiladze why he had invited Trump, who has generally avoided travelling abroad, to Georgia. He told me a story from 1989, when he was a young soldier in the Soviet Army. "They told me, for target practice, to shoot Ronald Reagan's face," he recalled. "I refused." The Army jailed him for several days. Soon after he was released, he said, he saw a magazine with Trump on the cover. He told himself, "One day, I will go to New York and meet this man."

He argued that the fact that "there was no luxury in Batumi" was precisely why the idea of a Trump Tower was so smart. The skyscraper, with its "pool and gyms and conference rooms," would single-handedly create "an entire universe of very New York-style luxury in a seaside town." The luxury condominiums, he added, were "for international buyers—Saudis, Turks, Russians." In his "strong opinion," the Trump brand was "the only brand for them." (David Borger, the Silk Road Group executive, told me that a study by a well-regarded Turkish firm had concluded that the tower was a good business idea, but he declined to share the name of the firm or the study.)

Melanie A. Bonvicino, who handles communications for the Silk Road Group, told me that the Trump Tower Batumi deal demonstrated an openhearted vision. "With

the Batumi project, Trump was once again able to demonstrate his keen business sense," she wrote in an e-mail. "Donald Trump in his role as futurist and visionary ordained the region as the next big thing. Mr. Trump had an immediate grasp over the geopolitical significance of the Republic of Georgia and its Black Sea region, acknowledging its vast potential by jointly transforming this hidden gem into the next Riviera. In the élite realm of global residential and commercial real-estate developers, the Trump moniker was and remains synonymous with Coca-Cola, Pepsi, and Michael Jackson."

In 2009, when Ablyazov fled to London, the Kazakh government seized control of B.T.A. Bank. (Tatishev moved to Singapore in 2013.) A lawyer representing the bank, Roman Marchenko, informed the Silk Road Group that he had reason to believe that it had participated in Ablyazov's loan scheme. The Silk Road Group denied any wrongdoing. A settlement was reached, for fifty million dollars—a bargain price, considering that the loans had totalled three hundred million. Marchenko believes that the Silk Road Group was deeply entwined with Ablyazov, but Kazakh government officials decided to stop investigating. They were pursuing Ablyazov's stolen assets all over the world, and there was more money in other countries.

The Kazakh government placed B.T.A. Bank's assets under the authority of its sovereign-wealth fund. Soon after, Timur Kulibayev—the powerful son-in-law of the country's dictator, Nursultan Nazarbayev—became the director of the fund. Kulibayev and his staff had access to all the bank's internal documents. Recently, Kulibayev became the majority owner of the bank, giving him total control over B.T.A.'s archives, as well as ownership of its assets. Kulibayev was surely familiar with the players involved in the Trump Tower Batumi project. In 2011, Giorgi Rtskhiladze and Michael Cohen, the Trump Organization executive, began promoting the idea of a Trump Tower in Astana, the capital of Kazakhstan. They visited Astana and met with Karim Masimov, the Prime Minister. Masimov is now the head of Kazakhstan's national-security apparatus.

Keith Darden is a political scientist at American University who has written extensively on the use of compromising information—*kompromat*—by former Soviet regimes against people they want to control. He told me that Kazakh intelligence is believed to collect dossiers on every significant business transaction involving the country. This would be especially true if a famous American developer was part of

the deal, even if it would not have occurred to them that he might one day become the U.S. President. "There is no question—they know everything about this deal," Darden said.

Darden explained that Kazakh intelligence agents work closely with their Russian counterparts. Kulibayev himself has direct ties to Russia's leadership. In 2011, he was named to the board of Gazprom, the Russian gas behemoth, which is widely considered to be a pillar of Putin's fortune. In "The Return: Russia's Journey from Gorbachev to Medvedev," Daniel Treisman, a political scientist at U.C.L.A. who specializes in Russia, wrote, "For Putin, Gazprom was a personal obsession. He memorized the details of the company's accounts, its pricing rules and pipeline routes. He personally approved all appointments down to the deputy level, sometimes forgetting to tell the company's actual C.E.O., Aleksey Miller." Kulibayev could not possibly be serving on Gazprom's board without Putin's assent.

Robert Mueller has assembled a team of sixteen lawyers. One of them is fluent in Russian, and five have extensive experience investigating and prosecuting cases of money laundering, foreign corruption, and complex financial conspiracies. The path from Trump to Putin, if one exists, might be found in one of his foreign real-estate deals.

When Mueller was appointed special counsel, his official writ was to investigate not just "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump" but also "any matters that arose or may arise directly from the investigation." Much hinges on the word "directly." Sekulow, Trump's lawyer, insists that Mueller's mandate essentially stops at the Russian border. Pawneet Abramowski, a former F.B.I. intelligence analyst, told me that Sekulow's assertion is nonsensical. "You must follow the clues," she said. When investigating a businessperson like Trump, "you have to follow the money and go wherever it leads—you must follow the clues all the way to the end." ♦

*Manuela Andreoni, Inti Pacheco, and Giannina Segnini, of Columbia University, contributed reporting for this piece.*

*This article appears in the print edition of the August 21, 2017, issue, with the headline "No Questions Asked."*



*Adam Davidson is a staff writer at The New Yorker.*  *Read more »*

---

## Video



*Trump's Business of Corruption*
*Adam Davidson follows the money trail in one of the President's past deals all the way to Vladimir Putin.*

### CONDÉ NAST

© 2018 Condé Nast. All rights reserved. Use of and/or registration on any portion of this site
constitutes acceptance of our **User Agreement** (updated 5/25/18) and **Privacy Policy and Cookie
Statement** (updated 5/25/18). **Your California Privacy Rights**. The material on this site may not be
reproduced, distributed, transmitted, cached or otherwise used, except with the prior written
permission of Condé Nast. *The New Yorker* may earn a portion of sales from products and services that
are purchased through links on our site as part of our affiliate partnerships with retailers. **Ad Choices**

# EXHIBIT GGG

[illegible dense hyperlink text]

# Trump gets millions from golf members. CEOs and lobbyists get access to president

Brad Heath, Fredreka Schouten, Steve Reilly, Nick Penzenstadler and Aamer Madhani, USA TODAY

Published 6:03 a.m. ET Sept. 6, 2017 | Updated 12:25 p.m. ET Sept. 8, 2017



(Photo: Saul Loeb, AFP/Getty Images)

Dozens of lobbyists, contractors and others who make their living influencing the government pay President Trump's companies for membership in his private golf clubs, a status that can put them in close contact with the president, a USA TODAY investigation found.

Members of the clubs Trump has visited most often as president — in Florida, New Jersey and Virginia — include at least 50 executives whose companies hold federal contracts and 21 lobbyists and trade group officials. Two-thirds played on one of the 58 days the president was there, according to scores they posted online.

Because membership lists at Trump's clubs are secret, the public has until now been unable to assess the conflicts they could create. USA TODAY found the names of 4,500 members by reviewing social media and a public website golfers use to track their handicaps, then researched and contacted hundreds to determine whether they had business with the government.

Listen to learn more about how this story was reported.

The review shows that, for the first time in U.S. history, wealthy people with interests before the government have a chance for close and confidential access to the president as a result of payments that enrich him personally. It is a view of the president available to few other Americans.

Among Trump club members are top executives of defense contractors, a lobbyist for the South Korean government, a lawyer helping Saudi Arabia fight claims over the Sept. 11 terrorist attacks and the leader of a pesticide trade group that sought successfully to persuade the Trump administration not to ban an insecticide government scientists linked to health risks.

ADVERTISEMENT

Members of Trump's clubs pay initiation fees that can exceed $100,000, plus thousands more in annual dues to his companies, held in a trust for his benefit.

GET THE NEWS

The arrangement is legal, and members said they did not use the clubs to discuss government business. Nonetheless, ethics experts questioned whether it's appropriate for a sitting president to collect money from lobbyists and others who spend their days trying to shape federal policy or win government business.

"I think we're all in new territory," said Walter Shaub, who recently resigned as director of the Office of Government Ethics after repeated clashes with the White House. "We never thought we'd see anyone push the outer limits in this way."

USA TODAY NETWORK Tips
(https://newstips.usatoday.com/)

Citing privacy and national security, the White House has moved to keep secret the president's interactions. Unlike the Obama administration, the Trump White House does not disclose the president's golf partners, or whether he played. The Trump team also ended an Obama administration practice of releasing White House visitor logs. In July, a federal court ordered the government to release visitor records from Trump's Mar-a-Lago resort in Palm Beach, Fla., to a watchdog group. The deadline is Friday.

Trump's U.S. golf clubs are among the most lucrative outposts in his empire, bringing in about $600 million in 2015 and 2016, according to his financial disclosure reports. It is unknown how much of that is profit because, unlike other recent presidents, Trump has not released his tax returns

Some members find themselves in close proximity to a president who has visited his golf clubs on about a quarter of the days that he has been in office. Many describe Trump as surprisingly approachable, welcoming advice on everything from the state of the tee boxes to the course of his administration.

Trump marked his 100th day in office by visiting a factory owned by a company run by a member of his New Jersey golf club.

Standing behind Trump as he signed two executive orders was Robert Mehmel, president of the company that owns the Harrisburg, Pa., factory and another company that sells radars and electronics to the military, including about $54 million worth of contracts last year.



President Trump signs an executive order on the establishment of the Office of Trade and Manufacturing Policy at The Ames Companies in Harrisburg, Pa., in late April. The company's president, Robert Mehmel, looked over Trump's shoulder as he signed. He's a member of one of Trump's private golf clubs. (Photo: Carolyn Kaster, AP)

Like millions of golfers, Mehmel registered his handicap on a public U.S. Golf Association website that golfers use to track their handicaps and check the scores of other players. The site requires golfers to sign up through a club and lists when and where they played. Only members are allowed to associate their handicaps with Trump's clubs, said Kyle Littlefield, a pro at Trump National Golf Club-Bedminster.

Mehmel registered his handicap there. He posted scores from seven rounds of golf at the club this year. Five were on days in May, June and August when Trump was visiting. Mehmel did not respond to phone calls or emails.

The White House and Trump's companies did not respond to questions about members' access to the president.

At the clubs Trump visits most often, the list of members reflects a cross-section of wealthy suburbanites: corporate executives, investment bankers, real estate agents, doctors, and their families.

The list includes dozens of people who either seek to influence the federal government or sell it things. It includes the chief executives of defense and technology contractors, the head of the Dell unit that sells information technology services to the federal government, the chief of a trade group representing rural utilities and lobbyists who represent energy companies and foreign governments.

One lobbyist for U.S. and Canadian airports mentioned his membership to Trump at a White House meeting in February. "I'm a member of your club, by the way," Kevin Burke said, in an exchange captured by C-SPAN. "Very good, very good" Trump replied.

Other club members work in industries closely regulated by the federal government, including the CEO of pharmaceutical maker Allergan and the chairman of the Estée Lauder cosmetics empire.

Trump has long afforded his clubs, and their members, a unique status.

10/28/2018     Trump gets millions from golf members. CEOs and lobbyists get access to president

Case 1:17-cv-08153-LAK Document 38-3 Filed 10/31/18 Page 54 of 165

Before he took office, Trump told guests at a dinner at his Bedminster club that they were "the special people" and joked they "might want to come along" as his team interviewed potential Cabinet secretaries. Guests at Mar-a-Lago snapped photos in February as he huddled around an open-air dinner table with security aides and the Japanese prime minister after a North Korean missile launch.



**President Trump, Japanese Prime Minister Shinzo Abe, his wife, Akie, first lady Melania Trump and Robert Kraft, owner of the New England Patriots, sit down for dinner at Trump's Mar-a-Lago resort on Feb. 10.** (Photo: Nicholas Kamm, AFP/Getty Images)

In interviews, several dozen members described a president who remains the chief host and resident celebrity during his visits. He speeds through 18 holes of golf, then lingers in the clubs' restaurants and seldom refuses to shake a hand or pose for a photo, sometimes snapped by his Secret Service detail. Senior aides regularly accompany him. Advice flows freely.

"Access to this president has been different than it has been in the past, and everybody thinks they have an opportunity to provide information that could be helpful to the country," said Ed Russo, a longtime member of the Bedminster club who has worked as an environmental consultant for several of Trump's courses.

Others said the club was merely a place to play. "I've done zero business. I go there to play golf," said Thomas Spulak, a member of the Trump National Golf Club in Washington's suburbs and a partner at the law firm King & Spalding, who represents the Saudi government in its efforts to fight claims by families of victims of the Sept. 11 terrorist attacks.

Most Trump real estate now sold to secretive buyers (https://www.usatoday.com/story/news/2017/06/13/trump-property-buyers-make-clear-shift-secretive-llcs/102399558/)

USA TODAY is tracking Trump's real estate deals. You can help. (https://www.usatoday.com/story/news/2017/08/08/usa-today-tracking-trumps-real-estate-deals-you-can-help/516120001/)

Exclusive: Secret Service depletes funds to pay agents because of Trump's frequent travel, large family (https://www.usatoday.com/story/news/politics/2017/08/21/secret-service-cant-pay-agents-because-trumps-frequent-travel-large-family/529075001/)

Experts on government ethics and federal contracting said there's no prohibition on executives from companies with federal contracts spending money at Trump's golf properties, as long they pay the going rate for their memberships and don't hand over money to seek an official favor or to thank the president for taking action on their behalf.

Lobbyists face no legal restrictions on golf memberships.

Jay Vroom, CEO of the pesticide trade group Crop Life America, said he had encountered Trump once since he became president. The group sought for months to keep the Environmental Protection Agency from banning an insecticide called chlorpyrifos that the agency's scientists linked to neurological delays in children and other health problems. EPA Administrator Scott Pruitt said in March that the government would not impose new restrictions on the insecticide's use.

Vroom said in a statement that he had not spoken to Trump about the issue. Those fighting to ban the insecticide said they were troubled by the prospect of his having access to the president at all.

"Not surprising, I'm sad to say, especially with the current president. And I'm tempted to say — and oh, God help me — par for the course," said Kristen Boyles, a lawyer for the environmental non-profit group Earthjustice, which is suing to force the EPA to ban chlorpyrifos.

**Trump's private golf clubs**

A look at President Trump's private clubs, his estimate of their revenue the past two years and approximate number of people USA TODAY has identified so far as affiliated with the member-only clubs:



**TRUMP NATIONAL GOLF CLUB BEDMINSTER**

Bedminster, N.J.

**$40 million**

**29 Trump visits**

**530**

One figure equals 10

Revenue 2015-2016

Golfers affiliated

Next

Source: USA TODAY research, USGA golf handicap system, media reports and social media postings
Credit: Frank Pompa, USA TODAY

Shaub, the former Office of Government Ethics director, said even conversations that have nothing to do with the government can raise ethics concerns. The Washington lobbying and contracting worlds are built on access, and that makes any opportunity to meet the president valuable, he said.

"Face time is everything when it comes to Washington," Shaub said. "The president bopping around his properties gives them access to him."

Presidents have long socialized with the wealthy and well-connected, including campaign donors. But although the Kennedys visited country clubs in Palm Beach and the Roosevelts "were hobnobbing with the moneyed rich in the Hudson Valley or in Manhattan, the very people (Trump) is hanging out with are paying to be there in that setting with him," said Barbara Perry, director of presidential studies at the University of Virginia's Miller Center.

"This is unprecedented on so many levels," she said.

Contributing: Sara Wise in McLean, Va.; John Kelly in Melbourne, Fla.; Gregory Korte in Bedminster, N.J.

**HOW WE REPORTED THIS STORY**

USA TODAY set out to identify as many members of Trump's private clubs as possible. We found more than 4,500 names by scouring social media posts, news stories and a public website golfers use to track their handicaps.

Our reporters then reviewed many hundreds of members' names and used information available online and public documents such as lobbying registrations, corporate records, property deeds and medical licenses to determine the members' jobs and if they make their living trying to influence the federal government or win contracts with it. Reporters also interviewed dozens of members, though many more declined to comment.

We prioritized reviewing and interviewing members at clubs where the President has spent the most time since taking office. Those are in Bedminster, N.J., Washington's suburbs in Virginia; and in and around Palm Beach, Fla.

If you are a Trump club member or employee, or otherwise have direct information about his clubs and their membership, we'd like to hear from you. Contact Brad Heath at bheath@usatoday.com or send us a secure tip using the instructions at newstips.usatoday.com.

Read or Share this story: https://usat.ly/2xNtEPd

# EXHIBIT HHH

Close alert

Breaking News   Brazil has joined the ranks of countries tilting to the far right, choosing Jair Bolsonaro, a fiery and divisive populist, as president.   6:26 PM
Breaking News   Brazil has joined the ranks of countries tilting to the far right, choosing Jair Bolsonaro, a fiery and divisive populist, as president.   6:26 PM

Sections   Home   Search

Politics |Donald Trump's Taxes: What We Know and Don't Know

- Share
- Tweet
- Email
- More
- Save

Account   Log In   0   Settings

Close search

## Site Search Navigation

Search NYTimes.com

Clear this text input   Go

https://nyti.ms/2duq5WI

1. 1.
   - Gun Violence and Pipe Bombs Jolt Voters as Election Season Ends. 'Again?' One Asks.
   - To Rally Voters, Democrats Focus on Health Care as Their Closing Argument
   - Tragedy in Pittsburgh, House and Senate Latest, Beto Backer: 9 Days to Go
   - Trump Calls for Unity After Synagogue Shooting, Then Swiftly Denounces Democrats
   - Retro Report
   - Religion and Right-Wing Politics: How Evangelicals Reshaped Elections
   - Selling Donald Trump: A First-Time Campaign Manager Tries to Defy the Doubters
   - Mediator
   - Trump's Attacks on the News Media Are Working
   - Driven by Trump Policy Changes, Fracking Booms on Public Lands
9. - Mattis Vows U.S. Will Hold Khashoggi's Killers Accountable
   - Republicans Rushing to Save House Seats From Onslaught of Democratic Money
   - A 'No' on Kavanaugh Yields a Windfall for Heitkamp's Campaign Coffers
12. - Shopping for Insurance? Don't Expect Much Help Navigating Plans
13. - The Tip Sheet
   - Bomb Suspect, Beto Poll, Obama Calls Out Trump: 10 Days to Go
14. - Red-Hot Economy? Women Aren't Convinced
   - 'Today, for the First Time, I Donated Money to a Campaign'
16. - Marijuana Legalization Has Gone Mainstream. Rick Steves Has Helped.
   - On Politics: The Biggest Stories of the Week
   - Trump, at Charlotte Rally, Tries to Rebuild Political 'Momentum' by Reviving Old Attac

**Democrats Have Numbers on Their Side in Battle for the House. Republicans Have the N**

**Tyrone Gayle, 30, Spokesman for Senators and Hillary Clinton, Dies**

2. Loading...

## Site Navigation

Home Page

- World
- U.S.
- Politics
- N.Y.
- Business
- Business
- Opinion
- Opinion
- Tech
- Science
- Health
- Sports

- Sports

- Arts
- Arts
- Books
- Fashion & Style
- Fashion & Style
- Food
- Food
- Travel
- Magazine
- T Magazine
- Real Estate
- Obituaries
- Video
- The Upshot
- Reader Center
- Conferences

- Crossword
- Times Insider
- The Learning Network

- Multimedia
- Photography
- Podcasts

- NYT Store
- NYT Wine Club
- nytEducation
- Times Journeys
- Meal Kits

- Subscribe
- Manage Account
- Today's Paper
- Tools & Services
- Jobs
- Classifieds
- Corrections

- More

## Site Mobile Navigation

Advertisement



And machine failures
reduce utilization

See a smart factory



## Politics

- Share

# Donald Trump's Taxes: What We Know and Don't Know

By MICHAEL D. SHEAR, STEVE EDER and PATRICIA COHEN UPDATED March 15, 2017

Photo



Donald J. Trump in September in New Hampshire. Credit Damon Winter/The New York Times

- email
- Share
- Tweet
- save
- more

The release of two pages of President Trump's 2005 tax returns provides a new glimpse into his finances, but leaves major questions unanswered about the sources of his wealth, his global debts and the complicated structure of his businesses.

Mr. Trump's refusal as a candidate to release full returns for multiple years, as has every presidential candidate since Richard Nixon, clouded the picture that voters normally see when deciding who they will cast a ballot for in presidential elections.

As president, Mr. Trump has continued to insist that he will not release information about his taxes because many years of his returns are under a routine federal audit by the Internal Revenue Service.

On Tuesday, the White House confirmed basic information from the 2005 returns ahead of the release of the documents by MSNBC's Rachel Maddow and David Cay Johnston, a former New York Times reporter, who said he received them in the mail.

They revealed that Mr. Trump paid $38 million in federal income taxes on reported income of $150 million, an effective tax rate of 25 percent.

In October, The New York Times obtained three pages of Mr. Trump's 1995 tax returns, for filings in New York, New Jersey and Connecticut, which was the first time any of his actual tax returns have been publicly revealed. They showed more than $900 million in losses that could have allowed him to avoid paying any federal income taxes for up to 18 years.

Continue reading the main story

**RELATED COVERAGE**



Donald Trump Tax Records Show He Could Have Avoided Taxes for Nearly Two Decades, The Times Found



Donald Trump's Taxes



Still, much about his current finances remains murky because documents that have emerged have not included supporting schedules, or any pages from his federal returns, and are from more than two decades ago.

## What We Know

In the absence of any disclosures from Mr. Trump, The New York Times and other news outlets have attempted to fill in the gaps. This is what has been uncovered from available records:

---

2005

Tax returns obtained by MSNBC and David Cay Johnston show that Mr. Trump used large-scale business losses to reduce his federal tax liability in 2005, though he still paid $38 million in federal taxes on annual income of $150 million.

The White House described the business losses as a "a "large-scale depreciation for construction," but did not elaborate.

Several things can be inferred from the new documents:

The returns, which are stamped "client copy," suggest that the leak of the documents may not have come from the I.R.S., which would have had a signed copy without that stamp.

The documents also appear to show that the $900 million business loss which Mr. Trump claimed in 1995 was not being used to offset his tax liability by a decade later.

But there is plenty that remains unclear:

There is nothing in the new documents which shows what Mr. Trump's net worth was at the time. And because the documents do not include any of the schedules, there is no way to determine the sources of his income — real estate, television contracts or other investments.

As a result, none of the information in the tax returns provide any information about Mr. Trump's potential ties to Russia, which has become the subject of investigations by Congress and the F.B.I.

---

1995

Tax returns obtained by The Times showed $916 million in business losses that Mr. Trump could use to wipe out that amount in taxable income for up to 18 years.

---

1991 AND 1993

The New Jersey Casino Control Commission reports for these years show that Mr. Trump claimed losses that could have allowed him to avoid paying income taxes. This was a time when Mr. Trump's Atlantic City casinos faced significant financial trouble. The losses may have helped Mr. Trump reduce or eliminate his tax bill in future years.

---

ADVERTISEMENT

1984

### Sidebar

Pages From Donald Trump's 1995 Income Tax Records



How Donald Trump Turned the Tax Code Into a Giant Tax Shelter

Donald Trump's Letter



Trump Casinos' Tax Debt Was $30 Million. Then Christie Took Office.



Donald Trump Tax Records Show He Could Have Avoided Taxes for Nearly Two Decades, The Times Found

Tax court records state Mr. Trump paid no federal income taxes.

---

1978 AND 1979

Although he claimed to be worth hundreds of millions of dollars at the time, Mr. Trump paid no federal income taxes, according to a 1981 report by the New Jersey commission, assessing his fitness for a casino license. He took advantage of deductions available to real estate developers and, claiming losses from partnerships, Mr. Trump reported a "negative income" of $406,379 in 1978 and another loss of $3.4 million in 1979 — thus avoiding any tax liability for those two years.

---

1975-1977

Mr. Trump paid more than $71,000 in federal income taxes on about $218,000 of taxable income earned during these years, according to the 1981 casino commission report.

---

ADVERTISEMENT



Donald Trump has continued to decline to release his tax returns despite mounting pressure from both Democrats and Republicans. A look at some of the explanations for keeping his taxes private. Credit Video by By SHANE O'NEILL and AINARA TIEFENTHÄLER on Publish Date October 01, 2016

## What Mr. Trump Has Said

Tax returns obtained by MSNBC and David Cay Johnston show that Mr. Trump used large-scale business losses to reduce his federal tax liability in 2005, though he still paid $38 million in federal taxes on annual income of $150 million.

The White House described the business losses as a "large-scale depreciation for construction," but did not elaborate on specifically what projects the losses were attributed to.

Several things can be inferred from the new documents:

Because of the prepayments that the president made in 2005, and the lack of a penalty, tax experts said it appears that Mr. Trump paid a maximum of $14 million in taxes in the previous year.

The returns, which are stamped "client copy," also suggest that the leak of the documents did not come from the I.R.S., which would have had a signed copy without that stamp.

The documents also appear to show that the $900 million business loss which Mr. Trump claimed in 1995 was not being used to offset his tax liability by a decade later.

But there is plenty that remains unclear:

Mr. Trump's net worth cannot be gleaned from the new documents. And because the documents do not include any of the schedules, there is no way to determine the sources of his income — real estate, television contracts or other investments.

The documents also do little to shed light on the evolution of Mr. Trump's business empire.

Over the course of the campaign, Mr. Trump has made various statements about his income tax returns, how much he pays and his plans to make them public — or not to do so. Here are the highlights:

During the first presidential debate, when Hillary Clinton mentioned how Mr. Trump had paid no taxes more than two decades ago, he responded, "That makes me smart."

In the "spin room" after the debate, Mr. Trump said his statements during the exchange were not an acknowledgment that he pays no federal taxes. "Of course I pay federal taxes," he told reporters.

The primary reason Mr. Trump has offered for not making his tax returns public is that he says they are under a routine audit by the Internal Revenue Service. But the agency has said that there is no requirement for a taxpayer to keep the forms secret during an audit.

Mr. Trump's oldest son, Donald Trump Jr., told The Pittsburgh Tribune-Review that releasing the voluminous returns, which he said covered 12,000 pages, would "distract" from his father's message.

Last February, Mr. Trump tweeted a photo of himself signing his tax return.



**Donald J. Trump** ✔
@realDonaldTrump

Signing a recent tax return- isn't this ridiculous?

12:35 PM - Feb 25, 2016

♡ 16.4K  💬 8,775 people are talking about this

## What We Do Not Know

Without the ability to look over Mr. Trump's taxes, a number of questions are unanswerable:

• Real estate developers like Mr. Trump get particularly advantageous treatment under the tax code. They can claim, for example, sizable tax write-offs for business losses. How much has he taken advantage of these kinds of breaks, particularly in recent years, and what effect has that had on the amount of income tax he paid?

• How much money does Mr. Trump make, and what might that say about his net worth?

• What foreign business ventures are included in the filing and what does that say about where Mr. Trump has financial interests?

• What charitable contributions has Mr. Trump deducted, if any?

• Does Mr. Trump have any potential ties to Russia, which has become the subject of investigations by Congress and the F.B.I.?

---

ADVERTISEMENT



## [Donald Trump Tax Records Show He Could Have Avoided Taxes for Nearly Two Decades, The Times Found](#)

Oct. 6, 2018



## [Donald Trump's Taxes](#)

Oct. 6, 2018



## [Pages From Donald Trump's 1995 Income Tax Records](#)

May 10, 2018



## [How Donald Trump Turned the Tax Code Into a Giant Tax Shelter](#)

Dec. 21, 2017



## [Donald Trump's Letter](#)

May 10, 2018



## [Trump Casinos' Tax Debt Was $30 Million. Then Christie Took Office.](#)

Jan. 20, 2018



## [Donald Trump Tax Records Show He Could Have Avoided Taxes for Nearly Two Decades, The Times Found](#)

Oct. 6, 2018

Advertisement

## Site Information Navigation

- [© 2018 The New York Times Company](#)
- [Home](#)
- [Search](#)
- Accessibility concerns? Email us at [accessibility@nytimes.com](mailto:accessibility@nytimes.com). We would love to hear from you.
- [Contact Us](#)
- [Work With Us](#)
- [Advertise](#)
- [Your Ad Choices](#)
- [Privacy](#)
- [Terms of Service](#)
- [Terms of Sale](#)

## Site Information Navigation

- [Site Map](#)
- [Help](#)
- [Site Feedback](#)
- [Subscriptions](#)

[Go to the previous story](#)
[Go to the next story](#)

# EXHIBIT III



# The New York Times

📕 **ELECTION 2016**

Who Will Win?  |  Senate Forecast  |  Latest Polls  |  Get the Podcast  |  Primary Results

Apr. 4, 2016

May. 13, 2016

May. 12, 2016

May. 11, 2016

May. 10, 2016

May. 9, 2016

May. 6, 2016

May. 5, 2016

May. 4, 2016

May. 3, 2016

May. 2, 2016

Politics Newsletter: [ Sign Up ]

Follow Us 🐦

Political News, Now.

6:59 am ET

**By Maggie Haberman**

# Donald Trump Met Secretly With Interest Groups

6:59 am ET

**By Maggie Haberman**

Donald J. Trump's private meeting in Washington on Thursday featured nearly a dozen industry leaders, including a veteran lobbyist and the chief executive of a major airline trade organization, attendees confirmed.

Mr. Trump's meeting, like others he held that day, was at the hotel he is building in the gutted body of the Old Post Office, and was kept secret, with attendees invited by phone.

Nicholas E. Calio, a former lobbyist who worked on legislative affairs for President George Bush, was in attendance. Mr. Calio is now the president and chief executive of Airlines for America, a large trade group. There was also Juanita Duggan, the president and chief executive of the National Federation of Independent Business, another major trade group. She is a former aide who served in the first Bush and Reagan administrations, and she was once an official with the tobacco giant Philip Morris Companies.

An aide to Ms. Duggan confirmed her attendance, but said that she was respecting a request not to discuss what took place. Penny Kozakos, an aide to Mr. Calio, said in an email that "Mr. Calio regularly meets with leaders of industry, members of Congress, other elected officials, including those seeking office, about the airline industry and its importance to the economy and jobs."

Yet Mr. Trump routinely makes "special interests" and lobbyists a focus of derision in his stump speeches, making the meeting something of a surprise.

Hope Hicks, a spokeswoman for Mr. Trump, said that the candidate's adviser, Senator Jeff Sessions, had arranged a meeting with people for whom he has "great respect."

"Mr. Trump didn't know them, but it was a brief meeting that took place right after the lengthy foreign policy team meeting," Ms. Hicks said in an email.

In a town-hall-style forum hosted by Greta Van Susteren of Fox News on Sunday night, Mr. Trump was asked about a potential merger of airlines, asking what his antitrust division might look like as president.

"I'd look at it very carefully," Mr. Trump said. "I'd look at a lot of that. You know, and that might be not the Republican thing to say. But if we don't have competition and keep some competition, we're going to have a lot of problems in the country."

He added: "And I see mergers of different things. I won't say it because what do I need certain industries against me for? But the fact is that you've got to have competition to be great. And when you see these big fat mergers and the companies get bigger, they get bloated and they don't do well."

Find out what you need to know about the 2016 presidential race today, and get politics news updates via Facebook, Twitter and the First Draft newsletter.

10/28/2018     Donald Trump Met Secretly With Interest Groups - First Draft. Political News, Now. - The New York Times

Case 1:17-cv-08153-LAK Document 33-3 Filed 10/31/18 Page 69 of 165

Fri. Apr. 01 24 Posts Tue. Apr. 05 4 Posts

---

© 2017 The New York Times Company

# EXHIBIT JJJ

# TIME

# Donald Trump Heads for Coal Industry Fundraiser in West Virginia



Robert Murray, founder and chairman of Cleveland-based Murray Energy Corp, is viewed on a television monitor as he is interviewed.　　Douglas C. Pizac—AP

By **WILL DRABOLD** June 28, 2016

When President Obama ran for reelection, Robert E. Murray, an Ohio coal company owner, said Obama's policies were the "greatest enemy" coal country had ever faced. He organized fundraisers for Republican Mitt Romney, and turned out his workers to protest the Obama campaign in the crucial swing state, which Obama won anyway.

Four years later, Murray is still on a crusade, but this time it's the prospect of a Hillary Clinton presidency that has led him to battle. On Tuesday, he will host a fundraiser for Republican nominee Donald Trump, who dismissed global warming as a hoax promoted by the Chinese government to hurt the U.S.

economy. "What I've seen is what I call a political power grab of America's power grid," Murray told TIME Monday. "Reliable, low-cost energy in this country has been destroyed by Barack Obama. [Clinton] says she'll expand on those policies."

Executives like Murray, whose company produced six percent of the country's coal in 2014, play a key role in Trump's ability to prove he can compete with Clinton. More than 1,200 people have said they will attend an invitation-only dinner on Tuesday with Trump in Wheeling, West Virginia, Murray told TIME. He would not disclose the fundraiser's price of admission.

A recent study found the coal industry has lost about 50,000 jobs in the five years that include Obama's first term. Murray places much of the blame on the President's "war on coal." Among other regulations, Obama has increased restrictions on coal-fired power plants emissions. The administration has argued those policies are necessary to combat climate change along with improving air and water quality. Murray has sued — and won — multiple times to stop these rules from taking effect.

Trump will hold rallies Tuesday in Ohio and Pennsylvania coal country counties he won in the primary. He will use the backdrops of an industrial Pennsylvania coal town and rural branch campus of an Ohio public university to argue that he understands blue-collar workers. Trump handily won Ohio and Pennsylvania coal counties in the primary; his opponents had dropped out by the time West Virginia voted. Murray, 76, wants to make sure Trump wins those counties again in the general.

"Trump has said he understands the overregulation of coal and that we need to keep the coal industry alive in America," Murray said. No Republican has won the White House without winning Ohio since 1964.

Murray said Clinton would only continue what he calls Obama's "outlaw" policies. For her part, the Democratic nominee has said she will invest $30 billion in coal communities to retrain and educate energy workers who lost their jobs. Clinton has also been less direct about use of federal regulations to strangle coal power plants than Obama.

In 2012, Murray laid off employees after Obama was reelected, announcing the layoffs with a prayer. He later rehired some of them. This time around, Murray says his workers are even worse off. In the last year, he told TIME his company laid off three thousand employees as a result of Obama's policies and a declining demand for coal.

"I care about my employees," Murray said when asked why he is fighting Clinton's candidacy. "This is why we're going through all this to have this event for Mr. Trump." His employees, he continued, "just want to work in honor and dignity. This is not the America that I cherish, that Obama has created and that Mrs. Clinton wants to perpetuate."

# EXHIBIT KKK



Video
Live
Shows
Good Morning America Good Morning America
World News Tonight World News Tonight
Nightline Nightline
20/20 20/20
This Week This Week
The View The View
What Would You Do? What Would You Do?

Menu

LOG IN

U.S.
Politics
International
Entertainment
Lifestyle
Health
Virtual Reality
Technology
Sports
Weather
FiveThirtyEight
Privacy PolicyPrivacy Policy
Your CA Privacy RightsYour CA Privacy Rights
Children's Online Privacy PolicyChildren's Online Privacy Policy
Interest-Based AdsInterest-Based Ads
Terms of UseTerms of Use
Contact UsContact Us

Yahoo!-ABC News Network | © 2018 ABC News Internet Ventures. All rights reserved.

Search Headlines, News and Video...



WATCH

A record-breaking $107 million poured in for President Trump's inauguration celebration from corporate giants, business titans and a roster of NFL owners, raising new questions about the influence of money in politics.

On Tuesday, the 58th Presidential Inaugural Committee (PIC), an organization appointed by the President-elect to plan and coordinate all inauguration activities, filed a 510-page report with the Federal Election Committee (FEC) to disclose that they had raised a staggering $106.7 million in donations -- the most ever raised for a president's inauguration.

In a statement, the inaugural committee said Trump's inauguration "was one of the most accessible and affordable inaugurations for the public in recent history."

The release of the contribution records reveals that Trump's top inaugural donors included business leaders and corporations, including several from the financial, energy, and technology sector that have business dealings with the U.S. government.

"This is the complete opposite of what candidate Trump campaigned on, where he attacked these huge corporations, made clear they could buy politicians because he had done so, and is the political equivalent of overflowing the swamp not

draining it," said Fred Wertheimer, president of Democracy21, a nonprofit, nonpartisan organization that works on money in politics and government reform issues.

He added that the report shows that Trump appears to have raised "influence money," despite his campaign promises to avoid special interests.

The White House did not immediately return ABC News' request for comment

Businesses that donated at least $1 million included Boeing, Dow Chemical, Pfizer and Bank of America. Other financial companies like JPMorgan Chase and American Financial Group gave $500,000 each.

Energy companies also contributed heavily. Chevron Products, Exxon and Citgo each donated more than $500,000.

The owners of NFL teams the New England Patriots, the Jacksonville Jaguars, Los Angeles Rams, Houston Texans and the Washington Redskins all wrote $1 million checks for Trump's inauguration.

Trump's largest donor was gambling billionaire Sheldon Adelson, who gave $5 million.

The FEC requires reporting of individual donations, in money or items, with a value of $200 or more made to inaugural committees. However, where the money was spent and how it was used is still a mystery since the FEC does not require that information to be reported.

The big-money donations appear to counter Trump's own statements. In August of last year, Trump railed against big-money donors who seek to curry favor with elected politicians.

"Look, I know the people that want something. I've been doing this all my life. I've been a very big contributor to many, many people on all sides for many, many years," Trump stated on CBS's "Face the Nation." "I don't want lobbyists. I don't want special interests."

According to a brochure obtained by the Center For Public Integrity last year, those who donated more than $1 million received exclusive access to Cabinet appointees and House and Senate leadership; an invite to an "intimate dinner" with Vice President Mike Pence and Mrs. Pence and tickets to other exclusive events with appearances by the First Family.

Trump's inaugural committee raised nearly double the $53 million President Obama's inaugural committee raised in 2009.

"The amount of funds raised for the inaugural celebration allowed the President to give the American people, those both at home and visiting Washington, a chance to experience the incredible moment in our democracy where we witness the peaceful transition of power, a cornerstone of American democracy," said PIC Chairman Tom Barrack in a press release Tuesday.

On Wednesday during the White House press briefing, White House Press Secretary Sean Spicer called record-smashing donating "nonpartisan activity."

"I think a lot of Americans and companies and entities are proud to support the inaugural," he said. "And I think that you've seen that over time, the people who have been – there are a lot of people who really take pride in helping us show the world a peaceful transformation of power."

The committee said that any leftover money will be donated to charities to be decided upon and announced at a later date.

Wertheimer said the undisclosed amount of funds could be a "pot of secret money for President Trump to play with," if the total is taxed.

"There are no rules that apply to what can happen to this money," Wertheimer said. "There is nothing to prevent this secret money from being turned into personal use by someone as long as they pay income taxes on it."

## Sponsored Stories

Recommended by Outbrain |▷



**Connecticut Homeowners: Gov't May Pay Off Your Home If Bought Before 2017**
financedaily.org



**We Ranked This Year's Best Luxury Vehicles for Seniors! The Winners Are...**
Faqeo



**[Gallery] Most Ferocious Dog Breeds That Are Incredibly Dangerous**
Herald Weekly



**Mac user? Your team will love this tool**
monday.com



Comments

**ADD INTERESTS**

Customize your news feed by choosing the topics that interest you.

| Pittsburgh Synagogue Shooting | + Add Interest | The Note | + Add Interest |
|---|---|---|---|
| Oct 29 — Pittsburgh rabbi recounts shooting: Congregants 'were slaughtered in my sanctuary' | | Oct 29 — The Note: Trump bets on divisions in angry midterm climate | |
| Oct 29 — Gunman slaughters Pittsburgh synagogue worshippers | ▶ | Oct 26 — The Note: Obamacare central to midterm races | |
| Oct 29 — Rabbi says he will never forget the horror during deadly Pittsburgh synagogue attack | ▶ | Oct 25 — The Note: Near-tragedies crash through campaign fantasies | |
| Oct 29 — Hate speech on social media may have played a role in recent incidents | ▶ | Oct 24 — The Note: Ballot access becoming defining issue for 2018 elections | |

# Why Jewish hospital president checked on injured synagogue shooting suspect

By MATTHEW CLAIBORNE and EMILY SHAPIRO     Oct 29, 2018, 4:23 PM ET      Share   Tweet





WATCH | 8 men, 3 women killed in Pittsburgh synagogue shooting

Dr. Jeff Cohen, President of Allegheny General Hospital, lives down the street from Pittsburgh's Tree of Life synagogue, and heard the gunshots and chaos that unfolded when a gunman carried out an anti-Semitic mass shooting inside the house of worship Saturday.

After suspect Robert Bowers was injured in an exchange of gunfire with police, the man accused of gunning down 11 worshippers was taken to Cohen's hospital for treatment.

(MORE: Portraits of the 11 synagogue shooting victims )

Cohen, who is Jewish, went to see Bowers in his hospital room, hours after the suspect allegedly shouted to SWAT officers that he wanted "all Jews to die."



From left, Kate Rothstein looks on as Tammy Hepps hugs Simone Rothstein, after multiple people were shot at The Tree of Life ... more +

Interest groups donated to Trump's record-breaking inauguration fund - ABC News

"I stopped to see him, I just asked him how he was doing. Was he in pain, and he said no, he was fine," Cohen told ABC News. "He asked me who I was. I said 'I'm Dr. Cohen, I'm the president of the hospital.' I turned around and left."

**(MORE: Pittsburgh synagogue rabbi says massacre that killed 11 not just against Jews but 'an attack on America')**

"The FBI agent that was guarding [Bowers] said, 'I don't know if I could have done that.' I said, 'I'm sure if you were in my shoes, I'm sure you could of,'" Cohen recalled.

"I thought it was important to at least talk to him and meet him," Cohen explained. "You can't on one hand say we should talk to each other, and then I don't talk to him. So you lead by example and I'm the leader of the hospital and I have a powerful voice in the community."



Andrew Caballero-Reynolds/AFP/Getty Images

Members and supporters of the Jewish community come together in front of the White House for a candlelight vigil, in rememb... **more +**

**(MORE: Pittsburgh synagogue shooting: What we know about alleged mass shooter Robert Bowers)**

"Where did I get the strength? I don't know. I think some of it comes from the actions of the people around me," Cohen said. "It comes from my mother-in-law, who [is a member of the Tree of Life synagogue and] sat with [the victims who were killed] every day. It came from being part of a community. It came from taking care of people for a long period of time."



Brendan Smialowski /AFP/Getty Images

People stand in front of flowers and candles placed below a police cordon outside the Tree of Life Synagogue after a fatal shoo... **more +**

**(MORE: Pittsburgh synagogue shooting prompts wide outpouring of public support)**

"I'm trying to make some sense of this," he said.

Cohen wasn't alone in his actions.

A Jewish nurse and Jewish doctor cared for Bowers at Allegheny General Hospital, he said.

"We have a very simple mission at [Allegheny General Hospital] and I imagine it's exactly the same at the other hospitals in the area: we're here to take care sick people. We're not here to judge you," Cohen said. "We're not here to ask do you have insurance or do you not have insurance. We're here to take care of people that need our help."



Comments

# EXHIBIT LLL

# The Guardian



# Oil and gas industry has pumped millions into Republican campaigns

**Fossil fuel barons have invested more than $100m in Republican presidential Super Pacs – raising concerns over special interests if GOP takes White House**

**Suzanne Goldenberg** *and* **Helena Bengtsson**

Thu 3 Mar 2016 07.00 EST

Fossil fuel millionaires collectively pumped more than $100m into Republican presidential contenders' efforts last year – in an unprecedented investment by the oil and gas industry in the party's future.

About one in three dollars donated to Republican hopefuls from mega-rich individuals came from people who owe their fortunes to fossil fuels – and who stand to lose the most in the fight against climate change.

The scale of investment by fossil fuel interests in presidential Super Pacs reached about $107m last year – before any votes were cast in the Republican primary season.

Campaign groups said the funds raised questions about what kind of leverage the fossil fuel industry might enjoy if the Republicans were to take the White House.

Ted Cruz, the Texas senator seen as having the best chance of stopping Donald Trump from clinching the Republican nomination, was among the biggest beneficiaries of fossil fuel support to his Super Pac.

Cruz, who more than any other Republican candidate openly rejects mainstream science on climate change, banked some 57% of the funds to his Super Pac, or about $25m, from fossil fuel interests, according to campaign filings compiled by Greenpeace and reviewed by the Guardian.

The Texas senator, who picked up three states on Super Tuesday compared to seven for Trump, told NPR in December that climate change was a fiction concocted by liberals who want control over the economy. "The scientific evidence doesn't support global warming," he claimed at the time.

Greenpeace, which helped compile the filings with the Guardian, said Cruz's rejection of climate science was a factor of his heavy reliance on fossil fuel funding.

"Ted Cruz's complete denial of climate change science is perfectly in line with the business interests of his biggest funders," said Jesse Coleman, a Greenpeace oil and gas campaigner. "These fossil funders have made denying climate change and ignoring scientists a prerequisite for being a Republican candidate."

The Cruz campaign disavowed any knowledge of the Super Pac, but a spokeswoman reasserted the rejection of mainstream science about climate change. "Regarding climate change, Cruz's position is very simple. The data does not back up the theory," the spokeswoman said in an email, describing the global challenge as a "politically driven cause that grows government and enriches entrenched Washington special interests".

Coleman suggested that Republicans were unlikely to give up climate denial even if Cruz does not win the nomination.

"While Donald Trump, also a climate change denier, is mostly self-funded for now, he will look to the fossil fuel industry for political support if he wins the nomination. Mr. Trump also has millions of dollars directly invested in the fossil fuel industry."

Other fossil fuel favourites have already fallen by the wayside, with the winnowing of the crowded Republican field that began the race for the White House in 2015.

Chris Christie, who never made it beyond New Hampshire, had strong fossil fuel support, with oil and gas interests accounting for 39% of the funds to his Super Pac.

The establishment candidate Jeb Bush, who dropped out of the race after his failure to rise out of single digits in the polls, obtained about 26% of the funds for his Super Pac from the oil and gas industry.

As for Marco Rubio, who picked up his first state on Super Tuesday, fossil fuel interests accounted for about 23% of the Florida senator's Super Pac.

The donations - $107m through the course of 2015 - came from 124 billionaires or businesses that pumped a minimum of $100,000 each towards Republican presidential hopefuls through support groups or Super Pacs.

Super Pacs, which operate outside the official campaigns, are free to take unlimited campaign contributions.

The $107m from mega-rich donors forms a major chunk of the $524m that was given to presidential contenders from both parties last year.

Campaign groups say the big spending by fossil fuel interests – and some candidates' heavy reliance on them – raises questions about the leverage fossil fuel companies may try to exert over the White House if the next occupant is a Republican.

The fossil fuel super-donors all have connections to oil and gas operations – from fracking to petrochemicals.

Fossil fuel donors traditionally have favoured Republican candidates many times over their Democratic counterparts.

However, Hillary Clinton, the Democratic frontrunner, appears to have made inroads into the ranks of the favoured. Mega-rich fossil fuel donors pumped about 7% of the funds into Clinton's Super Pac last year, according to the filings. Clinton was criticised by Bernie Sanders and Martin O'Malley, her erstwhile rival, for taking funds from fossil fuel lobbyists.

The findings revealed the largely unseen power players behind the Republicans' presidential hopefuls – led by the Wilks family in Texas.

The family, which made its fortune from making equipment used in fracking oil and gas wells, gave about $15m to a Cruz-supporting Super Pac in 2015.

Next in line among the big fossil donors to Cruz was Toby Neugebauer, the son of Texas Republican congressman Randy Neugebauer and cofounder of an energy investment firm which has invested heavily in the Barnett Shale – ground zero of oil and gas fracking in Texas. The younger Neugebauer donated about $10m to Cruz's Super Pac last year.

Cruz also won big from groups associated with the Kochs, the oil billionaires who have emerged as major funders of ultra-conservative causes in the US. Cruz's Super Pac took in $11.9m from donors who have supported Koch causes or its Freedom Partners organisation – compared to $7.8m for Rubio.

Even among Republican presidential contenders – who have given short shrift to climate change aside from using it as a punchline – Cruz has stood out for his rejection of the scientific mainstream on climate change.

The Texas Republican has repeatedly insisted – contrary to the overwhelming scientific consensus – that there is no evidence of global warming.

# Since you're here…

… we have a small favour to ask. More people are reading The Guardian's independent, investigative journalism than ever but advertising revenues across the media are falling fast. And unlike many news organisations, we haven't put up a paywall – we want to keep our reporting as open as we can. So you can see why we need to ask for your help.

The Guardian is editorially independent, meaning we set our own agenda. Our journalism is free from commercial bias and not influenced by billionaire owners, politicians or shareholders. No one edits our editor. No one steers our opinion. This is important because it enables us to give a voice to the voiceless, challenge the powerful and hold them to account. It's what makes us different to so many others in the media, at a time when factual, honest reporting is critical.

Our journalism is increasingly funded by our readers – thank you for your support. Less than three years ago we had 200,000 supporters; today we have been supported by over 900,000 individuals from around the world. Hundreds of millions read The Guardian's independent journalism every year but less than 1% of them help fund it. Our long term future will only be secure if we're able to keep growing this relationship.

If everyone who reads our reporting, who likes it, helps to support it, our future would be much more secure. **For as little as $1, you can support the Guardian – and it only takes a minute. Thank you.**

Support The Guardian

   

Topics
- US elections 2016
- Fossil fuels
- Energy
- US politics
- Super Pacs
- Oil and gas companies
- news

# EXHIBIT MMM



*A Pulitzer Prize-winning, non-profit, non-partisan news organization dedicated to covering climate change, energy and the environment.*

# Fossil Fuel Industries Pumped Millions Into Trump's Inauguration, Filing Shows

Among the big donors were Chevron, Exxon, BP and Citgo Petroleum, which each gave a half million dollars.

BY MARIANNE LAVELLE        Follow @mlavelles

APR 19, 2017



Fossil fuel companies did not contribute heavily to Donald Trump's election campaign, but they made up for it with large contributions to his inaugural committee. Credit: Scott Olson/Getty Images

Fossil fuel companies were not big donors to **Donald Trump**'s presidential campaign, but they helped him shatter records in raising money for his inauguration festivities, according to **new disclosures** filed at the Federal Election Commission.

More than 1,500 corporations and individuals gave a total $107 million to the presidential inaugural committee. That is more than double the $53 million raised for

President Barack Obama's then record-breaking inaugural in 2009.

Among the big donors were Chevron, which gave $525,000; Exxon, BP and Citgo Petroleum, which each donated $500,000; and the Ohio-based coal company Murray Energy, which contributed $300,000. Kelcy Warren, the chief executive of Energy Transfer Partners, developer of the **Dakota Access pipeline**, gave $250,000. Continental Resources, the Oklahoma-based fracking company whose chief executive Harold Hamm was an early Trump supporter, gave $100,000.

Those seven donations alone surpass the $2 million that the Trump campaign raised from the energy and natural resources industry before the election, according to the tally by the Center for Responsive Politics. (In contrast, Republican Mitt Romney raised $13 million from the sector in his 2012 presidential bid.)

The Trump team's inauguration fundraising blitz raises red flags for those concerned about the influence of money in politics. "It's very clear the reason a corporation would seek to make a contribution to an inauguration is that they are making a business investment," said Tyson Slocum, head of the energy program at Washington watchdog Public Citizen. "And they are expecting a financial return on their investment in the form of access, or when they are pushing for specific legislative and regulatory priorities."

The Trump inaugural committee **offered top donors perks** such as access to cabinet appointees at "leadership luncheons" and other events.

The fossil fuel industry certatinly wasn't the only sector contributing to the inauguration festivities. The committee recorded big donations from Las Vegas casino magnate Sheldon Adelson ($5 million), Microsoft ($500,000), American Financial Group ($500,000) and the health insurer Anthem ($100,000), among many others.

But less than 100 days into his presidency, it already is clear that the Trump administration has allied itself with fossil fuel interests—embarking on a systematic effort to roll back restrictions on oil, gas and coal development and cut programs on climate change. Trump ended an environmental review of the Dakota Access pipeline, clearing the way for construction, four days after he took office.

In addition to fossil fuel companies, some of the larger donors to the Trump inauguration were private equity titans who have major investments in oil, gas and coal. Contributing $1 million each to the inauguration were: Henry Kravis, co-chairman and CEO of **KKR**, a major energy company investor, and Paul Singer of Elliott Management, whose firm has stakes in Marathon Petroleum, Hess Oil and BHP Billiton. Private equity firms poured **$20 billion into investments in U.S. shale oil and gas production** in the first quarter of this year, indicating they are betting on big growth for the sector, despite low oil and gas prices, according to financial data firm Preqin.

Unlike campaign fundraising, there are few rules governing fundraising for inaugural activities. President George W. Bush capped gifts at $100,000 in 2001 and $250,000 in

Case 1:17-cv-08053-LAK Document 33-3 Filed 10/31/18 Page 89 of 165

2005. Obama put a donation limit of $50,000 in place for 2009 and did not take donations from corporations that year. But he raised the limit to $250,000 for individuals and up to $1 million for corporations in 2013. Trump did not put such limits in place.

Obama also recorded his share of donations from the fossil fuel industry for his 2013 inauguration, including $1 million from Chevron; $250,000 from Exxon; $100,000 from Southern Company, a major utility; and $85,000 from the electricity trade group, the Edison Electric Institute.

While campaign spending must be disclosed and accounted for, FEC rules do not require that inauguration committees disclose how they spend the money they raise. The inauguration committee told The New York Times that it was still identifying charities to receive money left over from the festivities.

Slocum said that regulations governing giving and disclosure around inaugurations are "woefully inadequate," given the opportunity it provides to exert influence. "It's not like giving to a campaign, where you're betting on a horse race," he said. "Your horse has already won. You have a 100 percent chance that your money is going to the winner."

Other energy companies that gave at least $100,000 to the Trump inauguration include Xcel Energy, one of the nation's largest utilities; White Stallion Energy of Houston, an oil and gas company; Consol Energy, a coal and natural gas company; and Cheniere Energy, a natural gas exporter.

The inaugural committee also garnered donations from the renewable energy industry, including $1 million from the Nebraska ethanol firm Green Plains Renewable Energy and $250,000 from NextEra Energy of Florida, the parent company of Florida Power & Light, which has mostly natural gas and nuclear power plants, but also a large amount of wind and solar generation.

PUBLISHED UNDER:
NATURAL GAS AND FRACKING
DONALD TRUMP,   DAKOTA ACCESS PIPELINE

## ABOUT THE AUTHOR



# Marianne Lavelle

Marianne Lavelle is a reporter for InsideClimate News. She has covered environment, science, law, and business in Washington, D.C. for more than two decades. She has won the Polk Award, the Investigative Editors and Reporters Award, and numerous other honors. Lavelle spent four years as online energy news editor and writer at National Geographic. She also has worked at U.S. News and World Report magazine and The National Law Journal. While there, she led the award-winning 1992 investigation, "Unequal Protection,"

on the disparity in environmental law enforcement against polluters in minority and white communities.

She can be reached at marianne.lavelle@insideclimatenews.org. PGP key: bit.ly/PGPML15

# EXHIBIT NNN



*Center for American Progress*

ENERGY AND ENVIRONMENT

# Are Industry Interests Behind President Trump's Attack on National Monuments?

By Mary Ellen Kustin | Posted on May 8, 2017, 8:59 am



AP/Carolyn Kaster

President Donald Trump holds up the signed executive order on the Antiquities Act during a ceremony at the Interior Department on April 26, 2017.

On April 26, President Donald Trump launched an attack on national parks, public lands, and waters. His executive order called on U.S. Secretary of the Interior Ryan Zinke to "review" the 54 national monuments that presidents have designated or expanded since 1996. The order gives

Are industry interests behind President Trump's attack on national monuments? - Center for American Progress

wide discretion to the secretary to recommend actions that the president or Congress should take to alter or rescind the protections for these natural, historical, and cultural treasures.

While the order is written in such a way that all recent national monuments—including the Stonewall, César E. Chávez, Belmont-Paul Women's Equality, and Pacific Remote Islands Marine national monuments—are subject to the 120-day review, Secretary Zinke publicly called out two monuments: The "bookends" of his review will be the Grand Staircase-Escalante and Bears Ears national monuments, both located in Utah. These two monuments later made the list of monuments Secretary Zinke is initially reviewing.

It has been widely reported that the Utah congressional delegation was the driving force behind President Trump's executive order. Sen. Orrin Hatch (R-UT) and Rep. Rob Bishop (R-UT) have been particularly outspoken in their opposition to the Antiquities Act writ large and to Utah's national monuments specifically. Indeed, both were at the signing ceremony for the executive order; Utah Gov. Gary Herbert (R) and Sen. Mike Lee (R-UT) were also in attendance. President Trump gave Sen. Hatch the pen he used to sign the order after recognizing Hatch as "tough" for repeatedly calling Trump to say "you got to do this."

The national monument review will be a legal, moral, and political minefield. President Trump's embrace of the Utah delegation and its pet cause is especially interesting given that most of the delegation's members were vocal in their opposition to him during the presidential primary. For a president known to keep a list of those who speak ill of him, it is a curious alliance. The Center for American Progress' analysis suggests that a closer look at the oil, gas, and coal underneath Utah's national monuments—and the fossil fuel industry's influence on Trump and the Utah delegation —might help explain this newly formed partnership.

## The Trump administration and the Utah delegation's history of disagreement

President Trump struggled to find support in Utah during his campaign, with the majority of the state's voters supporting someone else in both the Republican caucuses and the general election. Rep. Bishop reluctantly voted for Trump, saying, "Unless he resigns, I must support the Republican nominee as my only option." Sen. Hatch eventually supported Trump, but only after endorsing two other Republican candidates first. And Utah's junior senator, Mike Lee, another critic of the Bears Ears National Monument, told constituents that Trump "scares [him] to death." Similarly, Utah Rep. Chris Stewart (R) said last year that "Donald trump does not represent republican ideals, he is our Mussolini."

In addition, the Trump administration's early policy statements on land management differ from those of the Utah delegation. During the campaign, Trump indicated in an interview with *Field & Stream* magazine that his administration would be "great stewards" of public lands and that he did not "like the idea" of transferring federal lands to the states. His pick of Secretary Zinke, who resigned his delegate post at the Republican National Convention over the party's platform on this issue, underscored that commitment. By contrast, Rep. Bishop, Rep. Jason Chaffetz (R-UT), and Sen. Lee (R-UT) have all introduced legislation that would make it easier to sell off public lands.

It is noteworthy, then, that President Trump is pushing an executive order that is a thinly veiled land seizure. He even parroted a land seizure activist talking point—embraced by Rep. Bishop and other proponents of diminishing federal land management—just before signing the order, saying he would "give that power back to the states and to the people, where it belongs." Curious, perhaps, until one remembers that this rhetoric traces its roots to industry-backed front groups with vested interests in selling off public lands for private gain.

# Extractive industries threaten national monuments in Utah

Both President Trump and members of the Utah delegation, particularly Rep. Bishop, have benefited from oil, gas, and coal industry contributions. Trump's presidential campaign received more than $1.1 million from the fossil fuel industry. And coal, oil, and gas interests contributed $1 out of every $10 raised—a total of at least $10 million—for Trump's inaugural celebrations. These events were not subject to the same campaign finance restrictions as donations made during the election.

Rep. Bishop, meanwhile, received the highest percentage of out-of-state campaign contributions of anyone in the House, and the oil and gas industries—including the American Petroleum Institute, a trade association that represents hundreds of oil and gas companies—contributed more to his campaigns than any other industry. Although Bishop has repeatedly claimed that his issues with the Grand Staircase-Escalante and Bears Ears national monuments have nothing to do with the fossil fuel interests located below them, both monuments appear to be in the sights of this heavily invested industry.

The American Petroleum Institute was quick to send a letter to House Natural Resources Committee Chairman Bishop and his counterpart in the Senate shortly after the 115th Congress convened, imploring them to "re-examine the role and purpose of the Antiquities Act." The organization argued that the law threatens the extraction of fossil fuels from public lands and waters. In addition, the oil and gas industry group Western Energy Alliance, or WEA, has indicated interest in drilling in Bears Ears. WEA President Kathleen Sgamma has said about the monument,

"There certainly is industry appetite for development there, or else companies wouldn't have leases in the area." And geologists have known for years that the Grand Staircase-Escalante area has coal, oil, and mineral deposits.

The following maps reveal why special interests would want access to mine and drill within the boundaries of both Grand Staircase-Escalante and Bears Ears national monuments. A new analysis by CAP and Conservation Science Partners, or CSP, finds that Grand Staircase-Escalante scored in the 72nd percentile for oil and gas and the 37th percentile for mineral resources among similarly sized Western landscapes. The boundary of Grand Staircase-Escalante also encompasses the extensive coal beds found in the Kaiparowits Plateau. As CAP and CSP previously reported, when compared with similarly sized landscapes in the West, Bears Ears scored above the 50th percentile for both mineral resources and oil and gas. Without protection, Grand Staircase-Escalante and Bears Ears would be at great risk of destructive mining and oil and gas development.

FIGURE 1

## Oil, gas, coal, and mineral development threats in Grand Staircase-Escalante National Monument



Grand Staircase-Escalante National Monument

Coal fields

Mineral, oil, or gas resource potential

Low            High

Notes: State lands within the Grand Staircase-Escalante National Monument are not shown on the map, but they were excluded from the analysis. Grand Staircase-Escalante is in the 72nd percentile for risks from oil and gas development and the 37th percentile for mineral resources across similarly sized areas in 11 Western states. The boundary of Grand Staircase-Escalante also encompasses the extensive coal beds found in the Kaiparowits Plateau.

Source: Brett G. Dickson, Meredith McClure, and Christine M. Albano, "A landscape-level assessment of conservation values and potential threats in the Grand Staircase-Escalante National Monument" (Truckee, CA: Conservation Science Partners, forthcoming 2017).



FIGURE 2

## Oil, gas, and mineral development threats in Bears Ears National Monument

Bears Ears is in the 69th percentile for risks to mineral development and 54th percentile
for oil and gas development across similarly sized areas in 11 Western states





Note: State lands within the Bears Ears National Monument are not shown on the map, but they were excluded from the analysis.
Source: Brett G. Dickson, Meredith McClure, and Christine M. Albano, "A landscape-level assessment of conservation values and potential threats
in the Bears Ears National Monument" (Truckee, CA: Conservation Science Partners, 2017).

These national monuments are also two of the wildest and most ecologically valuable places in
the West. The new analysis indicates that Grand Staircase-Escalante is in the top 4 percent for
ecological intactness and the top 6 percent for connectivity, which are essential to biodiversity and
landscape-level conservation. As CAP and CSP previously showed, Bears Ears is in the top 10
percent of similarly sized places in the West for these two important factors.

Even though national monuments are public lands that, by definition, belong to the people,
President Trump said he was signing the executive order to "return control to the people—the
people of Utah, the people of all the states, the people of the United States." However, it appears
the people he has in mind may be those with close industry ties.

Case 1:17-cv-08153-LAK   Document 33-3   Filed 10/31/18   Page 98 of 165

# Methodology

To determine the ecological importance of Bears Ears National Monument and Grand Staircase-Escalante National Monument, CAP and CSP mapped and summarized 10 landscape-level indicators of resilience to climate change; ecological connectivity; and intactness, biodiversity, and remoteness. Publicly available spatial data and published methods of analysis were used to create indicator maps across 11 Western states to compare Bears Ears National Monument and Grand Staircase-Escalante National Monument with equivalently sized areas throughout the West. The same was done with each of seven national parks. A mixture of iconic Western national parks known for their ecological importance and Utah national parks were selected for comparison. CAP and CSP also assessed Bears Ears for two threat indicators: mineral resource potential and oil and gas resource potential. No coal resources were found within Bears Ears National Monument. Similarly, CAP and CSP assessed Grand Staircase-Escalante for three threat indicators: mineral resource potential, oil and gas resource potential, and coal resource potential.

CAP and CSP determined the values of each of the indicators relative to the larger landscape using a simple scoring system based on percentile ranks. Specifically, the mean value of each indicator within Bears Ears National Monument and Grand Staircase-Escalante National Monument was compared with the distribution of means of a large random sample of 1,000 areas across the 11 Western states, including all jurisdictions. The size of the random samples was equivalent to the size of the monument. CAP and CSP did the same for the seven national parks. Scores on indicators ranged from 0 to 100. For example, a score of 98 for a given indicator signified that the mean value of that indicator in the monument was greater than or equal to 98 percent of the equivalently sized random samples. Scores of 50 or higher suggested a relatively important indicator.

A more detailed description of methods and data can be found here.

*Mary Ellen Kustin is the Director of Policy for Public Lands at the Center for American Progress.*

*The author would like to thank Jenny Rowland, Kate Kelly, Meghan Miller, and Chester Hawkins for their contributions to this column.*



© 2018 - Center for American Progress

Case 1:17-cv-08153-LAK Document 33-3 Filed 10/31/18 Page 99 of 165

# EXHIBIT OOO

# POLITICO

POLITICO uses cookies to personalize and improve your reader experience. By pursuing your navigation on our website you agree to our use of cookies as described in our cookie policy.    ✕



Farage is scheduled to visit Washington, D.C., on July 19 | Dan Kitwood/Getty Images

## Farage angling for a meeting with Trump

Any meeting with the former UKIP leader would be seen as another blow to May.

By **ANNIE KARNI** | 7/13/18, 2:56 PM CET

ELLESBOROUGH, England — President Donald Trump may not be finished embarrassing British Prime Minister Theresa May — even after stating Friday that their relationship was "very, very strong" despite his comments undermining her Brexit strategy.

Nigel Farage, the right-wing British politician and Brexit mastermind, is scheduled to visit Washington, D.C., on July 19, two people familiar with his travel plans said, and is working to set up a meeting with Trump while he is there.

"As someone with unique insight into Brexit, the transatlantic relationship, and what's going on with the panicked EU member states, Nigel will be on hand for the president whenever Mr. Trump sees fit to talk," said a Farage associate who has been back-channeling with the White House about a potential meeting. Those plans, a second source cautioned, were still up in the air.

But any meeting with Farage would be seen as another blow to May, delivered personally by Trump — especially after local newspapers here reported that Farage had been "banned" from meeting with Trump during his two days in England.

Coming on the heels of a visit where British officials tried to impress Trump with visits to castles and even a tea with the Queen, any tete-a-tete would be seen as more U.S. intervention into a fragile political situation here – and a tacit backing to one of May's biggest detractors.

 "I think the deal that she is striking is not what the people voted on" — *Donald Trump in an interview with the Sun*

Trump already threw one wrench into the local political drama here on Thursday, by unloading his thoughts about Brexit, the nickname for the 2016 referendum forcing its withdrawal from the EU, in an interview with The Sun. In the Rupert Murdoch-owned tabloid newspaper, which is generally pro-Trump, the president undercut May hours after landing in England for a working meeting on trade issues. He expressed support for her conservative political rival, Boris Johnson, and raised doubts about his own willingness to negotiate a trade deal.

"I think the deal that she is striking is not what the people voted on," Trump told The Sun of May's approach to the Brexit negotiations, while also noting that Johnson, who resigned his post as foreign secretary last week to protest May's Brexit strategy, would make for an excellent prime minister.


**ALSO ON POLITICO**
**Bannon hosts Europopulists in London ahead of Trump's visit**
ANNIE KARNI

**ALSO ON POLITICO**
**Nigel Farage's last laugh**



**CHARLIE COOPER**

The interview was received as a diplomatic bombshell the day before Trump's bilateral meeting with May — the most politically damaging move the president could make to another world leader who has gone out of her way to play nice with him. But in Chequers on Friday, the odd couple smiled gamely for the cameras and claimed that their working relationship was going just great.

Trump said that a black-tie dinner at Blenheim Palace on Thursday night was the best time he's had with May since he took office. "We talked for an hour, an hour-and-a-half," he said. "Today, we're talking trade, we're talking military, we just moved some incredible anti-terrorism things."



Farage has spent quality time with Trump during his past visits to Washington | Drew Angerer/Getty Images

Trump allies, however, are conspiring behind the scenes.

Over the past two days, Farage has also been spending quality time with former White House chief strategist Steve Bannon, who has set up shop in London to confer with the leaders of Europe's surging populist movement. Bannon met with Farage again on Friday morning, just as Trump headed out for his meeting with May, according to a source familiar with the meeting.

Farage has also spent quality time with Trump during his past visits to Washington: In February of 2017, he joined the president for dinner at the Trump Hotel, along with Ivanka Trump and Jared Kushner. During other visits to Washington, he has been spotted at the Trump Hotel with aides like Stephen Miller.

During the presidential transition, Trump tweeted that Farage would make for a great U.K. ambassador.

White House press secretary Sarah Huckabee Sanders did not immediately respond to a request for comment about any potential meeting next week.

Later in the day on Friday, Trump is scheduled to sit down to tea with Queen Elizabeth II at Windsor Castle. That meeting is expected to impress the Anglophile in Trump more than his meeting with May, who insiders in Trumpworld said he considers "weak."

"I think he will be more respectful of the Queen than any other world leader," said television host Piers Morgan, a longtime friend of Trump's and a former contestant on The Apprentice. "I'm sure when he walks in there, it's going to be a humbling moment."

# EXHIBIT PPP

☐

**[U.S. news](#)**

**Trump Lawyer Confirms Meeting Ukrainian, Denies Carrying Peace Plan**







Michael Cohen, President Donald Trump's personal lawyer, arrives at Trump Tower in New York in December.Bryan R. Smith / AFP - Getty Images

## Breaking News Emails

Get breaking news alerts and special reports. The news and stories that matter, delivered weekday mornings.

SUBSCRIBE

Feb. 20, 2017 / 5:18 PM EST / Updated Feb. 20, 2017 / 6:31 PM EST

By Ken Dilanian

President Donald Trump's personal lawyer has acknowledged to NBC News that he met privately in New York last month with a controversial Russian-born Trump associate and a member of Ukraine's parliament, but disputes a New York Times report that the men gave him a peace plan for Ukraine that he delivered to then-National Security Adviser Mike Flynn.

The episode is drawing scrutiny because of the intense interest in any dealings by Trump associates having to do with Russia or Russia-related issues.



### Trump lawyer on final night of RNC

July 21, 201606:20



The Times reported that the meeting was called to discuss a peace plan being pushed by a Ukrainian lawmaker, Andrey Artemenko, who is associated with a former Ukrainian leader backed by Russian president Vladimir Putin and advised by Paul Manafort, Trump's former campaign chairman.

Manafort is the subject of an FBI inquiry over his Ukraine dealings, and the FBI is also investigating whether any Trump associates colluded with the Russian campaign to interfere in the U.S. presidential election.

In an interview with NBC News Monday, Michael Cohen confirmed that Felix Sater, a former Trump associate with a criminal past, asked him to come to a meeting in New York last month, and brought along Artemenko.

"I acknowledge that the brief meeting took place, but emphatically deny discussing this topic or delivering any documents to the White House and/or General Flynn," Cohen said. "I didn't see Gen. Flynn while I was at the White House, and I didn't spend two seconds talking about this, not even one second."

The Times told NBC News that it stood by its story, saying Cohen told the newspaper he did take a sealed envelope to Flynn's office.

The Times said the peace plan was designed to lead to the lifting of international sanctions against Moscow over its seizure of Crimea, a Ukrainian territory.

Cohen is a long-time lawyer for both Trump and his business organization. Sater worked on real estate projects with Trump's company.

"I've known Felix for years," Cohen said. "I received a phone call: 'Hey Mike, you have a few minutes? Can I meet you for coffee? You mind if I bring a friend?' Little did I know it would be a guy who wants to run for president of Ukraine."

**Recommended**



**[What to do if you win the lottery](#)**



**["They're almost all gone": Oyster farmers in the Florida Panhandle count their losses after Hurricane Michael](#)**

Cohen said he had no financial interest in the meeting and was not paid to attend.

Cohen said Artemenko claims to possess evidence of corruption by the current Ukrainian leader, Petro Poroshenko. The Times quoted Artemenko as saying he had received encouragement for his plans from top aides to Mr. Putin.

Sater, who served time in prison for stabbing a man in the face with broken glass during a Manhattan bar fight, later pleaded guilty to stock manipulation and began cooperating with the FBI and the CIA, according to news reports citing court documents.

Cohen added that even if he had taken an envelope with a Ukrainian peace plan to the White House, "So what? What's wrong with that?"

The FBI and the U.S. intelligence community have been seeking to corroborate or disprove allegations in an unverified dossier compiled by a former British intelligence agent that makes a series of claims about Trump and his associates. Among them is that Cohen met with a Russian representative in Prague during the presidential campaign to discuss Russia's hacking of the Democrats.

In the interview Monday with NBC News, Cohen said he was in Los Angeles when the meeting was supposed to have occurred, taking his son to a meeting with the baseball coach at the University of Southern California.

Trump's critics, he said, "are looking to malign President Trump, diminish his historic win and to undermine his presidency by claiming he didn't win — that it was given to him by the Russians," he said.

## SPONSORED STORIES

by Taboola

**7 Reasons Why You're Missing Out on Top Talent**
Randstad USA

**Desktop Users Love This New Grammar App**
Grammarly



# EXHIBIT QQQ

# POLITICO



WASHINGTON AND THE WORLD

## All of Trump's Russia Ties, in 7 Charts

By **MICHAEL CROWLEY** | March/April 2017

---

WHAT IS THE REAL STORY OF DONALD TRUMP AND RUSSIA? The answer is still unclear, and

To give you the best possible experience, this site uses cookies. If you
continue browsing, you accept our use of cookies. You can review our privacy          **Accept**          ✕
policy to find out more about the cookies we use.



These charts illustrate dozens of those links, including meetings between Russian officials and members of Trump's campaign and administration; his daughter's ties to Putin's friends; Trump's 2013 visit to Moscow for the Miss Universe pageant; and his short-lived mixed martial arts venture with one of Putin's favorite athletes. The solid lines mark established facts, while dotted ones represent speculative or unproven connections.

There's nothing inherently damning about most of the ties illustrated below. But they do reveal the vast and mysteriously complex web behind a story that has vexed Trump's young presidency from its start—and is certain to shake the White House for months to come.

————————

# 1. Trump and Putin, via Administration Officials

————————

# 2. Trump and Putin, via Michael Flynn

ADVERTISING



To give you the best possible experience, this site uses cookies. If you continue browsing, you accept our use of cookies. You can review our privacy policy to find out more about the cookies we use.    **Accept**    ✕

# 3. Trump and Putin, via Campaign Advisers

———————

# 4. Trump and Putin, via Paul Manafort

———————

# 5. Trump and Putin, via Business Ties

———————

# 6. Trump and Putin, via Felix Sater

———————

# 7. Trump and Putin, via Trump Family Members

ADVERTISING

To give you the best possible experience, this site uses cookies. If you continue browsing, you accept our use of cookies. You can review our privacy policy to find out more about the cookies we use.

Accept ✕

To give you the best possible experience, this site uses cookies. If you continue browsing, you accept our use of cookies. You can review our privacy policy to find out more about the cookies we use.

Accept ✕

# EXHIBIT RRR

# The New York Times

# Who Is Behind Trump's Links to Arab Princes? A Billionaire Friend

**By David D. Kirkpatrick**

June 13, 2018

The billionaire financier Tom Barrack was caught in a bind.

In April 2016, his close friend Donald J. Trump was about to clinch the Republican presidential nomination. But Mr. Trump's outspoken hostility to Muslims — epitomized by his call for a ban on Muslim immigrants — was offending the Persian Gulf princes Mr. Barrack had depended on for decades as investors and buyers.

"Confusion about your friend Donald Trump is VERY high," Ambassador Yousef al-Otaiba of the United Arab Emirates emailed back when Mr. Barrack tried to introduce the candidate, in a message not previously reported. Mr. Trump's image, the ambassador warned, "has many people extremely worried."

Not deterred, Mr. Barrack, a longtime friend who had done business with the ambassador, assured him that Mr. Trump understood the Persian Gulf perspective. "He also has joint ventures in the U.A.E.!" Mr. Barrack wrote in an email on April 26.

The emails were the beginning of Mr. Trump's improbable transformation from a candidate who campaigned against Muslims to a president celebrated in the royal courts of Riyadh and Abu Dhabi as perhaps the best friend in the White House that their rulers have ever had. It is a shift that testifies not only to Mr. Trump's special flexibility, but also to Mr. Barrack's unique place in the Trump world, at once a fellow tycoon and a flattering courtier, a confidant and a power broker.

During the Trump campaign, Mr. Barrack was a top fund-raiser and trusted gatekeeper who opened communications with the Emiratis and Saudis, recommended that the candidate bring on Paul Manafort as campaign manager — and then tried to arrange a secret meeting between Mr. Manafort and the crown prince of Saudi Arabia. Mr. Barrack was later named chairman of Mr. Trump's inaugural committee.

But Mr. Manafort has since been indicted by the special prosecutor investigating Russian meddling in the presidential election. The same inquiry is examining whether the Emiratis and Saudis helped sway the election in Mr. Trump's favor — potentially in coordination with the Russians, according to people familiar with the matter. Investigators have also asked witnesses about specific contributions and expenses related to the inauguration, according to people familiar with those interviews.



Mr. Trump in Riyadh, Saudi Arabia, in 2017, for an Arab summit meeting. "It all started with you and JK and I," Mr. Barrack wrote in a congratulatory email to the Emirati ambassador about the meeting; the initials refer to Jared Kushner.
Stephen Crowley/The New York Times

A spokesman for Mr. Barrack said he has been advised he is not a target of the special prosecutor. Investigators interviewed him in December but asked questions almost exclusively about Mr. Manafort and his associate Rick Gates, said a person familiar with the questioning.

Mr. Barrack has steered clear of any formal role in the administration; he has said he rebuffed offers to become treasury secretary or ambassador to Mexico. (He sought a role as a special envoy for Middle East economic development, but the idea never gained traction in the White House.)

Instead, he has continued making money, as he has for decades, working with the same Persian Gulf contacts he introduced two years ago to Mr. Trump. Mr. Barrack's company, known as Colony NorthStar since a merger last year, has raised more than $7 billion in investments since Mr. Trump won the nomination, and 24 percent of that money has come from the Persian Gulf — all from either the U.A.E. or Saudi Arabia, according to an executive familiar with the figures. Colony NorthStar has not disclosed the investors in its funds.

Mr. Barrack's email correspondence with Ambassador Otaiba, which has not previously been reported, was provided to The New York Times by an anonymous group critical of Emirati foreign policy, and it illustrates the formative role Mr. Barrack played as a matchmaker between Mr. Trump and the Persian Gulf princes.

Mr. Barrack's representatives did not dispute the authenticity of the emails. His spokesman said in a statement that Mr. Barrack "sees his business in the Middle East as a way to help political dialogue and understanding, not the other way around, and he does so through relationships that span as far back as the reign of even some of the grandfathers of the current regional rulers."

But having the ear of the president, say other executives and former diplomats who work in the gulf, has only enhanced Mr. Barrack's stature in the region.

"He is the only person I know who the president speaks to as a peer," said Roger Stone, a veteran Republican operative who has known both men for decades. "Barrack is to Trump as Bebe Rebozo was to Nixon, which is the best friend," Mr. Stone added, referring to the wealthy real-estate developer who is best remembered for his closeness to President Richard Nixon during his impeachment process.

Mr. Barrack's closeness to Mr. Trump extends to the president's family. By 2010, he had acquired $70 million of the debt owed by Mr. Trump's son-in-law, Jared Kushner, on his troubled $1.8 billion purchase of a skyscraper at 666 Fifth Avenue in New York. After a call from Mr. Trump, Mr. Barrack was among a group of lenders who agreed to reduce Mr. Kushner's obligations to keep him out of bankruptcy.

A month after his first outreach to Ambassador Otaiba, Mr. Barrack wrote again on May 26 to introduce Mr. Kushner, who was preparing for a role as a presidential envoy to the Middle East.

"You will love him and he agrees with our agenda!" Mr. Barrack promised in another email.

Mr. Trump and Mr. Barrack, the chairman of his inaugural committee, during the
president's inauguration concert at the Lincoln Memorial.  Kris Connor/REX, via Shutterstock

# A Billionaire Buddy

Thomas J. Barrack Jr. and Donald J. Trump first met in the 1980s, and Mr. Barrack got the
better of the encounters. He negotiated Mr. Trump into overpaying for two famous assets: a
one-fifth stake in the New York department store chain Alexander's in 1985, and the entire
Plaza Hotel in 1988. Mr. Trump paid about $410 million for the Plaza and later lost both
properties to creditors.

But Mr. Barrack nonetheless parlayed the deals into a lasting friendship, in part by flattering
Mr. Trump about his skill as a negotiator.

"He played me like a Steinway piano," Mr. Barrack recounted in a speech at the Republican
convention.

At 71, Mr. Barrack is the same age as President Trump and shares his fondness for expensive
trophies. He owns a 700-acre winery and polo ranch in the Santa Ynez Valley in California, sold
a seven-bedroom mansion in Santa Monica last year for $38 million, and snapped up an Aspen
ski resort for a reported $18 million just in time for the start of the season.

Yet people who know him well say he still tells new acquaintances that he is truly honored to
meet them, cheerfully doling out superlatives like "first-class," "amazing" and "brilliant." He
invariably tells the story of his own success as a parable about luck and perseverance, never
about talent.

He grew up speaking Arabic as the son of Lebanese immigrants to Los Angeles; his mother
worked as a secretary and his father ran a grocery store in Culver City. By 1972 he had earned
a law degree from the University of Southern California and he interviewed for a job with
Nixon's personal lawyer, Herbert Kalmbach. As Mr. Barrack tells the story, he returned
moments later to drop off a book about football that they had discussed, and his gesture won
him a job over candidates with more prestigious degrees.

Dispatched to Saudi Arabia because of his Arabic skills, Mr. Barrack was enlisted as a squash
partner for "a local Saudi," he often says, and the Saudi turned out to be a son of the king and
his first big break in business.

Mr. Barrack, left, playing polo in the Hamptons in 2017. He owns a 700-acre winery and polo ranch in the Santa Ynez Valley in California.  Rebecca Smeyne for The New York Times

In the decades to come, Mr. Barrack cultivated relationships across the region, once befriending an elderly Bedouin on a bus who turned out to be an executive of Aramco, the Saudi oil giant. Mr. Barrack invited his new Bedouin friend to stay with him in Newport Beach, Calif., while seeking a medical treatment, and the favor landed Mr. Barrack an assignment to help Aramco buy 375 Blue Bird school buses, the biggest deal in his life at the time.

His friends describe him as a concierge to the Persian Gulf royals, helping them buy American or European homes, looking after their children on visits to the West and vacationing with them at his home in the south of France. After his private equity firm bought a resort built by the Aga Khan on 35 miles of the Sardinian coast, Mr. Barrack, a Catholic, opened a halal restaurant to welcome gulf royals who came by in their yachts.

As a young lawyer, Mr. Barrack once negotiated drilling rights with Ambassador Otaiba's father, who was then the Emirati oil minister. The emails show that Ambassador Otaiba later worked with Mr. Barrack to help seal a 2009 deal in which his private equity firm sold the L'Ermitage Raffles hotel in Beverly Hills to a joint venture half owned by an Abu Dhabi investment fund for $41 million. Three years later, Ambassador Otaiba invested $1 million in a fund that Mr. Barrack had set up to buy homes on the cheap after the real estate crash, according to the emails.

When Ambassador Otaiba worried about Mr. Trump's proposed Muslim ban — "even someone as nonjudgmental as I am, had a problem with that statement" — Mr. Barrack wrote back that Mr. Trump was "the king of hyperbole."

"We can turn him to prudence," Mr. Barrack wrote in an email. "He needs a few really smart Arab minds to whom he can confer — u r at the top of that list!"

Jared Kushner, right, during Mr. Trump's meeting with Saudi Crown Prince Mohammed bin Salman in the Oval Office in March.  Doug Mills/The New York Times

# A Shift In Policy

Mr. Barrack's efforts began to pay off. Mr. Kushner met Ambassador Otaiba in May 2016. Soon after, Mr. Barrack and Ambassador Otaiba began working to arrange a secret meeting between Mr. Manafort, who became Mr. Trump's campaign manager that June, and Deputy Crown Prince Mohammed bin Salman of Saudi Arabia, the dominant adviser to his father, King Salman.

Mr. Barrack had befriended Mr. Manafort in the 1970s, when they were both living in Beirut and working for Saudi interests. Early in 2016, when Mr. Trump faced the prospect of a contested nomination fight at the Republican convention, Mr. Barrack had recommended Mr. Manafort for the job of campaign manager. "The most experienced and lethal of managers" and "a killer," Mr. Barrack called him in a letter to Mr. Trump.

Prince Mohammed was widely seen as an ambitious protégé of the Emirati rulers, and in an email to the Emirati ambassador, Mr. Barrack presented a Manafort meeting as a prelude to a meeting with Mr. Trump.

"I would like to align in Donald's mind the connection between the U.A.E. and Saudi Arabia which we have already started with Jared," Mr. Barrack wrote to Ambassador Otaiba on June 21, 2016. "I think it is important that you be the center pin!!"

Mr. Barrack had competition. The Saudi prince had tried to reach the Trump campaign through "a midlevel person" at the rival private equity giant Blackstone, Mr. Barrack wrote in a follow-up email. "Obviously I would like the meeting to be arranged by you and me rather than Blackstone," Mr. Barrack told the ambassador.

Yousef al-Otaiba, the Emirati ambassador to the United States, with the House speaker, Paul Ryan, center, in Abu Dhabi in January.  Jon Gambrell/Associated Press

Mr. Barrack also pitched Mr. Manafort on the value of the Emirati connection.

"Paul is totally programmed on the closeness and alignment of the U.A.E." and agreed to meet Prince Mohammed "because he is a friend of your boss and the U.A.E.," Mr. Barrack wrote.

The emails show that the meeting was scheduled for June 24, and that Mr. Manafort sought to meet at the prince's hotel to avoid the news media. But a spokesman for Mr. Barrack said that Mr. Manafort had canceled at the last minute for scheduling reasons.

Regardless, Mr. Barrack's advocacy apparently proved effective. The day after the meeting was scheduled, Mr. Barrack forwarded to the ambassador a message from Mr. Manafort with a "clarification" that modulated Mr. Trump's call for a Muslim ban.

A few weeks later, on July 13, Mr. Barrack informed Ambassador Otaiba that the Trump team had also removed a proposed Republican platform provision inserted to "embarrass" Saudi Arabia. The provision had called for the release of redacted pages about the kingdom in a report on the terrorist attacks of Sept. 11, 2001.

When Mr. Trump won in November, Ambassador Otaiba was eager to pull Mr. Barrack even closer. "We have a lot of things that we will have to do together. Together being the operative word," he wrote in a note congratulating Mr. Barrack on Mr. Trump's upset victory.

"Let's do them together," Mr. Barrack responded.

Later, Mr. Barrack attended a dinner party at Ambassador Otaiba's home with other Arab ambassadors and former American officials (the chef was from the world-renowned Inn at Little Washington). Mr. Barrack offered to make introductions in the new administration. "Tell me who is high on your hit list."

"Thanks to you, I'm in consistent contact with Jared and that has been extremely helpful, for both sides I think," Ambassador Otaiba wrote Mr. Barrack.

They celebrated again in May 2017, when Mr. Trump made his first foreign trip as president, to Riyadh in Saudi Arabia for an Arab summit meeting.

"It all started with you and JK and I so congratulations on a great beginning," Mr. Barrack wrote to Ambassador Otaiba, referring to Mr. Kushner by his initials.

Paul Manafort, center, who became chairman of the Trump campaign after a recommendation from Mr. Barrack, has pleaded not guilty to charges of financial fraud and lying to federal investigators.   Al Drago for The New York Times

# Things Go Sour — But Not For Barrack

Two weeks after the Riyadh meeting, Mr. Trump began to align himself firmly with the Saudis and Emiratis against their rivals around the region. When those two states imposed an embargo on their neighbor Qatar — home to a major United States air base — Mr. Trump broke with his own administration to throw his weight squarely behind the Saudis and Emiratis.

He quickly congratulated Prince Mohammed when he assumed the title of crown prince — and commended him again when he summarily detained about 200 businessmen and rivals in a consolidation of his power. This spring, Mr. Trump handed the Saudis and Emiratis an even greater victory by pulling out of the nuclear deal with their nemesis, Iran. In turn, the gulf monarchs have made only pro forma protests against Mr. Trump's recognition of Jerusalem as the capital of Israel.

Yet many of the connections facilitated by Mr. Barrack have brought liabilities, too.

The linkages between Mr. Trump and the Saudis and Emiratis have come under new scrutiny. A few months after Mr. Barrack arranged the initial introductions, George Nader, a Lebanese American businessman and a top adviser to the de facto ruler of the U.A.E., met with the candidate's son Donald Trump Jr. at the Trump headquarters in New York. In that Aug. 3, 2016, meeting, Mr. Nader reported that the rulers of both Saudi Arabia and the United Arab Emirates supported the Trump campaign and offered their assistance, according to people familiar with the discussion.

Such help would have violated campaign laws, and Mr. Nader is now cooperating with the special prosecutor, who is examining that meeting as well as a string of others that followed, according to people familiar the matter.

Mr. Manafort has pleaded not guilty to charges of financial fraud and lying to federal investigators in connection with his work for Russian-backed interests in Ukraine. Mr. Gates, whom Mr. Barrack hired to help run the inauguration and then as a Washington consultant, has pleaded guilty to making false statements to investigators and agreed to cooperate with the special prosecutor.

Mr. Kushner has also given testimony to the special prosecutor.

But Mr. Barrack's business is still going strong, in part as a result of his continuing relations with the Saudis and Emiratis. When his company was looking for partners in its $400 million purchase last year of a landmark Los Angeles office tower, One California Plaza, it sold a $70 million stake to an Israeli insurance company. Another $70 million stake went to a state investment company controlled by the crown prince of Abu Dhabi, in the United Arab Emirates, according to a person familiar with the deal.

What is more, Mr. Barrack may profit more directly than ordinary shareholders or executives from the investments he helps bring in, because in some cases, according to Colony NorthStar filings, he earns the extra fees known as carried interest on profits from funds he raised — as if he were a partner in a private equity firm rather than merely a chairman of a publicly traded company.

Friends of Mr. Barrack argue that his long history of business in the Persian Gulf shows that the investments are unrelated to any White House connections.

Yet one thing has shifted.

Until recently, Mr. Barrack's most prominent gulf customers were neither the Emiratis nor the Saudis — but their bitter rivals the Qataris, who bought the film studio Miramax and a Paris soccer team from him, among other marquee properties. During the campaign, Mr. Barrack reached out to the Qataris as well, helping set up a meeting between Mr. Trump and the emir of Qatar in Trump Tower in September 2016.

"Tom wanted Qatar to know he arranged it," said a person involved in meeting, "and he wanted Trump to know he arranged it."

But Mr. Trump's stance on the dispute with Qatar appears to have cast a shadow over Mr. Barrack's business there: None of the gulf investments that Mr. Barrack's company has brought in since Mr. Trump's nomination have come from Qatar.

"We still consider Tom a friend and partner," said a senior Qatari official, speaking on the condition of anonymity to avoid angering the White House. "But with all the recent things that have happened we have suspicions about the level of his involvement in this crisis."

Ben Protess, Maggie Haberman and Mark Mazzetti contributed reporting from Washington.

A version of this article appears in print on June 14, 2018, on Page A1 of the New York edition with the headline: Arab Princes Embrace Trump, Set Up by Tycoon Matchmaker

READ 167 COMMENTS

# EXHIBIT SSS

*Miami Herald*



This screenshot from Yuri Vanetik's Facebook page shows him flashing the thumbs-up sign with Kentucky Republican Sen. Rand Paul.

POLITICS

# Master of selfies with GOP pols, Soviet emigre has a confounding past

**BY KEVIN G. HALL**
*khall@mcclatchydc.com*

February 01, 2018 05:00 AM
Updated February 01, 2018 11:58 AM

WASHINGTON — When Soviet emigre Yuri Vanetik was appointed finance co-chair of New York state's Republican party last February, it took a few people by surprise. The Southern California-based fundraiser, who had hauled in funds for the past two GOP presidential campaigns, didn't seem to have deep connections to the Empire State.

But state party officials hailed him in a news release as a "tremendous asset."

What they didn't know then was that Vanetik had misrepresented his academic bona fides, been involved in several civil suits —including one in which he and his father were hit with a combined $4.75 million judgment for defrauding investors — and would soon be lobbying Congress on behalf of a controversial Ukrainian politician.

"We were not aware of any issues and had no reason to suspect any given his connections and prior activity with other Republican entities," said Jessica Proud, spokeswoman for the New York Republican State Committee.

**No tricks, all treats! Save 70% on digital access!**
Treat yourself to unlimited digital access for only $3.99 per month

SUBSCRIBE TODAY

These connections are prolific, if one's to draw anything from his social media postings, in which the diminutive Vanetik is pictured, Zelig-like, alongside almost every major Republican figure over the past 15 years.

There he was giving the thumbs up with House Majority Leader Kevin McCarthy of California, posing alongside Speaker Paul Ryan of Wisconsin or standing next to the highest-ranking lawmaker in the Senate, Mitch McConnell of Kentucky. His Instagram account pictures Vanetik with Energy Secretary Rick Perry, as well as former President George W. Bush – Bush's father, too, in fact, and brother Jeb, the former Florida governor who was the establishment favorite to win the Republican presidential nomination in 2016.

The list goes on and on.

Vanetik also has a profile on the Russian social-media site VK. Among the few photos on the public-facing portion is one with former Vice President Dick Cheney.



This screenshot from his VK profile, a Russian social media site similar to Facebook, shows Yuri Vanetik posing with former Vice President Dick Cheney.

Though Vanetik's activities might have raised red flags for politicians seeking to limit their social media exposure with self-promoters, they don't appear to have done so.

Federal campaign finance records show Vanetik served as a bundler for Arizona Sen. John McCain's presidential bid and raised money for Mitt Romney's run for president.

Vanetik has given almost $11,000 from 2013 to 2016 to McCarthy, and he was on the national board of Gen Next, whose Gen Equity PAC gave almost $16,000 to the McCarthy Victory Fund, a PAC, in the 2016 election cycle, about a third of its total giving in that period.

McCarthy and Vanetik intersect once again via controversial Ukrainian lawmaker Serhey Rybalka, who posted a photo last year of himself standing with the majority leader. Weeks later, Vanetik would belatedly register as a foreign agent representing Rybalka.

McCarthy spokesman Matt Sparks declined comment for this story.

Vanetik and his family did not respond to numerous attempts to reach him, including through one of his attorneys. There is no evidence that Vanetik is under investigation for election issues, or that he factors into the ongoing probes of possible collusion between Russia and Trump campaign officials.

But Vanetik has operated in the same sphere as some figures in the Trump-Russia saga, including Paul Manafort. And Vanetik's quite close to Rep. Dana Rohrabacher, a California Republican sometimes derided by opponents as "Putin's congressman."

"My daughters were the flower girls at his wedding. I consider him a friend, and he certainly has supported me politically, he donates to my campaign," Rohrabacher said of Vanetik in an interview with McClatchy.



Dana Rohrabacher
@RepRohrabacher

Representatives Rohrabacher, Young, Polis, and Blumenauer Launch Congressional Cannabis Caucus dlvr.it/NPgSJl

3:41 PM - Feb 17, 2017

Representatives Rohrabacher, Young, Polis,…

rohrabacher.house.gov

14    18 people are talking about this

Politico reported last July that Vanetik and a bodyguard joined Rohrabacher and other U.S. lawmakers on trip to Germany and Holland.

Then there's the fact that during the Republican convention in Cleveland in 2016, Vanetik's name appeared on an invitation to a private reception with former New York Mayor Rudy Giuliani, a high-profile surrogate for candidate Donald Trump. Vanetik is listed as one of 14 members of a leadership committee for the Great America PAC, the largest pro-Trump PAC in the last election, which reported it raised more than $30 million.

The circumstances of that connection are muddy. "He was never on the board of directors," said Dan Backer, general counsel for Great America. "As far as I know, I don't think he's ever done anything with the organization."

Backer said the Californian was hit up for a donation and accidentally was placed on the list of bigwigs. But Politico's reporters in May 2016 had interviewed Vanetik and described him as having signed on to the Great America PAC's board.



(Great America hit a rough patch in 2016 when British journalists posing as representatives of a Chinese businessman got a former PAC representative to pledge he'd route an illegal $2 million foreign donation to the PAC through a nonprofit that didn't have to disclose its donors; Vanetik was not linked to the activity.)

A McClatchy investigation shows that some of the credentials Vanetik claims on his personal website, where he touts philanthropy and his love of fine wines, don't stand up to scrutiny.

For one, Vanetik boasts that he was "class valedictorian" when he graduated from the University of California, Berkeley, in 1991. He also claims to have "graduated from the Anderson Business School at UCLA where he studied management."

However, a list provided by Berkeley of winners of its University Medal for the last 146 years (Berkeley's equivalent of a valedictorian) doesn't include Vanetik's name for 1991 or any other year.

At UCLA, officials said there are no enrollment records for Vanetik and that he did not get an MBA degree there. He did attend an executive program in 1991, which gave a certificate to participants taking one class per week over a period of months.

Vanetik's claim to have earned a law degree in 1998 from the University of California's Hastings School of Law was confirmed by the school, but officials there said they could not confirm or deny whether he graduated with top honors. School records show he was appointed to the board of trustees of the UC Hastings Foundation in summer 2016; his apparently embellished biography is included in foundation documents. UC Hastings had no immediate comment.

A few details about Vanetik have emerged in news reports over the past 18 months, including some recent deeper dives on the website Medium. But Vanetik's apparent misrepresentations and the extent of criminal behavior of some of his business associates haven't previously been reported.

Vanetik's official biography also skips over the legal troubles his businesses and several associates have faced over the past 15 years.

He has said he emigrated from Soviet Ukraine in 1976. Online biographies of his father, Anatoly "Tony" Vanetik, boast of his father's role as a "renowned international businessman" who helped put in place Vladimir Putin's law allowing charitable lotteries in 2000. Earlier, said one bio, Tony was appointed to head talks on behalf of U.S. engineering firms negotiating with Russia for the destruction of Soviet-era biological, chemical and nuclear weapons. McClatchy could find no publicly available diplomatic documents supporting this claim.

Although Vanetik and his father have set up numerous companies, at least on paper, over the years, NRG Resources Inc. is most frequently cited in court documents and litigation.

According to corporate documents, NRG Resources had at least two board members. One was Serge Lipatov, now a former executive in Russia's state rail agency. Lipatov was arrested last November in Russia on bank embezzlement charges, according to media reports there.

The other was Lee Samango, a California businesswoman who was surprised to learn she remains connected in records to the company; she told McClatchy she resigned 12 years ago.

She said she was excited when Vanetik, through a friend of a friend, asked her to sit on a company board, but soon learned the company wasn't what she thought. "I was only put on the board to show credibility, and there was never one meeting, at least one that I knew of," Samango said, adding she hasn't had contact with the Vanetiks for years.

She might be grateful for the distance, given that NRG and another Vanetik company have been the subject of multiple lawsuits.

The most striking is a 2008 civil suit brought in California by Kazakh investors claiming to have been cheated out of their stake in a second company, Turan Petroleum Inc. The investors, who allege that Yuri Vanetik set up the company, though on paper it was controlled by his father, said that a fellow Kazakh investor died under suspicious circumstances and directly accused the elder Vanetik and his partner Naum Voloshin of ordering two hits on another investor, Yerkin Bektayev.

Bektayev was stabbed in Kazakhstan outside his office in July 2007, according to the suit, then warned the next time he'd be killed by gunfire. He was shot five times on Oct. 31, 2008, but survived to allege Tony Vanetik was behind both attempts.

The civil suit also alleged Yuri Vanetik sold shares of the company as an unregistered underwriter. It dragged on through 2012 under appeal, never appearing to have been resolved on the underlying allegations. Vanetik never faced regulatory or criminal charges himself, but Voloshin was later barred by the securities industry's self-regulator, FINRA, from associating with any registered securites dealer.

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

Separately, the California Department of Corporations issued a desist and refrain order in April 2009 that barred NRG Resources, Turan Petroleum and individuals affiliated with the companies from selling securities in the Golden State.

Among the reasons the agency cited was their failure to tell investors that Tony Vanetik had been convicted of a felony for filing false tax returns and that they collectively "failed to disclose that new investors' funds would be used to pay prior investors."

In Michigan, Vanetik associate Hiep Trinh pleaded guilty in 2013 to racketeering and theft for selling phony stock there and in California. Michigan Attorney General Bill Schuette said Trinh sold securities for Vanetik-controlled companies NRG, which said it made a biodegradable oil additive, and Turan, a purported oilfield investment in Kazakhstan.

The scam, said Schuette, involved promising investors that these companies would soon offer shares to the broader public and their initial investment would soar. "The company never went public and was actually marketing product purchased from another supplier re-packaging it in NRG bottles," Schuette said in a Nov. 4, 2013, news release.

By the time of that guilty plea – though not before Trinh's criminal activity occurred – Turan had ousted the Vanetiks, in May 2008. The company's new management soon filed suit against them and Trinh, alleging embezzlement. That suit was terminated a year later.

Vanetik is also tied through legal woes to Richard O. Weed. The two men were listed on 2011 Florida incorporation documents as officers for Cold River, Inc., and Fairhaven Industries International, LLC. It is unclear if those companies exist as brick-and-mortar businesses or are shells designed to hold assets like stock and other securities.

A securities lawyer, Weed was indicted in 2013 and convicted in May 2016 on fraud charges involving companies unrelated to the Vanetiks; federal prosecutors outlined a complex pump-and-dump scheme where stock was sold to investors at artificially inflated prices.

Vanetik wasn't involved in that case, but he and his father are connected to Weed in other litigation. The three were sued in a civil case in 2013 that alleged another of their companies, Terra Resources PLC, defrauded investors. The Vanetiks were eventually hit with a combined $4.75 million judgment, and the judgment against Weed and his law firm was more than $2 million. Public records show Yuri Vanetik has yet to satisfy the 2016 judgment lein against him.

In rejecting a request on June 15, 2016, for a new trial, the court opined that the Vanetiks and Weed were "artful puppeteers" who scammed investors on the promise of Russian oil riches.

"Not a spoonful of dirt was turned in any Russian oil field," the opinion said. "As near as the court can recall, there was no testimony that either of these defendants ever even visited the oil fields with any of the plaintiff's money in their pockets."

## Ukrainian Intrigue

Among the dozens of political photographs Vanetik posted on social media last year was one that showed him flashing a thumbs-up sign at a table next to Paul Manafort; both were involved in lobbying for Ukrainian politicians.

The February photo came eight months before charges were brought by Special Counsel Robert Mueller against the one-time Trump campaign chief for alleged financial and lobbying misdeeds, including failing to register as a foreign agent.

About three weeks before Manafort was charged, Vanetik registered on Oct. 7 with the Justice Department as a foreign agent. Like Manafort's, Vanetik's filing came well after his lobbying began.

To print the document, click the "Original Document" link to open the original PDF. At this time it is not possible to print the document with annotations.

In December 2016 Vanetik had quietly opened an office in the Ukrainian capital of Kiev to provide legal advice and political consulting. The announcement came on the website of a Ukrainian non-government organization and featured a photo of Vanetik next to President George W. Bush, and includes a video in English of Vanetik heralding his new office.

When Vanetik eventually registered as a foreign agent, he identified himself as vice president of a company called Medowood Management, LLC, which lists its "corporate office" as being in Cheyenne, Wyoming. McClatchy's Panama Papers reporting in 2016 found that state was favored by overseas Russians using secretive limited liability companies to camouflage their assets. Medowood's founding predates Vanetik's registration as a lobbyist and its original purposes are unknown.

Medowood's filing indicated it had made payments totaling $25,000 to subcontractor Potomac International Partners, a Washington lobby run by Mark Cowan, a member of the Trump transition team and former CIA officer. Potomac's own FARA filing notes the lobbying was on foreign policy issues and issues of concern to Ukraine's Agrarian Party. Cowan declined further comment.

The registration documents for Vanetik show he also lobbied on behalf of Serhey Rybalka, a wealthy Ukrainian businessman with farm and snack-food interests who now heads the banking committee in his country's legislature.

Rybalka is affiliated not with the Agrarian Party but with the ultra-nationalist Radical Party, whose leader Oleg Lyashko claimed last year on his Facebook page that his 10-year U.S. visa had been revoked shortly after it had been issued.



This screenshot from Ukrainian lawmaker Serhey Rybalka's Facebook page shows him in the office of California Rep. Kevin McCarthy, the House majority leader.

Rybalka flaunts his wealth in ways common to many who have struck it rich in the post-Soviet economy. A story and photographs of Rybalka frolicking with six women on a luxury yacht off the Mediterranean coast in Saint-Tropez appeared on the online news site Strana last August, causing a stir at home. (One reason for the media attention to Rybalka was his high-profile divorce from the daughter of Ukrainian retail mogul Gennady Butkevich; the custody battle in the courts became tabloid fodder in 2016.)

Media reports in Ukraine allege Rybalka's snack-food company has been exporting to Crimea against international bans following Russia's seizure of the peninsula in 2014. That same year, Ukrainian media reported an assassination attempt on Rybalka.

None of this, however, seems to have caught the attention of the people with whom Vanetik posed for countless photos, or who turned to him to raise money for political campaigns.

But at least one doesn't see any issues with Vanetik's past. "I don't know a businessman who hasn't had those kind of problems so I can't fence myself off from anybody and allegations of business upheavals like that," said Rep. Rohrabacher, adding that "allegations are always made by people's enemies who want to make it sound as bad as they can."

Vanetik's background came as an unpleasant surprise to the New York state GOP when McClatchy shared its findings, though.

"It's a volunteer position in which cursory vetting is conducted, but clearly he did not reveal this information otherwise we would have rejected his offer to help," said Proud.

Vanetik is no longer affiliated with the state party, she said.

*-- Reporters Ben Wieder, Greg Gordon and Peter Stone contributed to this report.*

*Kevin G. Hall: 202-383-6038, @KevinGHall*

💬 COMMENTS ⌄



**SPONSORED CONTENT**

## Need cash? How to access your home's equity

**By LendingTree** — Consolidate debt, finance your home renovation, or even help pay for college. Compare offers now.

## TAKE US WITH YOU

Real-time updates and all local stories you want right in the palm of your hand.

 MIAMI HERALD APP →

 VIEW NEWSLETTERS →

  

### SUBSCRIPTIONS

Start a Subscription

Customer Service

eEdition

Vacation Hold

Pay Your Bill

Rewards

### LEARN MORE

About Us

Contact Us

Newsletters

News in Education

Public Insight Network

Reader Panel

### ADVERTISING

Place a Classified

Media Kit

Commercial Printing

Public Notices

Shopping

COPYRIGHT    COMMENTING POLICY    PRIVACY POLICY    TERMS OF SERVICE

# EXHIBIT WWW

# Newsweek

SIGN IN    SUBSCRIBE ☰



**U.S.**

## THESE RUSSIAN OLIGARCHS ON THE U.S. TREASURY LIST HAVE TIES TO TRUMP AND HIS CAMPAIGN

BY **CRISTINA MAZA** ON 1/30/18 AT 11:46 AM

SHARE     

**U.S.**    RUSSIA SANCTIONS    TRUMP CAMPAIGN

Just before midnight Monday, the Treasury Department released an unclassified list of Russian oligarchs, influential politicians and business professionals who are close to Russian President Vladimir Putin and could be the target of future sanctions.

The new list has more than 200 individuals, including all senior members of the po... every Russian oligarch with a net worth of $1 billion or more.

**Related: Trump campaign aide Carter Page may have been a Russian agent**

# Newsweek

SIGN IN    SUBSCRIBE

minister Dmitry Medvedev.



President Donald Trump chats with Russia's President Vladimir Putin as they attend the APEC Economic Leaders' Meeting last November.
GETTY IMAGES

Also included on the list are lesser-known advisers to Putin, such as German Klimenko, the director and owner of internet company LiveInternet. Klimenko is considered one of Putin's top advisers on all things digital.

Yevgeny Kaspersky, a Russian cybersecurity expert and CEO of the IT company Kaspersky Lab, is also on the list. In September, the U.S. banned government agencies from using Kaspersky products due to concerns about Russian espionage. The company is now pursuing legal challenges against the ban.

But also included on the list are a handful of Russian oligarchs with ties to Donald Trump campaign associates, Trump's family and Trump himself.

The heads of two Russian state gas and oil companies, Alexey Miller at Gazprom and Igor Sechin at Rosneft, are both on the list. The controversial Russia dossier compiled by former British intelligence officer Christopher Steele alleges that former Trump foreign policy adviser Carter Page met with Sechin during a trip to Russia during the 2016 presidential campaign. Page later admitted to meeting with Rosneft representatives during the trip.

Roman Abramovich, a Russian billionaire and owner of the Chelsea Football Club, is also among the oligarchs on the Treasury Department's list. Abramovich is known to be a close friend of Trump's daughter Ivanka and her husband, Jared Kushner. In 2014, the Kushners spent four days in Russia after Abramovich's wife, Dasha Zhukova, invited them.

Billionaire Oleg Deripaska is also on the list. An aluminum magnate, he has sued for Manafort and his business partner Rick Gates for over $25 million in damages for a company.

Manafort allegedly offered to provide Deripaska with personal briefings about the 2 have business ties going back decades, despite the fact that Deripaska was repeate

Case 1:17-cv-08153-AK Document 33-3 Filed 10/31/18 Page 140 of 165



# Newsweek

SIGN IN    SUBSCRIBE



Oleg Deripaska, a Russian billionaire who is suing former Trump campaign chairman Paul Manafort, speaks with the media.
GETTY IMAGES

Another figure on the oligarch list is Dmitry Rybolovlev, the president of the Monaco football club, who paid Trump $95 million for a beachfront mansion in Florida in 2008. The price was more than double what Trump paid for the house four years earlier, and Rybolovlev had never visited the property before he bought it.

In 2016, during Trump's campaign for president, journalists investigated why Rybolovlev's and Trump's aircraft landed in the same cities within an hour of each other on three separate occasions. Trump claims that he never met Rybolovlev.

# Newsweek

SIGN IN    SUBSCRIBE ☰



From left, **Dmitry Rybolovlev**, president of soccer club AS Monaco, and Vadim Vasilyev, vice president, look on during a French L1 match.
GETTY IMAGES

The people on the list will not immediately face asset freezes, visa bans or other penalties, though some of the individuals on it are already subject to sanctions. But the Treasury report serves as a warning to individuals that they could be subject to sanctions in the future. Experts say that being named on the list could deter foreign companies from doing business with a person because future sanctions could disrupt business deals.

Most of the report released Monday is unclassified, but it has a classified annex.

Russia warned that the release of the list could "jeopardize relations" and have "very, very serious consequences." Russian spokesman Peskov even said the list was an attempt by the U.S. to interfere in Russia's upcoming presidential election.

The U.S. Treasury and the State Department are mandated by the Countering America's Adversaries Through Sanctions Act of 2017, which passed in Congress last July, to complete the list. The CAATSA also ordered the Trump administration to sanction companies and individuals within Russia's defense and intelligence sectors. The sanctions are meant to punish Russia for its interference in the 2016 presidential election, the annexation of Crimea from Ukraine, interference in eastern Ukraine and ongoing human rights violations.

Early Monday, Trump declined to impose sanctions on companies and foreign countries doing business with Russian defense and intelligence entities blacklisted under CAATSA. He claimed that the legislation is already serving as a deterrent.

**REQUEST REPRINT** OR **SUBMIT CORRECTION**

## Promoted Links

Ads by Revcontent ▷





Case 1:17-cv-08153-LAK Document 33-3 Filed 10/31/18 Page 142 of 165

# Newsweek

SIGN IN   SUBSCRIBE   ☰

**$500 Spent on This Card**

Wise Bread

**Party People into Thinking She Was a Millionaire**

Trendchaser

**the White House Look Like a Hut**

Livestly



**"Miracle Pillow" Disrupting Multi-billion Dollar Drug Industry**

Amenity Health

**Here's What New Dental Implants Should Cost You**

SaveOnDentalImplant

**Meet the Tech Taking on an $11.2 Trillion Dollar Market**

XYO Network



## Recommended Slideshows



78

**Worst Movies of All Time: These Films Got 0 Percent on Rotten Tomatoes**



101

**The 100 Best Films of All Time, According to Critics**



59

**The 25 Most Powerful Passports in the World**



76

**The Most Powerful Military Forces in the World**





# Newsweek

SIGN IN   SUBSCRIBE ☰



**In Pictures: The 30 Highest-Paid Actors in the World**



**50 Surprising Facts About Queen Elizabeth II**

Find National
Prescription
Drug Take
Back Day
locations here.

**LATEST NEWS**

**'Pokémon Go' Halloween Event Research Task Update**

**Watch Mega Millions Results, Drawing Live Stream online**



## Newsweek

SIGN IN SUBSCRIBE





**'Pokémon Go' Halloween Event Raid Bosses**



**Dolphins Can't Communicate Properly Due to Human Noise**



**2018 Astronomy Photographer of the Year**



**NFL Trade Deadline: Saints acquire Giants CB Eli Apple**



**Trump Denies Sending White Nationalist Dog Whistle**

10/23/2018    These Russian Oligarchs' US Treasury List Have Ties Trump and His Campaign | ...

Case 1:17-cv-08153-LAK   Document 33-3   Filed 10/31/18   Page 145 of 165

**Newsweek**

SIGN IN   SUBSCRIBE   ☰



We support
expanded access
to Medication-
Assisted Treatment.

Learn More >



**N** **SIGN UP FOR OUR
NEWSLETTER**

SIGN UP  >

Update your preferences »



**RELATED STORIES**

 **Trump Aide Carter Page May Have Been Russian Agent**

 **Trump-Russia Dossier One Year Later: How True Is It?**

**State, Treasury Pound Away at Russia Sanctions Reports**







**Newsweek** Feed

by Engage.IM

Tom O'connor

Donald Trump

**How much does the U.S. make on arms sales to Saudi? Trump's figures and royal ties are challenged**

The $110 billion figure cited by President Donald Trump describing U.S. weapons sales to Saudi Arabia was described as "fake news." ...

Love Engage Share

Be the first to react 1 comment

**Hey There!**

Connect your account to surface **personalized** and **relevant** content!

Personalize with Facebook

Continue with E-mail

Already have an account? Login

Terms and Conditions

Jason Lemon

Orthodox Christianity

**The Russian and Ukrainian churches have officially split due to ongoing conflict**

Russia has responded by comparing the move to the Great Schism of 1054 that split western and eastern Christianity. ...

Love Engage Share

Be the first to react 0 comments

Wise Bread
Sponsored

Autumn Noel Kelly

Finance Daily
Sponsored

10/23/2018 These Russian Oligarchs on U.S. Treasury list have ties to Trump and his campaign

# Newsweek

SIGN IN | SUBSCRIBE



**New Card Offer: $200 Bonus After $500 Spend**

Read More

♡ Love

Be the first to react



**The most important names on Robin's contact list in 'Titans'**

Keep an eye out for Donna Troy, Michael Pearson and Lucius Fox in "Titans." ...

♡ Love    💬 Engage    ⤴ Share

Be the first to react    0 comments



**Born Before 1985? Connecticut Will Pay off $355/month Your Mortgage**

Read More

♡ Love

Be the first to react

---

**DM** David Magee



`Donald Trump`

**Donald Trump on Democrats: 'You don't have to have matches to be an arsonist'**

Donald Trump, speaking at a Kansas campaign rally, said Republicans "believe in the rule of the law, not the rule of the mob." He suggested Democrats will damage America if they win the midterms. ...

♡ Love    💬 Engage    ⤴ Share

---

**AH** Amenity Health
Sponsored



**The New Solution to the Sleep Problem That Affects 1 in 5 Americans**

Read More

♡ Love

Be the first to react

---

**TM** Tim Marcin



**Bernie Sanders on Saudis: U.S. can't have "ally who murders in cold blood"**

"Saudi Arabia is, and has always been, a despotic dictatorship in which dissent is not tolerated," Sanders said. ...

♡ Love    💬 Engage    ⤴ Share

Be the first to react    0 comments

---

**GM** Gundry MD
Sponsored



**Does Yo-yo Dieting Flood Your Liver with Ghrelin?**

Representations regarding the efficacy and safety of Prebiothrive have not been evaluated by the Food and Drug Administration. ...

♡ Love

---

**RT** Ramsey Touchberry



`Donald Trump`

**Senate Democrats demand Trump discloses Saudi Arabia business ties following the apparent murder of Jamal Khashoggi**

Despite repeated denials and claims of "fake news" by the president, Trump has a long personal history with the Saudi government consisting of tens of millions of dollars. ...

♡ Love    💬 Engage    ⤴ Share

---

**C** Confoundly
Sponsored



**John Travolta Finally Confirms the Rumors**

John Travolta is one of the most talented actors in the business, but he is also a man that lives with many secrets. From Scientology to rumors about his romantic...

♡ Love

LOAD MORE CONTENT



© 2018 NEWSWEEK

About Us    Corrections    Contact Us    Travel    Advertise    Copyright    Terms & Conditions    Privacy Policy    Cookie Policy    Terms of Sale

Archive    Announcements    Consent preferences

Editions:    U.S. Edition    Middle East    日本    한국    Pakistan    Polska    România

# EXHIBIT XXX



# Trump's business network reached alleged Russian mobsters

**Oren Dorell**, USA TODAY    Published 5:05 p.m. ET March 28, 2017 | Updated 11:10 p.m. ET March 28, 2017



(Photo: Jim Lo Scalzo, POOL, EPA)

To expand his real estate developments over the years, Donald Trump, his company and partners repeatedly turned to wealthy Russians and oligarchs from former Soviet republics — several allegedly connected to organized crime, according to a USA TODAY review of court cases, government and legal documents and an interview with a former federal prosecutor.

The president and his companies have been linked to at least 10 wealthy former Soviet businessmen with alleged ties to criminal organizations or money laundering.

Among them:

• A member of the firm that developed the Trump SoHo Hotel in New York is a twice-convicted felon who spent a year in prison for stabbing a man and later scouted for Trump investments in Russia.

• An investor in the SoHo project was accused by Belgian authorities in 2011 in a $55 million money-laundering scheme.

• Three owners of Trump condos in Florida and Manhattan were accused in federal indictments of belonging to a Russian-American organized crime group and working for a major international crime boss based in Russia.

ADVERTISEMENT



• A former mayor from Kazakhstan was accused in a federal lawsuit filed in Los Angeles in 2014 of hiding millions of dollars looted from his city, some of which was spent on three Trump SoHo units.

• A Ukrainian owner of two Trump condos in Florida was indicted in a money-laundering scheme involving a former prime minister of Ukraine.

Trump's Russian connections are of heightened interest because of an FBI investigation into possible collusion between Trump's presidential campaign and Russian operatives to interfere in last fall's election. What's more, Trump and his companies have had business dealings with Russians that go back decades, raising questions about whether his policies would be influenced by business considerations.

Trump told reporters in February: "I have no dealings with Russia. I have no deals that could happen in Russia, because we've stayed away. And I have no loans with Russia. I have no loans with Russia at all."

Yet in 2013, after Trump addressed potential investors in Moscow, he bragged to Real Estate Weekly about his access to Russia's rich and powerful. "I have a great relationship with many Russians, and almost all of the oligarchs were in the room," Trump said, referring to Russians who made fortunes when former Soviet state enterprises were sold to private investors.

Five years earlier, Trump's son Donald Trump Jr. told Russian media while in Moscow that "Russians make up a pretty disproportionate cross section of a lot of our assets" in places like Dubai and Trump SoHo and elsewhere in New York.

New York City real estate broker Dolly Lenz told USA TODAY she sold about 65 condos in Trump World at 845 U.N. Plaza in Manhattan to Russian investors, many of whom sought personal meetings with Trump for his business expertise.

"I had contacts in Moscow looking to invest in the United States," Lenz said. "They all wanted to meet Donald. They became very friendly." Many of those meetings happened in Trump's office at Trump Tower or at sales events, Lenz said.

**Read more:**
Jared Kushner to meet with Senate Intelligence Committee in Russia probe
(https://www.usatoday.com/story/news/politics/2017/03/27/kushner-meet-senate-intelligence-committee-russia-probe/99691802/)

Donald Trump's ties to Russia go back 30 years
(https://www.usatoday.com/story/news/world/2017/02/15/donald-trumps-ties-russia-go-back-30-years/97949746/)

Why does Donald Trump like Russians? Maybe because they love his condos
(https://www.usatoday.com/story/news/world/2016/12/15/donald-trump-russia-wealthy-condo-buyers/95464922/)

Dealings with Russian oligarchs concern law enforcement because many of those super-wealthy people are generally suspected of corrupt practices as a result of interconnected relationships among Russia's business elite, government security services and criminal gangs, according to former U.S. prosecutor Ken McCallion, as well as Steven Hall, a former CIA chief of Russian operations.

"Anybody who is an oligarch or is in any position of power in Russia got it because (President) Vladimir Putin or somebody in power saw some reason to give that person that job," Hall said in an interview. "All the organized crime figures I've ever heard of (in Russia) all have deep connections and are tied in with people in government."

FBI Director James Comey acknowledged at a congressional hearing into Russian interference in the U.S. election March 20 that many wealthy Russians may have close ties to the Kremlin and may be acting on its behalf.

Trump has not been accused of any wrongdoing in connection to any of the individuals mentioned in this article.

However, the deals, and the large number of Russians who have bought condos in Trump buildings, raise questions about the secrecy he has maintained around his real estate empire. Trump is the first president in 40 years to refuse to turn over his tax returns, which could shed light on his business dealings.

The White House declined to comment about this article, referring questions to the Trump Organization in New York. Amanda Miller, a spokeswoman for the Trump Organization, denied any transactions with people named in this article.

"The allegations ... are entirely without merit," Miller said in an email. "The Trump Organization never entered into a single transaction with any of these individuals and the condominium units were all owned and sold by third parties — not Trump."

Trump's privately held company works through a network of subsidiaries and partnerships that make direct connections hard to trace, particularly since he has refused to release his tax filings. In addition, some of the Trump Organization's investors and buyers operate through shell companies and limited liability corporations that hide the identities of individual owners.

Trump and the Trump Organization signed licensing agreements for an ownership stake in properties such as Trump SoHo and Trump International Beach Resort, which bear the Trump name without requiring an investment by him. In the SoHo project, Trump received an 18% share of the profits in return for use of his name, according to a deposition Trump gave in 2007 for a defamation lawsuit he brought against an author.

**The SoHo project**



**Donald Trump, Tevfik Arif and Felix Sater attend the Trump Soho Launch Party on Sept. 19, 2007 in New York.** (Photo: Mark Von Holden, WireImage)

Among Trump's partners in the SoHo project was Felix Sater, a Russian immigrant who spent a year in prison for the 1991 stabbing. He later cooperated with the FBI and the CIA for a reduced sentence after he was convicted in a $40 million stock manipulation and money-laundering scheme in New York state.

Sater was a major player in the Bayrock Group, which developed the Trump SoHo. A former Bayrock finance director and partner, Jody Kriss, referred to him as a controlling partner, but Bayrock says he was an executive, not a partner.

Sater's criminal past was not well-known until publicly divulged in 2007. As he sought investment opportunities in Russia, he carried business cards identifying him as a senior adviser to the Trump Organization that included the company's email and phone number.

In February, Sater introduced a Ukrainian politician pushing a pro-Russian peace proposal to Michael Cohen, Trump's personal lawyer and former chief counsel at the Trump Organization, Cohen told NBC News (http://www.nbcnews.com/news/us-news/trump-lawyer-confirms-meeting-ukrainian-denies-carrying-peace-plan-n723386).

Sater, 51, did not respond to multiple emails sent to his company or to calls seeking comment. He wrote on his company website that he made some bad decisions in the past but that he had paid his debt to society and helped the government with "numerous issues of national security, including thwarting terrorist attacks against our country." His website was dark last week, displaying the message, "Maintenance mode is on."

One source of financing recruited by Bayrock for the SoHo project was Alexander Mashkevich, according to a deposition by former Bayrock partner Kriss in a federal lawsuit. A Bayrock investment pamphlet lists Mashkevich as a source of financing for the Bayrock Group.  Mashkevich, a Kazakhstan mining billionaire, was accused in Belgium in 2011 in a $55 million money-laundering scheme. Mashkevich and two partners paid a fine and admitted no wrongdoing.

Federal indictments in New York, California and Illinois allege that people who bought Trump condos include felons and others accused of laundering money for Russian, Ukrainian or central Asian criminal organizations.

One indictment describes Anatoly Golubchik and Michael Sall, who own condos in Trump International Beach Resort in Sunny Isles Beach, Fla., and Vadim Trincher, who owns a unit in Trump Tower in Manhattan, as members of a Russian-American organized crime group that ran an illegal gambling and money-laundering operation.

Money laundering was an issue for Trump's Taj Mahal Casino in Atlantic City, which was fined $10 million in 2015 for failing to report suspicious transactions. Federal rules are designed to protect the U.S. financial system from being used as a safe haven for dirty money and transnational crimes, Jennifer Shasky Calvery, then-director of the U.S. Treasury's Financial Crimes Enforcement Network (FinCen), said at the time. It was the largest penalty the agency ever levied against a casino since reporting requirements began in 2003, according to The Wall Street Journal.

"The Trump Organization admitted that it failed to implement and maintain an effective (anti-money laundering) program; failed to report suspicious transactions; failed to properly file required currency transaction reports; and failed to keep appropriate records as required by (the Bank Secrecy Act)," FinCen said in a statement.

The statement said warnings over repeated violations went back to 2003, but it did not mention Russians.

In Los Angeles, the federal lawsuit filed in 2014 by lawyers for the Kazakh city of Almaty accuses former mayor Viktor Khrapunov of owning three Trump SoHo units through shell companies used to hide hundreds of millions of dollars allegedly looted by selling state-owned assets. Kazakhstan is a former Soviet republic.

The Trump SoHo project "was largely financed by illegally obtained cash from Russia and Eastern European sources, including money provided by known international financial criminals and organized crime racketeers," former prosecutor McCallion wrote on his blog in October. McCallion was an assistant U.S. attorney in New York from the mid-1970s to the mid-1980s under presidents Carter and Reagan.

Sallie Hofmeister, a public relations adviser to Bayrock, said the company "flatly denies that any of its properties were financed using illegal money, and sees no evidence to the contrary provided by Mr. McCallion or anyone else."

**The Manafort connection**



**A view of the Trump SoHo hotel condominium building, on Feb. 21, 2017 in New York City. The development of Trump SoHo, completed in 2010, was constructed in partnership with the Bayrock Group.** (Photo: Drew Angerer, Getty Images)

McCallion, as a private lawyer, also represented former Ukrainian prime minister Yulia Tymoshenko in a 2011 lawsuit alleging that Paul Manafort, Trump's former campaign manager, engaged in a racketeering and money-laundering scheme to hide $3.5 billion in stolen funds, much of it by buying U.S. real estate.

Manafort's co-defendants were Dmitry Firtash, a Ukranian gas executive under federal indictment for bribery, and Semyon Mogelivich, identified by the Justice Department as head of a transnational criminal organization that posed a threat to U.S. national security. The lawsuit was dismissed in 2015 because Tymoshenko was unable to show the role of each defendant in the alleged money-laundering plot.

Manafort resigned from the Trump campaign in August, days after Ukrainian investigators alleged that secret ledgers showed $12.8 million was put aside for Manafort by the party of pro-Russian President Viktor Yanukovych, who was ousted in a popular uprising in 2014. More details about the alleged secret payments surfaced March 20.

Manafort, who has acknowledged working for pro-Russian Ukrainian politicians, has denied receiving off-the-books pay and said his compensation covered campaign staff, polling and television ads in Ukraine.

Manafort also allegedly worked for a Russian billionaire to advance Putin's interests a decade ago, the Associated Press reported March 22.

Firtash, a major donor of Yanukovych's party, was indicted in 2013 by U.S. prosecutors in Chicago for allegedly paying officials in India $18.5 million in bribes for licenses to mine titanium ore. Firtash said he is an innocent victim of American efforts to punish political allies of Putin. His extradition from Austria to the United States was approved in February and then put on hold while an Austrian judge considers a Spanish indictment against him on charges of money laundering and organized crime.

Case 1:17-cv-08153-LAK    Document 33-8   Filed 10/31/18   Page 154 of 165

In an interview with USA TODAY, McCallion said he spent years looking into the Trump Organization, the businesses and individuals that dealt with it, and the possibility that Trump's real estate empire may depend on hundreds of millions of dollars from Russians.

"The FBI is always concerned if public officials can be blackmailed," McCallion said. "It's Russian-laundered money from people who operate under the good graces of President Putin. If these people pull the plug on the Trump Organization, it would go down pretty quickly."

Luke Harding, author of A Very Expensive Poison, about the 2006 lethal poisoning of defected Russian spy Alexander Litvinenko with radioactive polonium-210 in London, said the lawlessness in former Soviet republics like Russia, Ukraine and Azerbaijan explains why businessmen from those countries seek safe havens to invest their wealth.

"If you steal money in a place like Russia, you have a problem," Harding said. "You need to convert it to rubles and dollars and put it somewhere someone can't steal it from you. One place to do that is buy real estate in New York, Miami or London."

Ariel Cohen, a senior fellow at the Atlantic Council think tank, said not all wealthy Russians are crooks or beholden to Putin. "It's more complicated than that," Cohen said.

"There are oligarchs who are FOPs (friends of Putin) and there are those who lost their assets due to corruption, abuse of power, a crummy legal system and the lack of property rights," he said. "Many of these people moved abroad, to London, New York and Florida. They are refugees from the corporate raiding Russian-style practiced for the last couple of decades."

Some became wealthy before Putin's rise to power "and in some cases are in hidden resentment or quiet opposition to Putin," Cohen said. "A lot of these people run big businesses, banks, retail, oil and gas, and these are legitimate businesses that pay taxes" in Russia.

Here is a closer look at some of the Trump project investors or condo buyers with alleged ties to organized crime and the Russian government:

## Felix Sater

Sater spent a year in prison for stabbing a man in the face with a broken margarita glass at the Rio Grande restaurant and bar in New York in 1991.

A federal criminal complaint in New York in 1998 accused Sater of money laundering and stock manipulation but was kept secret by prosecutors because the Russian immigrant was working as a CIA informant, according to numerous published reports. Salvatore Lauria, a co-defendant, co-wrote in a 2003 book that he and Sater sought to reduce their sentences by acting as middlemen for the CIA to buy weapons that fell into the hands of mobsters after the fall of the Soviet Union. The scheme fell apart, but the relationships remained, according to Lauria's book, The Scorpion and the Frog: High Crimes and High Times (https://www.amazon.com/Scorpion-Frog-High-Times-Crimes/dp/1893224260).

Kriss, a former finance director for the developers, accused Sater, Lauria and Bayrock partners in a 2010 federal lawsuit of diverting millions of dollars to shell companies to avoid U.S. taxes. He also claimed they kept secret Sater's criminal past and his guilty plea to racketeering charges while "he was aiding the prosecution of his Mafia and Russian organized crime confederates."

Kriss alleged that while Bayrock was seeking  money from foreign investors for Trump SoHo, it considered two groups of Russians with offices in Iceland. One group offered better terms, but Bayrock rejected that and went with the FL Group, which provided $50 million in financing and was "in favor with Putin," according to the original complaint. The lawsuit (https://docs.justia.com/cases/federal/district-courts/new-york/nysdce/1:2010cv03959/362805/439) is still pending, but without that allegation.

Sater and his co-defendants denied the allegations, calling Kriss' lawsuit a long-running extortion scheme. But many of the racketeering and fraud claims against them survived a motion to dismiss the lawsuit, according to a Dec. 2 order signed by U.S. District Judge Lorna Schofield (https://docs.justia.com/cases/federal/district-courts/new-york/nysdce/1:2010cv03959/362805/439).

Sater's criminal past came to light in 2007. That year, Trump testified in a deposition in a defamation lawsuit that he didn't think Sater was a principal at Bayrock and that he was considering not doing business with him anymore. But Sater subsequently traveled to Russia carrying business cards identifying him as a senior adviser to Trump with a Trump Organization phone number and email address, according to photos of the card posted online by NBC, the BBC and other news organizations. In 2013, Trump said in another deposition that he didn't think Sater was connected to the Mafia, that Sater mostly dealt "with my company, not me" and that "if he was sitting in the room right now I really wouldn't know what he looked like."

Sater told The Washington Post last year that he met one-on-one numerous times with Trump. He met alongside Donald Trump Jr. in Phoenix with local officials, and in New York he met repeatedly with Trump and his staff to talk about potential deals in Los Angeles, Ukraine and China, the Post reported (https://www.washingtonpost.com/politics/former-mafia-linked-figure-describes-association-with-trump/2016/05/17/cec6c2c6-16d3-11e6-aa55-670cabef46e0_story.html?utm_term=.888c4a3d4fae).

Trump's lawyer, in interviews with The New York Times and the Post, downplayed the relationship between the two men, saying Trump met and spoke with lots of people but his relationship was with Bayrock, not Sater. Sater did not respond to calls and emails sent to his office.

## Alexander Mashkevich

Mashkevich, a Kazakh mining billionaire, was another source of funds for the SoHo project, according to Kriss' lawsuit. Bayrock's investment pamphlet describes him in general as a source of Bayrock financing.

Investigators in Belgium accused Mashkevich and two of his Kazakh business partners of money laundering and forgery connected to the $55 million in alleged bribes they received from a Belgian company in the mid-1990s, according to the Financial Times (https://www.ft.com/content/95f8ecc4-c8dd-11e0-a2c8-00144feabdc0). In 2011, all three men agreed to pay an undisclosed fine to settle the case. They admitted no wrongdoing, and the charges were dropped.

Mashkevich and principal Bayrock partner Tevfik Arif were embroiled in a case in 2010, when Turkish police alleged prostitution and human trafficking after they raided a luxury yacht that Mashkevich chartered. After police boarded the Savarona — once owned by the founder of the modern Turkish state, Mustafa Kemal Atatürk — they arrested 10 wealthy men, including Arif, a former Kazakh official. They also found nine young women from Russia and Ukraine — two were 16 years old — and "a huge amount of contraceptives," according to the Israeli newspaper Yedioth Ahronoth (http://www.ynetnews.com/articles/0,7340,L-4048812,00.html).

Mashkevich, who was not at the scene, and Arif denied being involved in anything illegal. The women stayed silent about their involvement, according to published reports. Mashkevich was not charged with a crime. Arif was charged but acquitted, and the court file was sealed.

## Peter Kiritchenko

Kiritchenko, a Ukrainian businessman who owned two condominiums with his daughter at Trump International Beach Resort in Sunny Isles Beach, Fla., was named in a money-laundering scheme involving former Ukraine prime minister Pavlo Lazarenko.

According to federal prosecutors (https://archives.fbi.gov/archives/sanfrancisco/press-releases/2009/sf111909a.htm) in San Francisco in 2009, Kiritchenko helped Lazarenko launder millions of dollars obtained through extortion by purchasing luxury real estate in the United States and other countries. Kiritchenko was convicted of one count of receiving stolen property in California after he testified against the former prime minister. Lazarenko was sentenced to eight years in federal prison and fined $9 million after he was convicted on multiple counts of money laundering.

A federal appeals court (http://caselaw.findlaw.com/us-9th-circuit/1546625.html) said Kiritchenko was a "deep and willing" accomplice "in the heart of the conspiracy."

## Viktor Khrapunov

Khrapunov, a former Kazakhstan energy minister and mayor of Almaty, owns three units in the Trump SoHo through shell companies, according to lawyers for the Kazakh city who filed a 2014 federal lawsuit against him in Los Angeles. Almaty's lawyers alleged in the lawsuit that Khrapunov used real estate in California, New York, Europe and the Middle East to hide hundreds of millions of dollars looted by selling state-owned assets. Khrapunov, who lives in Switzerland, denies the claim, saying he and his family are being targeted by a political opponent, Kazakh President Nursultan Nazarbayev.

## Anatoly Golubchik, Vadim Trincher and Michael Sall

Three Trump condo owners — Golubchik, Trincher and Sall — were convicted in 2013 in federal court in New York of participating in an illegal high-stakes sports betting ring for a Russian-American organized crime group. The betting ring operated illegal gambling websites and catered almost exclusively to wealthy oligarchs from the former Soviet Union, according to prosecutors (https://www.justice.gov/usao-sdny/pr/four-more-defendants-plead-guilty-manhattan-federal-court-their-roles-two-international).

Golubchik and Sall own Trump condos in Sunny Isles Beach. And professional poker player Trincher owns a condo in Trump Tower in New York City.

Golubchik and Trincher were principal leaders of the enterprise, which included money laundering and extortion, prosecutors charged in the indictment (https://www.justice.gov/sites/default/files/usao-sdny/legacy/2015/03/25/Tokhtakhounov%2C%20Alimzhan%20et%20al.%20Indictment_6.pdf).

The godfather of the operation was identified as Alimzhan Tokhtakhounov, who federal prosecutors said was a Vor, "a powerful figure in former Soviet Union organized crime" who never left Russia because he was under indictment in the U.S. for his role in allegedly bribing officials at the 2002 Winter Olympics in Salt Lake City.

Sall helped launder tens of millions of dollars from the gambling enterprise, prosecutors said when they announced that all three condo owners pleaded guilty to lesser charges (https://www.justice.gov/usao-sdny/pr/four-more-defendants-plead-guilty-manhattan-federal-court-their-roles-two-international). Sall pleaded guilty to interstate travel in aid of an unlawful activity — illegal gambling. Golubchik and Trincher pleaded guilty to conspiracy to commit racketeering. Tokhtakhounov remains in Russia, which does not have an extradition treaty with the United States.

Read or Share this story: http://usat.ly/2nJOUCJ





# EXHIBIT YYY

# The New York Times

## *2 White House Officials Helped Give Nunes Intelligence Reports*

By Matthew Rosenberg, Maggie Haberman and Adam Goldman

March 30, 2017

WASHINGTON — A pair of White House officials helped provide Representative Devin Nunes of California, a Republican and the chairman of the House Intelligence Committee, with the intelligence reports that showed that President Trump and his associates were incidentally swept up in foreign surveillance by American spy agencies.

The revelation on Thursday that White House officials disclosed the reports, which Mr. Nunes then discussed with Mr. Trump, is likely to fuel criticism that the intelligence chairman has been too eager to do the bidding of the Trump administration while his committee is supposed to be conducting an independent investigation of Russia's meddling in the presidential election.

It is the latest twist of a bizarre Washington drama that began after dark on March 21, when Mr. Nunes got a call from a person he has described only as a source. The call came as he was riding across town in an Uber car, and he quickly diverted to the White House. The next day, Mr. Nunes gave a hastily arranged news conference before going to brief Mr. Trump on what he had learned the night before from — as it turns out — White House officials.

The chain of events — and who helped provide the intelligence to Mr. Nunes — was detailed to The New York Times by four American officials.

Since disclosing the existence of the intelligence reports, Mr. Nunes has refused to identify his sources, saying he needed to protect them so others would feel safe going to the committee with sensitive information. In his public comments, he has described his sources as whistle-blowers trying to expose wrongdoing at great risk to themselves.

That does not appear to be the case. Several current American officials identified the White House officials as Ezra Cohen-Watnick, the senior director for intelligence at the National Security Council, and Michael Ellis, a lawyer who works on national security issues at the White House Counsel's Office and was previously counsel to Mr. Nunes's committee. Though neither has been accused of breaking any laws, they do appear to have sought to use intelligence to advance the political goals of the Trump administration.

Sean Spicer, the White House spokesman, refused to confirm or deny at his daily briefing that Mr. Ellis and Mr. Cohen-Watnick were Mr. Nunes's sources. The administration's concern was the substance of the intelligence reports, not how they ended up in Mr. Nunes's hands, Mr. Spicer said.

The "obsession with who talked to whom, and when, is not the answer," Mr. Spicer said. "It should be the substance."

Jack Langer, a spokesman for Mr. Nunes, said in a statement, "As he's stated many times, Chairman Nunes will not confirm or deny speculation about his source's identity, and he will not respond to speculation from anonymous sources."

Mr. Cohen-Watnick, 30, is a former Defense Intelligence Agency official who served on the Trump transition team and was originally brought to the White House by Michael T. Flynn, the former national security adviser.

He was nearly pushed out of his job this month by Lt. Gen. H. R. McMaster, who replaced Mr. Flynn as national security adviser, but survived after the intervention of Jared Kushner, the president's son-in-law, and Stephen K. Bannon, Mr. Trump's chief strategist.



Representative Adam B. Schiff of California, the top Democrat on the House Intelligence Committee, said he accepted an invitation on Thursday to review the same materials that Mr. Nunes had seen. Gabriella Demczuk for The New York Times

The officials who detailed the newly disclosed White House role said that this month, shortly after Mr. Trump claimed on Twitter that he was wiretapped during the campaign on the orders of President Barack Obama, Mr. Cohen-Watnick began reviewing highly classified reports detailing the intercepted communications of foreign officials.

There were conflicting accounts of what prompted Mr. Cohen-Watnick to dig into the intelligence. One official with direct knowledge of the events said Mr. Cohen-Watnick began combing through intelligence reports this month in an effort to find evidence that would justify

Mr. Trump's Twitter posts about wiretapping.

But another person who was briefed on the events said Mr. Cohen-Watnick came upon the information as he was reviewing how widely intelligence reports on intercepts were shared within the American spy agencies. He then alerted the N.S.C. general counsel, but the official said Mr. Cohen-Watnick was not the person who showed the reports to Mr. Nunes.

That person and a third official said it was then Mr. Ellis who allowed Mr. Nunes to view the material.

The intelligence reports consisted primarily of ambassadors and other foreign officials talking about how they were trying to develop contacts within Mr. Trump's family and inner circle before his inauguration, officials said.

The officials all spoke on the condition of anonymity to describe the intelligence and to avoid angering Mr. Cohen-Watnick and Mr. Ellis. Officials say Mr. Cohen-Watnick has been reviewing the reports from his fourth-floor office in the Eisenhower Executive Office Building, where the National Security Council is based.

The officials' description of the intelligence is in line with Mr. Nunes's characterization of the material, which he said was not related to the Russia investigations when he first disclosed its existence.

According to Mr. Nunes, who served on the Trump transition team, he met his source on the grounds of the White House. He said he needed a secure location where people with security clearances could legally view classified information, though such facilities could also be found in the Capitol building and at other locations across Washington.

The next day, Mr. Nunes gave a news briefing at the Capitol and then returned to the White House to brief Mr. Trump on the information before telling other committee members about what he had reviewed. His actions have fueled criticism that the committee, under his leadership, is unable to conduct a serious, independent investigation.

On Thursday, Representative Adam B. Schiff of California, the top Democrat on the House Intelligence Committee, said he needed clarification on whether White House officials had pursued "a circuitous route" to feed Mr. Nunes the materials so he could then hand them to Mr. Trump.

"If that was designed to hide the origin of the materials, that raises profound questions about just what the White House is doing that need to be answered," he said. He later said he accepted an invitation on Thursday to review the same materials that Mr. Nunes had seen.

Yet even before Thursday, the view among Democrats and even some Republicans was that Mr. Nunes was given access to the intelligence reports to divert attention from the investigations into Russian meddling, and to bolster Mr. Trump's debunked claims of having been wiretapped.

On both counts, Mr. Nunes appears to have succeeded: The House inquiry into Russian meddling that he is leading has descended into a sideshow since he disclosed the information, and the administration has portrayed his information as vindicating the president's wiretapping claims.

Yet Mr. Nunes has dismissed Democratic calls to step aside. Instead, he has canceled all committee hearings for now, stalling his own investigation, which opened last week with a hearing during which James B. Comey, the director of the F.B.I., publicly disclosed that the bureau's investigation into Russian meddling included an examination of any evidence that Trump associates had colluded in the effort.

The chaotic situation prompted the leaders of the Senate Intelligence Committee, which is running its own investigation, to bluntly state on Wednesday that their work had nothing to do with the House inquiry. And television news programs have been dominated by arguments about whether the incidental intelligence gathering of Mr. Trump and his associates was the real issue, or simply a distraction from the Russia investigations.

Mr. Nunes has acknowledged that the incidental intelligence gathering on Trump associates last year was not necessarily unlawful, and that it was not specifically directed at Mr. Trump or people close to him. American intelligence agencies typically monitor foreign officials of allied and hostile countries, and they routinely sweep up communications linked to Americans who may be taking part in the conversation or are being spoken about.

The real issue, Mr. Nunes has said, was that he could figure out the identities of Trump associates from reading reports about intercepted communications that were shared among Obama administration officials with top security clearances.

He said some Trump associates were also identified by name in the reports. Normally, intelligence agencies mask the identities of American citizens who are incidentally present in intercepted communications, though knowledgeable readers can often figure out the identities in context.

Follow Matthew Rosenberg on Twitter at @AllMattNYT, Maggie Haberman at @maggieNYT and Adam Goldman at @adamgoldmanNYT

Mark Mazzetti, Matt Apuzzo and Emmarie Huetteman contributed reporting.

A version of this article appears in print on March 31, 2017, on Page A1 of the New York edition with the headline: Trump Aides Gave Reports to Head of House Inquiry

READ 2773 COMMENTS

# EXHIBIT ZZZ

Politics

# Meeting That Gates Admits Lying About Matches Rohrabacher Dinner

By <u>Andrew Martin</u> and <u>David Voreacos</u>
February 23, 2018, 3:44 PM EST



Ex-Trump Aide Rick Gates Changes Plea to Guilty

Former Trump campaign aide Rick Gates just admitted to lying to U.S. investigators about a March 19, 2013, meeting between his boss, Paul Manafort, and an unidentified U.S. congressman. Public filings show a meeting that day between Manafort and Dana Rohrabacher, a Russia-friendly Republican congressman from California.

Gates pleaded guilty Friday to conspiracy against the U.S. and making false statements about a meeting that day. In a criminal information unsealed Friday, he admitted that he'd withheld that the meeting included a discussion of Ukraine, where he and Manafort had done political consulting work.





Dana Rohrabacher  *Photographer: Andrew Harrer/Bloomberg*

Gates and Manafort were charged in October with money laundering and failing to register foreign lobbying work with the U.S. government. Since then, Special Counsel Robert Mueller has been pressing both men to cooperate, ratcheting up the pressure on Thursday with bank and tax fraud charges and again on Friday with conspiracy and false-statement counts.



Details of a March 19, 2013, meeting surfaced last year in supplemental filings from DMP International, Manafort's firm, and Mercury Public Affairs, whose partner, Vin Weber, also participated in the 2013 meeting.

Weber and a representative for him didn't immediately respond to requests for comment.

Read More: Follow the Trump Administration's Every Move

The lobbying that Gates and Manafort are accused of hiding included work on behalf of Ukraine's then-President Viktor Yanukovych, who was backed by Russia.

After the guilty plea on Friday, a spokesman for Rohrabacher, who has sought better relations with Russia, said: "As the congressman has acknowledged before, the meeting was a dinner with two longtime acquaintances -- Manafort and Weber -- from back in his White House and early congressional days."

"The three reminisced and talked mostly about politics," the spokesman said. "The subject of Ukraine came up in passing. It is no secret that Manafort represented Viktor Yanukovych's interests, but as chairman of the relevant European subcommittee, the congressman has listened to all points of view on Ukraine."

## In this article

0336658D
**SPECIAL COUNSEL**
Private Company

Terms of Service
Trademarks Privacy Policy
©2018 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices ▷ Contact Us Help