# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

RICHARD BEHAR

   Plaintiff,

  v.

U.S. DEPARTMENT OF HOMELAND
SECURITY,

   Defendant.

Nos. 17 Civ. 8153 (LAK)
18 Civ. 7516 (LAK)

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S RENEWED
CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION
TO DEFENDANT'S RENEWED MOTION FOR SUMMARY JUDGMENT**

David A. Schulz (Bar No. 459197)
Charles Crain
Anna Windemuth, law student intern
Sara Worth, law student intern
MEDIA FREEDOM & INFORMATION
 ACCESS CLINIC
YALE LAW SCHOOL
P.O. Box 208215
New Haven, CT 06520
Tel: (203) 432-9387
Email: david.schulz@yale.edu

*Counsel for Plaintiff*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................ 1

BACKGROUND ....................................................................................................................... 2

A.    The Records at Issue ................................................................................................... 2

B.    Defendant's Initial Failure to Justify Withholding the Records ................................ 3

C.    Defendant's Effort to Supplement the Record ........................................................... 4

D.    Public Interest in Mr. Trump's Meetings .................................................................. 6

ARGUMENT ............................................................................................................................. 8

I.    DEFENDANT STILL FAILS TO ESTABLISH ANY SIGNIFICANT PRIVACY
      INTEREST IN THE RECORDS ................................................................................. 9

      A.    Defendant Fails To Establish Any Privacy Interest On Behalf Of Mr. Trump ...... 9

            1.    Defendant has not shown that the records would reveal any personal facts
                  about Mr. Trump ........................................................................................... 9

            2.    Defendant incorrectly attempts to establish a cognizable privacy interest
                  for Mr. Trump by importing executive privilege arguments ................... 13

      B.    Defendant Fails To Establish Any Significant Privacy Interest On Behalf Of Mr.
            Trump's Visitor ....................................................................................................... 14

            1.    Defendant's submissions are conclusory and fail to particularly address
                  the privacy interests of any specific categories of visitors ...................... 15

            2.    Defendant still fails to show a potential for negative consequences of
                  disclosure for third parties. ...................................................................... 17

                  (a)    Defendant erroneously disclaims its duty to show negative
                         consequences ................................................................................. 18

                  (b)    No negative consequences from appearing in the records are
                         apparent on their face .................................................................. 20

II.   DISCLOSURE WOULD ADVANCE A SIGNIFICANT PUBLIC INTEREST ........... 21

      A.    The Public Interest Sought To Be Advanced Is Significant ................................ 22

B.      The Public Interest Would Likely Be Advanced By Disclosure ......................... 25

C.      Defendant Improperly Asserts a Non-Cognizable FOIA Interest in Non-
        Disclosure ......................................................................................................... 28

        1.      Defendant incorrectly asserts that there is a 'public interest' in rejecting
                FOIA requests when disclosure might limit the government's future
                information-gathering efforts .................................................................. 28

        2.      The authority cited by the Government does not support its attempt to read
                a 'public interest' in non-disclosure into the 7(C) balancing test ............ 30

        3.      The agency's original and renewed declarations do not support its factual
                assertions regarding the consequences of disclosing the records at issue. 31

III.    The Public Interest in Disclosure Outweighs Any Minimal Privacy Interests ................ 33

IV.     IN CAMERA REVIEW ...................................................................................... 34

CONCLUSION ............................................................................................................... 35

# TABLE OF AUTHORITIES

**CASES**                                                                        **PAGE**

*Ackerly v. Ley*, 420 F.2d 1336 (D.C. Cir. 1969) .......................................................... 12

*Adelante Alabama Worker Ctr. v. DHS*, 376 F. Supp. 3d, 345 (S.D.N.Y. 2019) ........................ 31

*Advocates for Highway & Auto Safety v. Fed. Highway Admin.*, 818 F.Supp.2d 122 (D.D.C. 2011) ........................................................................................................ 29, 30

*All. for Wild Rockies v. Dep't of Interior*, 53 F. Supp. 2d 32 (D.D.C. 1999) .............................. 25

*Alvary v. United States*, 302 F.2d 790 (2d Cir. 1962).................................................... 6

*Am. Civ. Liberties Union v. Office of the Dir. Of Nat'l Intelligence*, No. 10 Civ. 4419(RJS), 2011 WL 5563520 (S.D.N.Y. Nov. 15, 2011)............................................................... 34

*Am. Immigration Lawyers Association v. Exec. Office for Immigration Review*, 830 F.3d 667 (D.C. Cir. 2016) ........................................................................................... 27

*Am. Oversight v. U.S. Gen. Servs. Admin.*, 311 F. Supp.3d 327 (D.D.C. 2018) ........ 23, 25, 26, 28

*Assoc. Press v. DOD*, 554 F.3d 274 (2d Cir. 2009)............................................... passim

*Associated Press v. DOD*, 410 F. Supp.2d 147 (S.D.N.Y. 2006) ................................... 31

*August v. FBI*, 328 F.3d 697 (D.C. Cir. 2003)...................................................... 28

*Brannum v. Dominguez*, 377 F. Supp. 2d 75 (D.D.C. 2005) ........................................ 31

*Citizens for Envtl. Quality, Inc. v. U.S. Dep't of Agric.*, 602 F. Supp. 534 (D.D.C. 1984) .... 12, 24

*Citizens for Responsibility & Ethics v. DOJ*, 746 F.3d 1082 (D.C. Cir. 2014) ........................ 24

*Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854 (D.C. Cir. 1980)........................... 31

*Common Cause v. Nat. Archives & Records Serv.,* 628 F.2d 179 (D.C. Cir. 1980).................... 10

*Conti v. DHS*, No. 12 Civ. 5827(AT), 2014 WL 1274517 (S.D.N.Y. Mar. 24, 2018) ................ 30

*Dep't of Air Force v. Rose*, 425 U.S. 352, 96 S. Ct. 1592 (1976) ................................. 32

*Diamond v. FBI*, 532 F. Supp. 216 (S.D.N.Y. 1981).................................... 16, 18, 27, 30

*DOD  v. Fed. Labor Relations Auth.*, 510 U.S. 487, 114 S. Ct. 1006 (1994)........................ 22, 29

*Doe v. New York City Dep't of Soc. Servs.,* 709 F.2d 782 (2d Cir. 1983) ..................................... 28

*DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 109 S. Ct. 1468 (1989) . 11, 29, 33

*Donovan v. FBI*, 806 F.2d 55 (2d Cir. 1986), abrogated on other grounds by *DOJ v. Landano*, 508 U.S. 165, 113 S. Ct. 2014 (1993) .................................................................. 34

*Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 639 F.3d 876 (9th Cir. 2010) . 17, 23

*Fish v. Kobach*, No. 16-2105-JAR, U.S. Dist. LEXIS 58280 (D. Kan. Apr. 17, 2017) .............. 13

*Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856 (D.C. Cir. 1981) .................................................................................................................................. 11, 21

*Garcia v. DOJ*, 181 F. Supp. 2d 356 (S.D.N.Y. 2002) ................................................................ 15

*Halpern v. FBI*, 181 F.3d 279 (2d Cir. 1999) ...................................................................... passim

*Inner City Press/Comm. on the Move v. Bd. of Govs. of Fed. Res. Sys.*, 463 F.3d 239 (2d Cir. 2006) ........................................................................................................................................ 29

*Judicial Watch, Inc. v. DOJ,* 394 F. Supp. 111 (D.D.C. 2019) ................................................ 21

*Judicial Watch, Inc. v. FDA.*, 449 F.3d 141 (D.C. Cir. 2006) .................................................. 19

*Judicial Watch, Inc. v. USSS*, 726 F.3d 208 (D.C. Cir. 2013) ................................................... 14

*Kuzma v. United States Dep't of Justice*, 92 F. App'x 30 (2d Cir. 2017) ................................... 20

*Lardner v. DOJ*, No. Civ.A.03-0180(JDB), 2005 WL 758267 (D.D.C. Mar. 31, 2005) ............. 23

*Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552 (S.D.N.Y. 1989) ......................... 20

*Long v. DOJ*, 5:06-CV-1086 (NAM/TWD), 2012 WL 13028918 (Mar. 31, 2012) ..................... 28

*Long v. Office of Pers. Mgmt,* 692 F.3d 185 (2d Cir. 2012) ....................................... 10, 15, 20, 29

*Maydak v. DOJ*, 218 F.3d 760 (D.C. Cir. 2000) ....................................................................... 28

*Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224 (D.C. Cir. 2008) ................................... 24

*Nat. Assoc. of Retired Fed. Emps. v. Horner*, 879 F.2d 873 (D.C. Cir. 1989) ............................. 9

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 124 S. Ct. 1570 (2004) ....... 20, 21, 22

*Nat'l Ass'n of Atomic Veterans, Inc. v. Dir., Def. Nuclear Agency*, 583 F. Supp. 1483 (D.D.C. 1984) ........................................................................................................................................ 12

*Nat'l Council of La Raza v. DOJ*, 411 F.3d 350 (2d Cir. 2005) ................................................. 33

*Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885 (D.C. Cir. 1995) ........................... 10, 21, 26

*New York Times Co. v. FBI*, 297 F. Supp. 3d 435 (S.D.N.Y. 2017) ............................................ 21

*Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 97 S. Ct. 2777 (1977) ........................................ 13

*Perlman v. DOJ*, 312 F.3d 100 (2d Cir. 2002) ...................................................................... 19, 30

*Phillips v. ICE*, 385 F. Supp. 2d 296 (S.D.N.Y. 2005) .............................................................. 12

*Prison Legal News v. Samuels*, 787 F.3d 1142 (D.C. Cir. 2015) ................................................ 27

*Prop. of the People, Inc. v. Office of Mgmt. & Budget*, No.  17-677 (RC), 2019 WL 3891166
(D.D.C., Aug. 19, 2019)......................................................................................................... 25

*See Bd. of Trade v. CFTC*, 627 F.2d 392 (D.C. Cir. 1980)......................................................... 17

*Taggart v. Office of the Inspector Gen.*, 10. Civ. 5447 (PGG), 2011 WL 13128214 (S.D.N.Y.
2011) ...................................................................................................................................... 15

*U.S. Dep't of State v. Ray*, 502 U.S. 164, 112 S. Ct. 541 (1991).......................................... passim

*U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 102 S. Ct. 1957 (1982) ............................ 17

*United States v. Nixon,* 418 U.S. 683, 94. S. Ct. 3090 (1974) ................................................ 13, 14

*United States v. Restrepo*, 986 F.2d 1462 (2d Cir. 1993) .......................................................... 28

*Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252 (D.C. Cir. 1982)... 12, 24,
29, 31

*Wilner v. Na'l Sec. Agency*, 592 F.3d 60 (2d Cir. 2009) ......................................... 8, 10, 18, 34

*Wood v. FBI*, 432 F.3d 78 (2d Cir. 2005) .............................................................................. 15, 19

## STATUTES

5 U.S.C. § 552(b)(7)(C) ........................................................................................................... 8

5 U.S.C. §552(b)(4). ................................................................................................................ 29

## RULES

FED. R. EVID. 201(B) ................................................................................................................ 6

## PRELIMINARY STATEMENT

Investigative reporter Richard Behar's Freedom of Information Act (FOIA) case is before the Court on renewed cross-motions for summary judgment.   The single issue presented is whether defendant has met its burden to show that disclosing records identifying individuals and groups who met with Donald J. Trump while he was receiving Secret Service protection as a candidate for President and as President-elect would be an unwarranted invasion of personal privacy under FOIA Exemption 7(C).  After evaluating the facts provided by defendant in the last round of briefing, this Court could find only a minimal privacy interest—for either Mr. Trump or anyone else—in the records at issue, and found that it lacked sufficient information to evaluate the public interest at stake.  The Court therefore ordered defendant to submit additional information to support its withholdings.  Despite this second bite at the apple, defendant still fails to justify its refusal to disclose the records.

Defendant again attempts to identify a substantial privacy interest, but comes up empty-handed.  It suggests that most people would not want their meetings with Mr. Trump to become public but still fails to identify—let alone substantiate—a *single* negative consequence likely to result from disclosure.  Defendant also points to a confidential label on some of the documents, but courts have recognized repeatedly that deference to such labels is inappropriate in light of FOIA's disclosure objectives and its mandate for independent, *de novo* judicial review.  Nor does defendant explain how the potential confidentiality of information in the context of Mr. Trump's 2016 campaign could create a FOIA privacy interest years after the election.

While defendant can still identify no more than a minimal privacy interest in the records for either Mr. Trump or his visitors, there is ample evidence that disclosure will shed light on the operations of government.  Knowing who had access to Mr. Trump during the critical period

1

when he was seeking and preparing to assume this country's highest office can provide insight into his priorities and inform the public about who had the President's ear as he made high-profile cabinet appointments.  Learning of any meetings during this period between Mr. Trump and special interest groups or noteworthy individuals—for example, two recently indicted Ukrainian businessmen—would directly shed light on subsequent actions by his administration. Unlike the minimal and largely speculative privacy concerns alleged by defendant, the public interest in disclosure is both considerable and tangible.

Defendant still fails to carry its burden under Exemption 7(C) and has no proper basis to withhold the records under FOIA.

## BACKGROUND

The records at issue concern meetings between individuals and Donald Trump or members of his political circle during the critical period when Mr. Trump campaigned for president and prepared to assume office.  After an initial round of briefing, this Court ordered defendant to provide additional submissions to address "deficiencies" in the factual support for its Exemption 7(C) claims.  ECF No. 49, Memorandum Opinion ("Mem. Op.") at 26-27.  Most importantly, the Court found that defendant "paint[ed] with too broad a brush" in categorically asserting that nothing in the records would "shed light on Mr. Trump's post-inauguration priorities and conduct." *Id.* at 25.

**A.     The Records at Issue**

Defendant has provided the following information about the emails ("Emails") at issue:[1] The Emails are (1) an April 2016 email chain reflecting a future meeting between Mr. Trump

---

[1] Two responsive emails are no longer at issue because Mr. Behar received the records with the following uncontested redactions: the names and identifying information of law enforcement personnel and law enforcement procedures withheld under Exemption 7(E). Mem. Op. at 11 n.43, 27.

and an individual assisting with preparation for a speech; (2) a July 2016 email reflecting an

ongoing meeting between Mr. Trump, an individual and staff at Trump Tower; (3) a July 2016

email reflecting a meeting with an individual; (4) a September 2016 email chain reflecting a

then-anticipated meeting between Mr. Trump and an individual; and (5) a November 2016 email

providing a list of individuals who would need access to certain secure areas within Trump

Tower.  ECF No. 55, Defendant's Memorandum in Support of Renewed Motion for Summary

Judgment ("Def. Mem.") at 5; ECF No. 57, Declaration of Kevin L. Tyrrell ("Tyrrell Decl.") ¶ 5.

Defendant has also disclosed that "there are 4 general types" of schedules ("Schedules")

at issue: "itineraries, line schedules, detailed schedules, and master calendars."  Tyrrell Decl. ¶

13.  There are several dozen Schedules, some of which exist in multiple copies or iterations.  *See*

Tyrrell Decl. ¶¶10-11.

The records at issue pertain to both the campaign period and the post-election transition

period. Tyrrell Decl. ¶¶10-11.

## B.    Defendant's Initial Failure to Justify Withholding the Records

In its initial opinion reviewing defendant's Exemption 7(C) withholdings, the Court

found a minimal privacy interest in the names of individuals reflected in the records.  Because

defendant made "no showing that disclosure of their names would lead to embarrassment,

retaliation or other unwelcome consequences," Mem. Op. at 21, the Court did not afford that

general interest "much weight in the balance" between the privacy and public interests.  *Id.* at 22.

The Court further found that any privacy interest of Mr. Trump "is tempered by the fact that he

was an aspiring and then successful candidate for federal office during the relevant period."  *Id.*

at 23.  It noted that defendant made no effort to distinguish between "meetings related to

Mr. Trump's candidacy" and "personal matters" (if any) reflected in the records.  *Id.* at 25.

By contrast, the Court found a clearly cognizable public interest in documents that "likely reflect meetings that occurred in the days and weeks before Mr. Trump assumed the highest office in the land." *Id.* at 24-25.  Such records may shed light on "whom Mr. Trump relied upon in selecting his initial cabinet and perhaps other presidential appointees and determining the priorities of his administration."  Mem. Op. at 24.  If the records indicate, for example, that Mr. Trump "had multiple meetings with representatives of particular interest groups shortly before publicly announcing appointments of members or proponents of one or more of those groups or their policy preferences," the public "reasonably might draw conclusions, rightly or wrongly, about Mr. Trump's post-inaugural priorities from the occurrence of those meetings." *Id.* at 25. Finding defendant's record insufficient, the Court ordered it to provide "additional declarations or other submissions" to account for "deficiencies" identified by the Court. *Id.* at 26-27.

## C.  Defendant's Effort to Supplement the Record

In its second attempt to meet its burden, defendant has submitted new declarations from Deputy Director Leonza Newsome, III, who oversees the Secret Service's investigative and protective operations, and the agency's Supervisory FOIA Officer, Kevin L. Tyrrell.[2]  The Secret Service asserts that the records "generally," "mostly," or in "many cases" do not include relevant information needed to conduct the balancing required under Exemption 7(C).  *See* Tyrrell Decl. ¶¶11-12, 25. The agency does not provide any additional information quantifying what "generally," "mostly," or "in many cases" mean in this context.

---

[2] Instead of providing a detailed *Vaughn* index "that would correlate statements made in the Government's refusal justification with the actual portions of the document," *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973), defendant continues to withhold the records in a blanket fashion and provides limited supplemental information.

Regarding privacy, Mr. Tyrrell asserts that the Secret Service found a "significant" privacy interest in the records, but admits that the agency cannot "determine whether disclosure of particular meetings or other information in the records might result in unwelcome consequences for third parties." Tyrrell Decl. ¶ 20. The declarations therefore do not show, or attempt to show, how disclosure "would lead to embarrassment, retaliation or other unwelcome consequences." Mem. Op. at 21. Instead, the Secret Service repeats that certain records were marked "confidential," Tyrrell Decl. ¶18, that the records were treated as confidential, *id.* ¶ 19, and that duplicates of the records show how they evolved over time. *Id.* ¶¶12, 16. The agency also lists several dozen records with dates and generic descriptions such as "President-elect Trump itinerary and detailed schedule" or "President-elect Trump itinerary with tentative details regarding additional days." *Id.* ¶¶10, 11.

Regarding the public interest, the Secret Service states that in "many cases" the records "do not identify the organization or other affiliation of the individual(s) listed," and claims that "research" would be required to determine information relevant to the public interest. *Id* ¶25. The agency provides no information about those cases in which the Emails and Schedules *do* identify relevant affiliations or organizations, and the bulk of its supplemental submissions on the public interest make the novel claim of a "public interest in non-disclosure." ECF No. 56, Declaration of Leonza Newsome, III ("Newsome Decl.") ¶11.

Finally, the agency asserts for the first time that some meetings during the presidential transition period "may be exempt from disclosure under FOIA Exemption 5 in conjunction with the presidential communication privilege," and that, therefore, "the White House should have an opportunity to review the records to determine whether to assert the . . . privilege." Tyrrell Decl. ¶30. In support of this contention, Mr. Tyrrell provides a letter from White House Counsel

asserting the presidential communication privilege's applicability to presidential transitions in response to an investigation by the House Intelligence Committee. *Id.* Ex. A.

## D.     Public Interest in Mr. Trump's Meetings

As the Court's initial decision found, there is a legitimate public interest in knowing the groups and individuals Mr. Trump met with before his inauguration because that information would shed light on the staffing and priorities of the Trump administration. Mem. Op. at 24-25. Extensive media coverage confirms the public's strong and sustained interest in knowing who Mr. Trump chose to meet with as a candidate and as President-elect. The press, for example, reported on Mr. Trump's secret meeting with twelve special interest groups, ECF No. 36, Declaration of John Langford ("Langford Decl.") ¶ 65 & Ex. III; his attendance at a coal industry executive's invitation-only fundraiser, *id.* ¶ 66 & Ex. JJJ; and his receipt of nearly $107 million in inauguration funds from lobbyists. *Id.* ¶ 67 & Ex. KKK.

Since Mr. Trump's inauguration, public interest in his pre-inauguration meetings and relationships has only grown. For example, recent campaign finance law indictments[3] against Lev Parnas and Igor Fruman, two associates of Mr. Trump's personal lawyer Rudolph W. Giuliani, have ignited intense public interest in Mr. Trump's alleged ties with the two Ukrainian businessmen. The press has reported that Mr. Trump met Mr. Parnas during the campaign at an exclusive fundraiser in October 2016, Plaintiff's Statement of Material Facts ("Pl.'s SMF") ¶ 1

---

[3] Press Release, U.S. Attorney's Office Southern District of New York, Parnas And Igor Fruman Charged With Conspiring To Violate Straw And Foreign Donor Ban (Oct. 10, 2019), https://www.justice.gov/usao-sdny/pr/lev-parnas-and-igor-fruman-charged-conspiring-violate-straw-and-foreign-donor-bans. The Court may take judicial notice of facts "not subject to reasonable dispute" when they are "generally known within the trial court's territorial jurisdiction" or are "accurately and readily determined from sources whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b). *See also Alvary v. United States,* 302 F.2d 790, 794 (2d Cir. 1962) (approving judicial notice of facts that are "common knowledge or capable of certain verification").

& Declaration of Charles Crain ("Crain Decl.") Ex. A, and that President-Elect Trump posed with Mr. Fruman at his "Thank You Tour Rally" in December that same year.  SMF ¶2 & Crain Decl. Ex. B.  Shortly before the inauguration, on January 19, 2017, Mr. Parnas reportedly stood with Mr. Trump at a Washington gala for donors who had given $250,000 or more to the president-elect's inaugural committee.  SMF ¶¶ 3-4 & Crain Decl. Exs. B, C.  Mr. Parnas reportedly donated about $100,000 to Mr. Trump and his party allies two weeks before the election, and has since contributed about $1 million together with Fruman.  SMF ¶ 1 & Crain Decl. Ex. A.  The public interest in any past meetings between Mr. Trump and the businessmen is only heightened by Mr. Trump's denial that he knows the men.  SMF ¶ 5 & Crain Decl. Ex. D.

The public's interest in the groups and individuals who may hold sway with the Trump administration has persisted throughout his presidency.  The *Associated Press* reported that bankers, e-cigarette makers, "Big Candy" interests, and payday lenders occupied hotels and golf resorts owned by Mr. Trump in the year after his inauguration, at the same time that they were achieving regulatory victories such as less stringent borrower vetting and a delay in vaping product oversight.  SMF ¶ 12 & Crain Decl. Ex. K.  This has led to at least "the appearance of 'pay for play,'" a phenomenon government ethics watchdogs said "can cause the public to question some of the Trump administration's decisions."  SMF ¶ 13 & Crain Decl. Ex. L.

Similarly, the watchdog group Public Citizen has identified at least sixty-four trade groups, foreign governments, companies, charities, and politicians that have held events at Mr. Trump's properties since his election, including special interest groups like the American Petroleum Institute and the Billy Graham Evangelistic Association.  SMF ¶ 14 & Crain Decl. Ex. M.  Citizens for Responsibility and Ethics in Washington has also tracked what it identifies as conflicts stemming from Mr. Trump's decision to retain his business interests.  SMF ¶ 15 &

Crain Decl. Ex. N.  Special interest groups themselves have been open about their attempts to curry favor with the administration by frequenting Trump establishments.  *See, e.g.,* SMF ¶ 16 & Crain Decl. Ex. O (quoting evangelicals stating that they will "do everything [they] can to make [Trump] successful," including "having dinner or staying in his hotel").

Knowing who met with Mr. Trump as a candidate and as President-elect is clearly a matter of continuing public interest and relevant to understanding his administration's conduct.

## ARGUMENT

Defendant may not, through the assertion of vague and minimal privacy concerns, justify the wholesale withholding of records whose release would vindicate a strong public interest. *See* ECF No. 31, Plaintiff's Motion for Summary Judgment ("Pl.'s Mot. Summ. J.") at 15.  Rather, to withhold material under Exemption 7(C), defendant must establish that disclosure could "reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  This requires a showing that the personal privacy interest in a record outweighs the public interest in disclosure.  *Associated Press v. DOD*, 554 F.3d 274, 284 (2d Cir. 2009).  To meet this burden, defendant must provide declarations that both "describe the justifications for nondisclosure with reasonably specific detail" and "demonstrate that the information withheld logically falls within the claimed exemption."  Mem. Op. at 8-9 (citing *Wilner v. Na'l Sec. Agency*, 592 F.3d 60 (2d Cir. 2009)).

Defendant has not done so.  It still has not articulated any significant privacy interests in the requested records, and even admits that it cannot identify any negative consequences of disclosure in some cases.  Tyrrell Decl. ¶20.  Defendant has failed to correct the deficiencies in its original submissions and has not met its FOIA burden.  By contrast, plaintiff has shown a substantial public interest, and FOIA therefore mandates disclosure of the Emails and Schedules.

## I.   DEFENDANT STILL FAILS TO ESTABLISH ANY SIGNIFICANT PRIVACY INTEREST IN THE RECORDS

Defendant still fails to establish any non-trivial personal privacy interests in the records on behalf of Mr. Trump or his visitors.  "[W]hether disclosure of a list of names is a 'significant or a *de minimis* threat depends upon the characteristic(s) revealed by virtue of being on the particular list, and the consequences likely to ensue.'" *U.S. Dep't of State v. Ray*, 502 U.S. 164, 176 n.12, 112 S. Ct. 541, 548 n.12 (1991) (quoting *Nat. Assoc. of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 877 (D.C. Cir. 1989)).  The Schedules and Emails do not logically implicate any cognizable personal privacy interests for Mr. Trump or his visitors, and the Secret Service's declarations do not provide any facts establishing such interests.  Defendant improperly invokes executive privilege arguments as if they create a personal privacy interest for Mr. Trump, and still fails to identify a single negative consequence for Mr. Trump's visitors from disclosure of the records.  Defendant therefore fails to show a compelling privacy interest in the records.

### A.   Defendant Fails To Establish Any Privacy Interest On Behalf Of Mr. Trump

As this Court recognized, "[t]he privacy interest protected by Exemption 7(C) is an interest in avoiding disclosure of personal matters and keeping personal facts away from the public eye." Mem. Op. at 21 (quoting *Associated Press*, 554 F.3d at 289).  Defendant did not initially provide evidence to suggest that the requested records would reveal any "personal facts" about Mr. Trump. *Id.*  It still has not.

#### 1.   Defendant has not shown that the records would reveal any personal facts about Mr. Trump

As this Court previously observed, "Mr. Trump's privacy interest is tempered by the fact that he was an aspiring and then successful candidate for federal office during the relevant period."  Mem. Op. at 23; *see also Common Cause v. Nat. Archives & Records Serv.,* 628 F.2d 179, 184 (D.C. Cir. 1980) (noting that public figure candidates for federal office have "less

privacy interest than others in information relating to their candidacies"); *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 894 n.9 (D.C. Cir. 1995) (noting an individual's "national prominence and former status as a presidential candidate" may diminish their right to privacy). Defendant does not dispute that Mr. Trump, as a prominent businessman and candidate for federal office, was a public figure when these records were generated. *See* Def. Mem. at 9-12. Because individuals' personal privacy interests in government records are "context specific," *Long v. Office of Pers. Mgmt,* 692 F.3d 185, 192 (2d Cir. 2012), Mr. Trump's privacy interest in the records is particularly minimal. They reflect the activities of a public figure while a major party candidate for this country's highest office.

Defendant nonetheless asserts that "[c]ompelled disclosure of the particular information at issue here . . . would be highly intrusive," Def. Mem. at 14, but fails to provide any logical explanation as to why this is so. *See Wilner*, 592 F.3d at 68 (requiring the agency to justify withholdings with "reasonably specific detail" to demonstrate that an exemption "logically" applies); *Halpern v. FBI*, 181 F.3d 279, 290 (2d Cir. 1999) (requiring more than mere "conclusory and generalized allegations of exemptions"). Defendant makes three categorical arguments to substantiate a privacy interest on behalf of Mr Trump: that (1) "many" of the documents are identifiable as "emanating from the Trump campaign or the President-elect"; (2) "[m]ost of the schedules" were marked "confidential"; and (3) the "[i]nformation was provided to the Secret Service by Trump or staff with an expectation of privacy." Tyrell Decl. ¶18-19. None justifies withholding the records under Exemption 7(C).

First, that "many" of the records are "identifiable" as campaign materials does not logically implicate an interest in "personal matters"—in fact, it demonstrates that the privacy interest in those records is minimal. *See Associated Press,* 554 F.3d at 289. Plaintiff does not

10

seek personal information about Mr. Trump but rather "information advancing public knowledge on whom Mr. Trump relied upon" in making decisions affecting the public.  Mem. Op. at 24. Accordingly, in giving defendant a chance to supplement the record, this Court required it to distinguish between materials "related to 'Mr. Trump's candidacy'" and those regarding "personal matters."  *Id.* at 2.   Defendant has systematically failed to do so.  It therefore fails to justify a blanket withholding, since "the degree of intrusion occasioned by disclosure is necessarily dependent upon the character of the information in question."  *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 865 (D.C. Cir. 1981). Defendant's declarations do implicitly acknowledge that certain records pertain to Mr. Trump's campaign activities and not to personal matters.  *See* Tyrrell Decl. ¶24 (scheduled "photo-ops, press interviews, and fittings"); Tyrrell Decl. ¶ 5 (email discussing "a future meeting between Mr. Trump and an individual assisting with preparation for a speech").  In such instances, it plainly has not met its burden and the record should be disclosed. *See Associated Press,* 554 F.3d at 289.  Further, any potential interest in maintaining the confidentiality of meetings that might disclose campaign strategies lapsed with the election.  *See DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763, 109 S. Ct. 1468, 1476 (1989) (noting that privacy interests change with "the passage of time").

Second, an agency cannot agree to confidentiality in contexts where the statute does not allow it.  Defendant, therefore, does not satisfy its burden by simply observing that some records were marked "confidential." Tyrell Decl. ¶18.  "[T]to allow the government to make documents exempt by the simple means of promising confidentiality would subvert FOIA's disclosure mandate."  *Wash. Post Co. v. U.S. Dep't of Health & Human Servs.*, 690 F.2d 252, 263 (D.C. Cir. 1982); *see also Ackerly v. Ley*, 420 F.2d 1336, 1339 n.3 (D.C. Cir. 1969) (holding that "a

pledge of confidentiality . . . can not, in and of [itself], override [FOIA]"); *Citizens for Envtl. Quality, Inc. v. U.S. Dep't of Agric.*, 602 F. Supp. 534, 538 (D.D.C. 1984) (noting that a confidentiality pledge "is clearly not dispositive on the question of whether disclosure would create an invasion of privacy" under Exemption 6); *Nat'l Ass'n of Atomic Veterans, Inc. v. Dir., Def. Nuclear Agency*, 583 F. Supp. 1483, 1488 (D.D.C. 1984) (stating that a pledge of confidentiality should not be given determinative weight because "[o]therwise, the government could subvert the requirements of FOIA at whim simply by pledging confidentiality"). Defendant makes no claim that *all* the records were marked confidential, yet again fails to disclose those without such a label.

Third, the suggestion that information was provided with an expectation of privacy is equally insufficient. Defendant relies on *Ray*, 502 U.S. 164, 112 S. Ct. 541, and *Phillips v. ICE*, 385 F. Supp. 2d 296, 305 (S.D.N.Y. 2005), for the proposition that significant weight must be given to the fact that agency records were generated with an expectation of privacy. Def. Mem. at 12. But these cases are readily distinguishable on their facts. At issue in *Phillips* was the disclosure of asylum records whose "sensitive nature" courts had previously recognized. *Phillips*, 385 F. Supp. 2d at 305. The *Phillips* court found that records revealing a person had claimed a "credible fear" of persecution abroad clearly implicated a personal privacy interest, regardless of how they were characterized by the agency. *Id.* In contrast, Mr. Trump's campaign schedules and related emails do not clearly implicate any such sensitive personal privacy interest. In *Ray*, the Supreme Court withheld the names and confidential interview records of Haitian emigrants returned to Haiti who would have faced "retaliatory action" back home. *Ray*, 502 U.S. at 176 n.12, 112 S. Ct. at 548 n.12. Defendant has not alleged that the

requested records would reveal any personal facts about Mr. Trump sufficient to raise such significant privacy concerns.

> ### 2.    Defendant incorrectly attempts to establish a cognizable privacy interest for Mr. Trump by importing executive privilege arguments

Unable to establish that Mr. Trump has any cognizable privacy interest in the records, defendant attempts to import presidential privilege arguments to justify its withholdings. Defendant asserts that disclosure of the Schedules and Emails would be an invasion of privacy because "Presidents have substantial interests in maintaining the confidentiality of their visitor information." Def. Mem. at 14. This argument is entirely off base.

First, the presidential communications privilege does not establish a "privacy" interest in official White House communications. *See Nixon v. Adm'r of Gen. Servs.,* 433 U.S. 425, 465, 97 S. Ct. 2777, 2801 (1977) (noting the president's "lack of expectation of privacy in the overwhelming majority of [White House] materials" as opposed to the "small quantity of private materials" reflecting his own "personal communications"). Rather, the privilege applies only to "'communications in performance of [a President's] responsibilities' of his office." *Id.* at 449, 97 S. Ct. at 2793 (quoting *United States v. Nixon,* 418 U.S. 683, 711, 94. S. Ct. 3090, 3109 (1974).

Moreover, the presidential communications privilege does not logically apply to records generated before a person becomes president, and no court has ever held that it does. A Kansas federal court rejected a similar assertion of executive privilege for a photograph of an advisory document prepared for the President-elect by a member of his transition team. *Fish v. Kobach*, No. 16-2105-JAR, U.S. Dist. LEXIS 58280, at *15-17 (D. Kan. Apr. 17, 2017). The court reasoned that, if the executive privilege were construed to apply to "communications made before a president takes office," then "potentially almost everything communicated to a president-elect by the hundreds of persons seeking appointments in the new administration

would be shielded by privilege." *Id.* Such a result would be untenable and entirely inconsistent

with Supreme Court precedent regarding this qualified privilege. *See Nixon,* 418 U.S. at 703, 94

S. Ct. at 3105 (rejecting an "absolute privilege" for "all Presidential communications").

Nor can defendant invoke "separation of powers concerns" on behalf of an individual

who did not occupy the Office of the President. Def. Mem. at 14. The D.C. Circuit has

construed FOIA to exclude Secret Service documents for a *sitting* President specifically to avoid

the constitutional concerns inherent in disclosing executive branch activities via a congressional

statute. Releasing such records, the court of appeals found, "could render FOIA a potentially

serious congressional intrusion into the *conduct of the President's daily operations*." *Judicial*

*Watch*, *Inc. v. USSS*, 726 F.3d 208, 211 (D.C. Cir. 2013) (emphasis added). The Office of the

President is excluded from the reach of FOIA not to shield indiscriminately from public scrutiny

every document related to any current or future president, but rather to prevent the erosion of

Presidential prerogatives by the Congress. Those concerns do not apply here.

### B. Defendant Fails To Establish Any Significant Privacy Interest On Behalf Of Mr. Trump's Visitor

Defendant has failed to meet its burden to demonstrate that disclosing the records would

invade anyone else's personal privacy. Defendant provides no new information regarding Mr.

Trump's visitors. It advances no new legal arguments addressing their personal privacy interests

and still fails to establish that anything more than a *de minimis* privacy interest is at stake. The

agency does not dispute that disclosing the requested Emails and Schedules would reveal only

the fact that these individuals met with or were scheduled to meet with Mr. Trump and, in some

cases, the general nature of the meeting. *See* Def. Mem. at 14. The agency asserts without

explanation that the mere disclosure of this information is, in itself, an invasion of privacy.

However, it still does not identify—as it must—any potential negative consequences resulting from disclosure.

### 1. Defendant's submissions are conclusory and fail to particularly address the privacy interests of any specific categories of visitors

Defendant still has not provided any factual basis for its assertion that disclosure would negatively impact anyone's privacy, as required by this Court. Mem. Op. at 26. Instead, defendant broadly asserts that "the names and contact information in the schedules and emails is the type of personal information that a person would not ordinarily wish to make known about himself or herself." Def. Mem. at 16. Such a sweeping and "conclusory" assertion is plainly insufficient under FOIA. *Halpern*, 181 F.3d at 290.

It is well-settled that "[n]ames and other identifying information do not always present a significant threat to an individual's privacy interest." *Wood v. FBI*, 432 F.3d 78, 88 (2d Cir. 2005) (citing *Ray,* 502 U.S. at 177 n.12, 112 S. Ct. 541 n. 12 (internal citation omitted)). Rather, personal privacy interests in government records are "context specific." *Long v. Office of Pers. Mgmt,* 692 F.3d 185, 192 (2d Cir. 2012). Defendant must therefore provide contextually relevant "subcategories of information" concerning those privacy interests to inform the court's balancing test. *See Garcia v. DOJ*, 181 F. Supp. 2d 356, 372 (S.D.N.Y. 2002) (finding sufficient the categories of "FBI Special Agents who were responsible for conducting, supervising, and/or maintaining the investigative activities reported in [an] investigation" and the "names, identities, addresses and information pertaining to third parties who were of investigative interest to the FBI"); *Taggart v. Office of the Inspector Gen.*, 10. Civ. 5447 (PGG), 2011 WL 13128214, at *11 (S.D.N.Y. 2011) (finding sufficient categories such as "OIG, FBI, and the USAO personnel" involved in a contentious investigation involving harassment).

Defendant objects that it would have to engage in "research" to properly categorize Mr. Trump's visitors.  Def. Mem. at 13.  This is because the itineraries and line schedules (a subset of the Schedules) "generally" do not reference the names of individuals meeting with Mr. Trump, and the records "do not identify the organization or other affiliation of the individual(s) listed" in "many cases." *Id.* at ¶¶14, 25.  Such imprecise generalizations are woefully insufficient to justify invoking categorical exemptions under FOIA.  *See Halpern,* 181 F.3d at 293 (finding "vague" declarations insufficient).  This is especially true given that defendant's partial Email disclosures demonstrate that some records *do* include the names of Mr. Trump's visitors and/or their "affiliation[s]." Langford Decl." ¶ 6 & Ex. C (containing a redacted August 2016 email referencing "Rudy Giuliani," "WI Governor Scott Walker" and "Milwaukee County Sheriff David Clarke," and a redacted January 2017 email referencing "Martin Luther King III").  Mr. Behar is left to wonder whether these two emails are the only requested records that include the names or affiliations of Mr. Trump's visitors.

If other individuals are named in the records, it is defendant's obligation to consult its "existing [agency] files" as well as "public statements" to determine whether any significant personal privacy interest exists in the withheld records.  *Diamond v. FBI*, 532 F. Supp. 216, 227 (S.D.N.Y. 1981); *see also* Pl.'s Mot. Summ. J. at 26-27 (noting that defendant can determine from public records if any of these individuals donated to Mr. Trump's campaign).  Indeed, defendant has already produced part of a record identifying two individuals because "the Secret Service . . . determined that [they] appeared in public with Mr. Trump."  ECF No. 28, Declaration of Kim E. Campbell ("Campbell Decl.") ¶16 n.2.  Defendant has failed to make such disclosures consistently.

Because defendant fails to provide meaningful categories of third parties identified in these records, Mr. Behar is left to speculate as to their privacy interests.  Based on what we do know, it is clear that several likely categories of third parties would have little or no privacy interest in the records.  Among the categories of individuals who might be mentioned in the records are campaign and transition team staff members, business leaders, and representatives of lobbying or issue advocacy groups.  Campaign or transition team staff members have no discernible privacy interests in the records.  *See U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600, 102 S. Ct. 1957, 1961 (1982) (holding that "employment history . . . is not normally regarded as highly personal").  Similarly, a businessperson's meeting with Mr. Trump would raise minimal privacy concerns under FOIA.  *See Bd. of Trade v. CFTC*, 627 F.2d 392, 399-400 (D.C. Cir. 1980) (finding a minimal privacy interest in a person's identity as a "trade source" who supplied information about a commercial contract because the revelations did not concern personal matters).  And identifying a representative of a lobbying or issue advocacy group would not raise significant privacy concerns, especially if they have publicly been associated with Mr. Trump.  *See Elec. Frontier Found. v. Office of the Dir. of Nat'l Intelligence*, 639 F.3d 876, 887-88 (9th Cir. 2010) (finding "a clear public interest in obtaining information about the effects of lobbying on government decisionmaking" which outweighed the minimal "privacy concerns of . . . lobbyists in keeping their names and the nature of their employment activities private" because such information is not "sensitive").  Defendant has provided no factual basis for its contention that disclosure would invade any single visitor's personal privacy.

> 2.   **Defendant still fails to show a potential for negative consequences of disclosure for third parties.**

Defendant still fails to explain why disclosing the Emails and Schedules would invite any negative consequences.  The records would reveal only that certain individuals met with or were

scheduled to meet with Mr. Trump—a famous businessman, major-party candidate for President of the United States, and then President-elect.  Defendant's original declaration lacked the requisite "reasonable specificity of detail as to demonstrate that the withheld information logically falls within [exemption 7(C)]" because it lacked information concerning "whether disclosure of the documents has the potential to result in unwelcome consequences on the part of the visitors."  Mem. Op. at 8-9, 26 (quoting *Wilner*, 592 F.3d at 60) (internal quotations omitted)).  Defendant's renewed submissions are similarly lacking.[4]

### (a)       Defendant erroneously disclaims its duty to show negative consequences

Defendant wrongly argues that this Court's determination regarding the insufficiency of its declarations was "incorrect as a matter of law."  Def. Mem. at 16.  The Court correctly ruled that defendant is obligated under FOIA to justify its withholdings by providing sufficient information concerning alleged threats to the privacy of identified individuals, including the potential for negative consequences of disclosure.  Mem. Op. at 21.

To withhold information under Exemption 7(C), defendant must demonstrate that disclosure would be an unwarranted invasion of privacy.  Whether disclosure constitutes a significant privacy invasion "depends upon the characteristic(s) revealed" by being named in a record "and the consequences likely to ensue."  *Ray*, 502 U.S. at 176 n.12, 112 S. Ct. at 548 n.12 (internal quotations and citations omitted).  An agency cannot simply "describe, categorically, the sorts of harms that might result from" disclosure, but must plead facts with particularity to demonstrate the potential for negative consequences of disclosure.  *Diamond*, 532 F. Supp. at

---

[4] The agency previously met its burden of demonstrating that identification of "law enforcement personnel" mentioned in the records would bring unwelcome consequences for those individuals. Campbell Decl. ¶33. Defendant now fails to demonstrate that disclosure of the records would harm Mr. Trump's visitors.

226.  Following this approach, the Supreme Court in *Ray* found that disclosure of the names of Haitian nationals returned to Haiti "would be a significant invasion of their privacy because it would subject them to possible embarrassment and retaliatory action."  *Ray,* 502 U.S. at 176 n.12, 112 S. Ct. at 548 n.12.  The Court further found that release of confidential interviews conducted with these emigrés could lead to "danger" in the form of "retaliatory action."  *Id.* at 177, 112 S. Ct. at 542.  Given the highly sensitive context, disclosure presented a concrete risk of harm sufficient to override the public interest in obtaining the records.

Following *Ray,* courts have continued to consider the context in which a given record was generated and the risk of negative consequences for identified individuals.  *See, e.g., Assoc. Press v. DOD*, 554 F.3d 274, 287 (2d Cir. 2009) (disclosing names of abused Guantanamo Bay detainees could subject them to "embarrassment and humiliation");[5] *Wood*, 432 F.3d at 88 (FBI special agents who investigated other agents accused of misrepresenting information in arrest warrant affidavits could be subject to "harassment or embarrassment if their identities [were] disclosed"); *Perlman v. DOJ*, 312 F.3d 100, 106 (2d Cir. 2002) (being identified as "part of a law enforcement investigation" could subject witnesses and third parties "to 'embarrassment and harassment'") (quoting *Halpern*, 181 F.3d at 297); *see also Judicial Watch, Inc. v. FDA.*, 449 F.3d 141, 153 (D.C. Cir. 2006) (finding a sufficient privacy interest given evidence of "abortion-related violence" against those identified in the records).

---

[5] Defendant mischaracterizes *Associated Press* in claiming that "the focus . . . must be solely on what the requested information reveals, not upon what it might lead to." Def. Mem. at 17 (quoting *Assoc. Press v. DOD*, 554 F.3d 274 at 29).  In *Associated Press*, the court did not reject the need to weigh the consequences of disclosure in the balance.  Rather, that court refused to conduct fact-finding and engage in conjecture regarding the likelihood of a particular chain of events coming to pass—in that case, Taliban retaliation against the identified individuals.  Instead, the court found that family members of Guantanamo detainees logically retain a significant privacy interest in nondisclosure of their identities where the consequences of disclosure were obvious in context.

This case is unlike others in which the nature of a privacy harm is clear from the context of a record.  For example, in *Long*, the government submitted affidavits alleging that if the names or locations contained in certain personnel files were to be publicly released, terrorists could locate agency personnel.  *Long*, 692 F.3d at 185.  Recognizing that their "occupation alone could subject the employee to harassment or attack," the court held that "the federal employees in both the *sensitive agencies* and the *sensitive occupations* have a cognizable privacy interest in keeping their names from being disclosed wholesale."  *Id.* at 192 (emphasis added).  Similarly, in *Kuzma v. United States Dep't of Justice*, 92 F. App'x 30, 35 (2d Cir. 2017), the court placed great weight on the fact that FBI agents who investigated a civil rights activist killed at Wounded Knee could be subjected to "unwanted media inquiries, harassment, violence, and stigma."  The agency has identified no similar concerns here—it has neither demonstrated a significant privacy interest in the records nor pointed to any potential unwelcome consequences from disclosure.

> **(b)    No negative consequences from appearing in the records are apparent on their face**

Simply appearing on Mr. Trump's meeting schedule does not implicate the reputational harms typically recognized under Exemption 7(C).  The stigma of being named in law enforcement records arises because the public may assume that an individual named in the file was the subject of a criminal investigation.  *Lawyers Comm. for Human Rights v. INS*, 721 F. Supp. 552, 565 (S.D.N.Y. 1989) (noting the "stigmatizing connotation" of being mentioned in a law enforcement file); *see also Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 166, 124 S. Ct. 1570, 1577 (2004) (discussing sensitivity of law enforcement files containing information on individuals "interviewed as witnesses or initial suspects but whose link to the official inquiry may be the result of mere happenstance," for which the privacy interest is "at its apex"); *Fund for Constitutional Gov't,* 656 F.2d at 865 ("revelation of the fact that an individual

has been investigated for suspected criminal activity represents a significant intrusion on that individual's privacy"); *New York Times Co. v. FBI*, 297 F. Supp. 3d 435, 448 (S.D.N.Y. 2017) ("the disclosure of the names or identifying information of third parties or witnesses could subject them to harassment or suspicion, perhaps suggesting to others that they have themselves been subjects of criminal investigation"); *Judicial Watch, Inc. v. DOJ,* 394 F. Supp. 111, 118 (D.D.C. 2019) (finding the "stigma" of being associated with an investigation was diminished because the named individual had "already been thrust into the spotlight because of his relationship with the FBI").

In contrast, appearing in the Schedules and Emails would not carry any particular connotation or stigma because the Secret Service logs visitors routinely. *See Nation Magazine*, 71 F.3d at 894 & nn.8-9 (finding that the magnitude of Ross Perot's privacy interest "turns on whether disclosure might result in unwarranted association with criminal activity or reputational harm," and that records discussing offers of assistance "may implicate a less substantial privacy interest than any records associating Perot with criminal activity").  The mere fact that the records are law enforcement records does not itself demonstrate a significant privacy interest for Mr. Trump's visitors.  Defendant has still provided no countervailing evidence to demonstrate such an interest and thus has failed to meet its burden to establish an unwarranted invasion of personal privacy.

## II.    DISCLOSURE WOULD ADVANCE A SIGNIFICANT PUBLIC INTEREST

In contrast to the minimal privacy interests at stake in these records, the public interest in their disclosure is overwhelming.  Knowing who had the potential to shape government policymaking during the critical period while Mr. Trump campaigned for the presidency and planned his future administration is a "significant" interest that would be advanced by disclosure. *Favish*, 541 U.S. at 172, 124 S. Ct. at 1580-81; *see also Associated Press*, 554 F.3d at 288.  So

would knowing that prominent businesspeople or lobbying groups discussed by the press *do not* appear in the records.  On their face, at least some of the records include information about the nature of meetings, Campbell Decl. ¶ 30, Tyrrell Decl. ¶14, as well as the organizations and individuals involved in them.  Tyrrell Decl. ¶ 25.  This public interest therefore strongly outweighs any minimal privacy interests that might exist in the records.

In determining the public interest in disclosure, courts look to "the extent to which disclosure of the information sought would shed light on an agency's performance of its statutory duties or otherwise let citizens know what their government is up to."  *DOD  v. Fed. Labor Relations Auth.*, 510 U.S. 487, 497, 114 S. Ct. 1006, 1013 (1994).  Under Exemption 7(C), the Supreme Court requires satisfaction of two prongs to overcome a cognizable privacy interest.  "First, the citizen must show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and "[s]econd, the citizen must show the information is likely to advance that interest."  *Favish*, 541 U.S. at 172, 124 S. Ct. at 1580-81; *Associated Press*, 554 F.3d at 288.  Mr. Behar has satisfied both prongs.

### A.      The Public Interest Sought To Be Advanced Is Significant

The public interest in knowing the policymakers, businesspeople, and interest groups that had access to Mr. Trump while he campaigned and planned his future administration is plainly "more specific than having the information for its own sake."  *Favish*, 541 U.S. at 172, 124 S. Ct. at 1580-81. Knowledge of meetings with particular individuals or groups would help the public draw conclusions, "rightly or wrongly, about Mr. Trump's post-inaugural priorities from the occurrence of those meetings."  Mem. Op. at 25.

Courts have recognized the broad public interest in knowing who might be shaping federal decisions and policy.  *See Am. Oversight v. U.S. Gen. Servs. Admin.*, 311 F. Supp.3d 327, 348 (D.D.C. 2018) (finding, *inter alia*, that the public interest in "who is shaping federal

decisions and policy" justifies disclosure of personal information about members of Trump's

presidential transition team); *see also Elec. Frontier Found.*, 639 F.3d at 887 (finding that "the

public's interest in knowing which politically active groups affect government decision making"

was sufficient to overcome the privacy interest in withholding agency records); *Lardner v. DOJ*,

No. Civ.A.03-0180(JDB), 2005 WL 758267, at *18 (D.D.C. Mar. 31, 2005) (finding

"considerable public interest in identifying the actors who are able to exert influence on the

pardon application and selection process" such that it outweighed the "modest privacy interest"

in the names of "private citizens").

    Further, there has been sustained public interest in groups and individuals who may hold

sway with the Trump administration, as evidenced by extensive media coverage of this issue

both during and after the 2016 presidential election.  Before Mr. Trump was elected, for

example, media outlets reported extensively on Mr. Trump's private meeting with twelve special

interest groups, Langford Decl. ¶ 65 & Ex. III, his attendance of an invitation-only fundraiser

organized by a top coal industry executive, *id.* ¶ 66 & Ex. JJJ, and his receipt of nearly $107

million in inauguration funds from special interest groups.  *Id.* ¶ 67 & Ex. KKK.  The media

therefore reported extensively on meetings showing who may have influenced the Trump

campaign and transition team.

    Since Mr. Trump was elected President, the public interest in his meetings has only

grown.  The press has analyzed special interest groups that visited Trump properties in the first

year of Mr. Trump's presidency and the regulatory victories they achieved shortly after their

visits.  SMF ¶ 12 & Crain Decl. Ex. K.  The public has further focused on the many trade groups,

foreign governments, companies, charities, and politicians that held events at Trump properties.

SMF ¶14 & Crain Decl. Ex. M.

Media outlets have also reported extensively on Mr. Trump's alleged meetings with Rudolph W. Giuliani's indicted associates, Lev Parnas and Igor Fruman.  SMF ¶¶1-4 & Crain Decl. Exs. A-C.  At the same time, Mr. Trump has denied ever meeting the two businessmen, further heightening the public's interest in shedding light on their possible pre-inauguration interactions.  SMF ¶5 & Crain Decl. Ex. D.

The public can therefore also draw conclusions from the *non*-occurrence of meetings. Courts have recognized significant public interest in the Department of Justice's "decision *not to* charge" a prominent public official, *Citizens for Responsibility & Ethics v. DOJ*, 746 F.3d 1082, 1094 (D.C. Cir. 2014) (emphasis added); data allowing the public to "more easily monitor" an agency's administration or *non*-administration of subsidy and benefit programs, *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1233 (D.C. Cir. 2008); and the public's ability to make "valid inferences" from test results in some, though not necessarily all, records at issue.  *Citizens for Envtl. Quality, Inc. v. U.S. Dep't of Agric.*, 602 F. Supp. 534, 540 (D.D.C. 1984).  Similarly, disclosing the Schedules and Emails would allow the public to both learn about the individuals and groups who had access to Mr. Trump, and those who apparently did not.  This public interest is especially strong given public disagreements about the extent of Mr. Trump's interactions with individuals like Mr. Parnas and Mr. Fruman.  SMF ¶5 & Crain Decl. Ex. D.

This public interest is further evidenced by sustained scrutiny of Mr. Trump's possible conflicts of interest.  *See Am. Oversight*, 311 F. Supp. 3d at 348 (finding, *inter alia*, that "a public interest in shedding light on and weighing [President Trump's] conflicts of interest" justifies disclosure of personal information about members of Trump's presidential transition team); *see also Wash. Post. Co.*,  690 F.2d at 246-65 (concluding that disclosure is not "clearly unwarranted" given a "singularly strong" public interest in disclosing "conflicts of interest").

Citizens for Responsibility and Ethics in Washington, for example, has tracked more than 2,000 conflicts stemming from Mr. Trump's decision to retain his business interests. SMF ¶15 & Crain Decl. Ex. N.

Courts, the media, and special interest groups themselves have recognized the significant public interest at stake here.  FOIA entitles the public to see the Emails and Schedules and draw its own conclusions about how the meetings reflected therein have affected government activity.

### B.    The Public Interest Would Likely Be Advanced By Disclosure

Disclosing the Emails and Schedules is likely to advance the public interest in knowing which groups and individuals may have shaped the current administration's policies and priorities.  On their face, at least some of the records disclose information concerning the nature of the meetings, organizations involved in the meetings, individuals involved in the meetings, and individuals' affiliations.  At the same time, disclosure would also inform the public about groups and individuals that did *not* have access to Mr. Trump during this time.

Information contained in calendar entries "has the potential to be quite revelatory."  *Prop. of the People, Inc. v. Office of Mgmt. & Budget*, No.  17-677 (RC), 2019 WL 3891166 (D.D.C., Aug. 19, 2019) (in the context of National Security Council meetings and the application of executive privilege).[6]  Such revelations are especially likely given "the benefit of hindsight," as the public "could potentially use the timing and attendees of a given meeting" to infer additional information about government activity.  *Id; see also All. for Wild Rockies v. Dep't of Interior*, 53 F. Supp. 2d 32, 37 (D.D.C. 1999) (finding that "the public ha[d] much to learn" from the disclosure of private commentators' names and addresses); *Nation Magazine*, 71 F.3d at 894-95

---

[6] Although the court in *Property of the People, Inc.* held that the records were exempt from disclosure because of executive privilege, the privilege does not apply here, as discussed in Section II.A.

(noting that records "pertain[ing] to an individual's activities" may be "cloaked with the public interest").

Defendant's declarations substantiate the public interest in the Emails and Schedules. The records contain both names of visitors and "information concerning the nature and/or circumstances surrounding the[ir] visits." Campbell Decl. ¶30. The records refer to ongoing or future meetings with particular individuals in the months leading up to Mr. Trump's election and inauguration, and also provide individuals "who would need access to certain areas within Trump Tower." *Id.* ¶ 16. Further, some records "describe the function being attended," Tyrrell Decl. ¶ 14, and "the organization or other affiliation of the individual(s) listed." *Id.* at ¶25.

The records pertain to both the campaign period and the transition period, "directly" reflecting government activities because they "reflect meetings that occurred in the days and weeks before Mr. Trump assumed the highest office in the land." Mem. Op. at 24-25; *see also Am. Oversight*, 311 F. Supp. 3d. at 347-48 (rejecting the government's argument that disclosing communications between the General Services Administration and members of Mr. Trump's transition team would not shed light on "what the government is up to" given the "significant public interest" in "who is shaping federal decisions and policy").

Several of Mr. Trump's cabinet appointees were announced during this period, including: Betsy DeVos as Secretary of Education on November 23, 2016, Crain Decl. ¶ 8 & Ex. E; Elaine Chao as Secretary of Transportation on November 29, 2016, Crain Decl. ¶ 9 & Ex. F; Wilbur Ross as Secretary of Commerce on November 30, 2016, Crain Decl. ¶ 10 & Ex. G; Ben Carson as Secretary of Housing and Urban Development on December 5, 2016, Crain Decl. ¶ 11 & Ex. H; Steven Mnuchin as Secretary of the Treasury on November 30, 2016, Crain Decl. ¶ 12 & Ex. I; and Sonny Perdue as Secretary of Agriculture on January 18, 2018, Crain Decl. ¶ 13 & Ex. J.

Access to meeting records during this critical period before Mr. Trump's inauguration would therefore directly inform the public about individuals and groups who may have played a role in cabinet appointments, and conversely those who were *not* consulted during this time.

To the extent defendant attempts to refute the public interest in disclosure, its showings are insufficient.  The Secret Service states that it could not ascertain a public interest in the records "without conducting research, making broad assumptions, and engaging in speculation." Tyrrell Decl. ¶25.  But the public interest is clear without engaging in speculation or involved research.  Plaintiff has shown as much through routine internet searches, and has therefore satisfied its burden.  To counter this public interest, defendant would have to consult "[p]ublic statements" and show why certain documents do not shed light on matters of public interest. *Diamond*, 532 F. Supp. at 227.  Courts have asked agencies to provide "subgroups of judges" based on their disciplinary and employment histories, *Am. Immigration Lawyers Association v. Exec. Office for Immigration Review*, 830 F.3d 667, 676 (D.C. Cir. 2016), explain the nature of claims brought by prisoners against various officials, *Prison Legal News v. Samuels*, 787 F.3d 1142, 1142 (D.C. Cir. 2015), and ascertain "first, whether the existing files demonstrate if the [third party] is no longer living, and second, if that [third party] has indicated in any manner preferences about disclosing his name and involvement [in an FBI investigation]," *Diamond*, 532 F. Supp. at 227, to counter public interest in disclosure.

Knowing that Mr. Trump had multiple meetings with particular interest groups, business executives, religious organizations, or political officials would inform the public about Mr. Trump's post-inauguration priorities and policymaking.  With whom Mr. Trump met illustrates

whose opinions he may have valued in determining policy priorities and cabinet appointments.[7]

At the same time, the possible lack of records reflecting meetings with certain individuals would also shed light on what the government is up to.  Disclosure would therefore advance a cognizable public interest under Exemption 7(C).

### C.    Defendant Improperly Asserts a Non-Cognizable FOIA Interest in Non-Disclosure

In the face of the clear public interest favoring disclosure, Defendant argues for a public interest in keeping the records secret. Def. Mem. at 22.  The effort is entirely misdirected.

### 1.    Defendant incorrectly asserts that there is a 'public interest' in rejecting FOIA requests when disclosure might limit the government's future information-gathering efforts

The Secret Service asserts that "[p]rotectees will be reluctant to provide scheduling and visitor information to the Secret Service if they believe that by doing so the information will become subject to public disclosure under FOIA."  Newsome Decl. ¶12.  Yet black letter FOIA

---

[7] Defendant now argues, for the first time, that records related to "some meetings during the presidential transition period may be exempt from public disclosure under FOIA exemption 5 . . . in conjunction with the presidential communications privilege" if they "shed light on presidential deliberations or decisionmaking."  *See* Def. Mem. at 22 n.16.  This argument is waived because it was not raised initially on summary judgment and defendant makes no showing now of "an intervening change in controlling law, the availability of previously unavailable evidence, or the need to correct a clear error of law or prevent manifest injustice." *Long v. DOJ*, 5:06-CV-1086 (NAM/TWD), 2012 WL 13028918, at *17 (Mar. 31, 2012) (citing *Doe v. New York City Dep't of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir. 1983)).  The argument is also improperly raised in a footnote, *see United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993), and its claim that executive privilege *might* apply is plainly insufficient, *see Maydak v. DOJ*, 218 F.3d 760, 765 (D.C. Cir. 2000).  Invoking Exemption 5 at this stage is "the sort of tactical maneuvering at a plaintiff's expense" that courts explicitly reject. *August v. FBI*, 328 F.3d 697, 700 (D.C. Cir. 2003).

Rather than briefing this issue, defendant appends to one of its declarations a February 2018 memo from Donald McGahn, former Counsel to the President, to Representative Devin Nunes regarding the applicability of the presidential communications privilege to "communications," "deliberations," and "advice" during the presidential transition.  *See* Tyrell Decl. Ex. A at 2.  Mr. McGahn's analysis is irrelevant here because the records do not disclose the "advice" of Mr. Trump's staff or visitors, or their "discussions" or "deliberations" with Mr. Trump.

law states that "the *only* relevant public interest in the FOIA [public interest] balancing analysis"

is "the extent to which disclosure of the information sought would 'she[d] light on an agency's

performance of its statutory duties' or otherwise let citizens know 'what their government is up

to.'" *DOD*, 510 U.S. at 495, 114 S. Ct. at 1013 (quoting *Reporters Comm. for Freedom of Press*,

489 U.S. at 775, 109 S. Ct. at 1483 (emphasis added)); *see also Long*, 692 F.3d at 193 (quoting

*Reporters Committee* for the same proposition).[8]

The D.C. Circuit explicitly rejected defendant's interpretation of FOIA's privacy

exemptions more than 30 years ago. Whether disclosure "might impair the government's ability

to acquire similar information in the future" carries "no weight" under Exemption 6, and by

extension under Exemption 7,[9] because it "focuses on individual privacy interests." *Wash. Post

Co.*, 690 F.2d at 259 (rejecting the agency's argument that disclosing statements of employment

and financial interests filed by members of the National Cancer Institute's advisory boards and

committees "would impair the [agency's] ability to obtain candid and accurate information in the

future"); *see also Advocates for Highway & Auto Safety*, 818 F. Supp.2d at 131 (giving "no

weight" to the Federal Highway Administration's argument that disclosing videos made during a

---

[8] Instead of applying Exemption 7(C)'s privacy/public interest balance, defendant seems to import
Exemption 4's approach to protecting trade secrets and confidential commercial or financial information.
5 U.S.C. §552(b)(4).  When evaluating an Exemption 4 claim, the Second Circuit considers whether
disclosure "will impair the ability of the government to obtain information in the future" because
individuals "may decline to cooperate with officials" given confidentiality concerns. *Inner City
Press/Comm. on the Move v. Bd. of Govs. of Fed. Res. Sys.*, 463 F.3d 239, 245 (2d Cir. 2006) (internal
quotation omitted).  Defendant's attempt to import this consideration into FOIA's privacy exemptions has
no basis in the statute and has been rejected elsewhere.  In *Advocates for Highway & Auto Safety v. Fed.
Highway Admin.*, 818 F.Supp.2d 122, 131 (D.D.C. 2011), the court refused to consider the government's
ability to acquire future study participants in the context of Exemption 6, noting that "[t]he chill on future
studies may be relevant in considering the applicability of other FOIA exemptions which focus on
governmental privileges, but [the government] has not argued that any other exemption applies in this
case").

[9] *See DOD*, 510 U.S. at 496 n.6, 114 S. Ct. at 1113 n.6  (noting that the public interest analysis is "the
same" under Exemption 7(C) as under Exemption 6).

study would "chill future studies" and thus "might impair the government's ability to acquire similar information in the future" under Exemption 6).

> ### 2. The authority cited by the Government does not support its attempt to read a 'public interest' in non-disclosure into the 7(C) balancing test

Defendant cites a few cases in which courts briefly considered a public interest in non-disclosure, but these cases involved substantiated risks of harassment or embarrassment to witnesses in specific federal investigations. Def. Mem. at 22-23.  In *Perlman*, the plaintiff sought a report discussing the alleged impropriety of agency officials in running a visa program.  While the court found a "strong [public] interest" in the "right to be informed about what the[] government is up to" by gaining access to records regarding the government employees who were investigated, this interest did not extend to "witnesses and other third parties" whose cooperation was needed to conduct the investigation. *Perlman*, 312 F.3d at 106. Similarly, the government withheld the names of third-party witnesses at risk of "harassment, embarrassment, [and] humiliation" in *Conti* because the plaintiff sought specific investigatory case files.  *Conti v. DHS*, No. 12 Civ. 5827(AT), 2014 WL 1274517, at *18 (S.D.N.Y. Mar. 24, 2018).  This risk plainly does not apply here.  Unlike in *Perlman* and *Conti,* the records at issue do not pertain to a specific investigation and are therefore not subject to sensitive law enforcement dynamics that may lead to harassment or other harm.  In fact, defendant has acknowledged that it cannot "determine whether disclosure of particular meetings or other information in the records might result in unwelcome consequences for third parties."  Tyrrell Decl. at ¶20.

Defendant also misconstrues *Diamond*.  That case did not address the public interest prong of the balancing test.  Rather, the court acknowledged a *privacy* interest in the non-disclosure of the identities of third parties who cooperated with a specific FBI investigation because disclosure would "likely cause embarrassment."  *Diamond*, 532 F. Supp. at 225; *see also*

*Brannum v. Dominguez*, 377 F. Supp. 2d 75, 84 (D.D.C. 2005) (discussing the consequences of disclosing names on personnel vote sheets in the context of *privacy* interests).

> 3.    **The agency's original and renewed declarations do not support its factual assertions regarding the consequences of disclosing the records at issue.**

Many of the assertions included in the declarations submitted by defendant are speculative discussions about the unwelcome consequences that might result from disclosing these records. Those statements, unlike statements directly related to a declarant's experience and expertise, are not entitled to deference and do not support defendant's effort to import privacy and governmental interests into the public interest prong of the 7(C) balancing test.

Agency statements are given a presumption of good faith, but conclusory assertions will not suffice to carry the government's burden of proof in defending FOIA cases. *See Adelante Alabama Worker Ctr. v. DHS*, 376 F. Supp. 3d, 345, 367 (S.D.N.Y. 2019) (finding speculative an agency declaration claiming that disclosure would cause "*possible* harassment and unwanted contact" without showing a "'real' threat"); *Associated Press v. DOD*, 410 F. Supp.2d 147, 151 & n.2 (S.D.N.Y. 2006) (finding DOD claim that disclosure could put a detainee and his family "at serious risk of reprisals—including death or serious harm" improperly provided "thin and conclusory speculation" of possible retaliation); *Wash. Post Co.*, 690 F.2d at 262 (noting government's failure to "explain why it reaches [a] conclusion" about the privacy interests at stake); *see also Halpern*, 181 F.3d at 290 (noting that the government must justify its withholdings "without resort to conclusory and generalized allegations of exemptions"); *cf. Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 861 (D.C. Cir. 1980).

Mr. Newsome's declaration is factually insufficient where it improperly speculates about the conduct of future presidential candidates. When Mr. Newsome grounds his statements in his "extensive protective experience," such as in his discussion of the importance of "obtaining

timely and detailed scheduling information from protectees," Newsome Decl. ¶8, his statements are entitled to deference.  But Mr. Newsome's expertise does not extend to finding a legally cognizable "public interest in non-disclosure of confidential scheduling and visitor information provided to the Secret Service by its protectees." *Id.* ¶11.  Without mooring his conclusion to facts or his own expertise, he asserts that "[p]rotectees will be reluctant to provide scheduling and visitor information to the Secret Service if they believe that by doing so the information will become subject to public disclosure under FOIA." *Id.* ¶12.

Mr. Trump was an internationally famous presidential candidate with extensive business holdings when the records were generated, and his meetings have been subject to uniquely overwhelming public interest.  The "mere possibilit[y]" that another candidate might be similarly situated and decide that the benefits of having Secret Service protection, such as avoiding assassination, are outweighed by the possibility of disclosure several years later does not satisfy FOIA's rigorous demands. *See Dep't of Air Force v. Rose*, 425 U.S. 352, 380 n.19, 96 S. Ct. 1592, 1608 n.19 (1976).  This is especially so since the public interest at stake here hinges on Mr. Trump winning the election and assuming the presidency. *See* Mem. Op. at 25.  A candidate would be weighing the immediate and obvious benefits of Secret Service protection against the possible outcome of a hypothetical FOIA request filed after a future election victory.

Mr. Tyrrell offers similar speculation.  He claims that disclosure would disadvantage non-incumbent presidential candidates, thus discouraging them from seeking protection.  Def. Mem. at 24, Tyrrell Decl. ¶13.  The only rationale provided for this conclusion is that disclosure would create an "anomaly" by causing "disparate treatment between categories of protectees."

Tyrrell Decl. ¶13.  Again, this assertion is both legally irrelevant[10] and conclusory.  Defendant's argument takes no account of the significant time lag between the creation of the records and Mr. Behar's request.  *See Reporters Comm. for Freedom of Press*, 489 U.S. at 763, 109 S. Ct. at 1476 (recognizing that privacy interests rest in part on "the passage of time").  The Emails and Schedules reflect meetings which were held or planned more than two years ago (in many cases more than three years ago).  The information is not being made available during the presidential race.  Nor would disclosure even be contemplated if a candidate did not go on to assume the presidency.  *See* Mem. Op. at 25.   It is therefore not plausible that a ruling in plaintiff's favor would disadvantage future candidates.

In sum, defendant's arguments contradict black letter law and fly in the face of an Act designed to "strongly favor[] a policy of disclosure." *Nat'l Council of La Raza v. DOJ*, 411 F.3d at 355.

## III.   THE PUBLIC INTEREST IN DISCLOSURE OUTWEIGHS ANY MINIMAL PRIVACY INTERESTS

To prevail on summary judgment under Exemption 7(C), defendant must show that "the invasion of personal privacy resulting from release of the information would outweigh the public interest in disclosure." *Halpern*, 181 F.3d at 296. The minimal invasion of privacy that would result from disclosure of the requested records, as discussed in Section III.A., does not outweigh the significant public interest in the Schedules and Emails.

Beyond asserting that meetings with Mr. Trump and his entourage are a type of information that someone would ordinarily not want to be made public, defendant has provided

---

[10] Defendant originally included this argument as part of its privacy analysis, ECF No. 29, Defendant's Memorandum of Law in Support of Summary Judgment at 10, but has since improperly transplanted it into FOIA's public interest analysis, as discussed above.

no plausible privacy interests warranting the application of Exemption 7(C).  Nor has it distinguished any meetings as having personal implications for Mr. Trump or his political affiliates.  Rather, Mr. Trump's engagements as a major presidential candidate—and future president—with a sprawling business empire merit public scrutiny.  Exemption 7(C) is therefore inapplicable and the records should be disclosed.

## IV.    IN CAMERA REVIEW

Should the Court decide that defendant has again failed to provide sufficient information, it should order that the records be disclosed.  Failing disclosure, Mr. Behar respectfully requests *in camera* review.  Such review can be applied when courts are "faced with conclusory or otherwise insufficient agency affidavits."  *Am. Civ. Liberties Union v. Office of the Dir. Of Nat'l Intelligence*, No. 10 Civ. 4419(RJS), 2011 WL 5563520, at *13 (S.D.N.Y. Nov. 15, 2011).  *In camera* review is appropriate if "questions remain after the relevant issues have been identified by the agency's public affidavits and have been tested by plaintiffs."  *Wilner*, 592 F.3d at 75-76. Further, such review is commonly used "when only a small number of documents are to be examined." *Donovan v. FBI*, 806 F.2d 55, 59 (2d Cir. 1986), *abrogated on other grounds by DOJ v. Landano,* 508 U.S. 165, 113 S. Ct. 2014 (1993).  Here, *in camera* review would be warranted to assess the public interest in disclosure.

## CONCLUSION

For the foregoing reasons, Mr. Behar respectfully requests that the Court order disclosure of the documents with appropriate redactions and grant Mr. Behar's motion for summary judgment.[11]

Dated: December 6, 2019

Respectfully submitted,

By: __/s/ David A. Schulz__
David A. Schulz
Charles Crain
Anna Windemuth, law student intern
Sara Worth, law student intern
MEDIA FREEDOM & INFORMATION
   ACCESS CLINIC
YALE LAW SCHOOL
P.O. Box 208215
New Haven, CT 06520
Tel: (203) 432-9387
Email: david.schulz@yale.edu

*Counsel for Plaintiff*

---

[11] This memorandum has been prepared by a clinic associated with the Abrams Institute for Freedom of Expression and the Information Society Project at Yale Law School but does not purport to present the school's institutional views, if any.